Alan C. Milstein (Pro Hac Vice)
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com

Marianne Dugan (OSB #932563)
259 E. 5th Avenue, Suite 200-D
Eugene, OR 97401
Telephone: 541-338-7072
Facsimile: 866-650-5213
E-Mail: mdugan@mdugan.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| BRANDON AUSTIN, | Case No. 6:15-cv-02257-MC |
| Plaintiff, | PLAINTIFF'S SECOND AMENDED COMPLAINT |
| v. | **JURY TRIAL DEMANDED** |
| UNIVERSITY OF OREGON; SANDY WEINTRAUB; CHICORA MARTIN; ROBIN HOLMES; and MICHAEL R. GOTTFREDSON, all in their individual capacities only, | |
| Defendants. | |

Plaintiff Brandon Austin, by and through his counsel, Alan C. Milstein of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. (admitted pro hac vice), and local counsel Marianne Dugan, by way of this Second Amended Complaint[1] against Defendants University of Oregon,

---

[1] On January 25, 2016, the Defendants filed a motion to dismiss the First Amended Complaint [Document No. 9]. This Second Amended Complaint, filed pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), and such other authorities as are applicable, renders the motion to dismiss moot.

Sandy Weintraub, Chicora Martin, Robin Holmes, and Michael R. Gottfredson (collectively, "Defendants"), hereby says, states, and avers as follows:

## SUBJECT MATTER JURISDICTION, AND VENUE

1.     This Court has subject matter jurisdiction over this removed action pursuant to 28 U.S.C. § 1331, as it arises out of the laws of the United States, including 42 U.S.C. § 1983, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX").

2.     This Court has subject matter jurisdiction over Mr. Austin's state-law claims pursuant to 28 U.S.C. § 1367(a), which provides in pertinent part as follows: "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

3.     Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C. § 1391(b), as the Defendants reside within this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

## THE PARTIES

4.     Plaintiff Brandon Austin is a 21-year-old individual who was formerly a matriculated student at the University of Oregon (when abbreviated, "University" or "Oregon").

5.     Defendant University of Oregon is, and was at all relevant times, an institution of higher education chartered and existing pursuant to the laws of the State of Oregon, located in Eugene, Oregon.

6.     Defendant Sandy Weintraub is, and was at all relevant times, the Director of Student Conduct & Community Standards at the University of Oregon.  Mr. Weintraub can be

served with process at the Office of the Dean of Students, 164 Oregon Hall, Eugene, OR 97403. Mr. Weintraub is being sued in his individual capacity only.

7.      Defendant Chicora Martin was, at all relevant times, the Assistant Dean of Students at the University of Oregon.   Ms. Martin can be served with process at Mills College, Cowell Building, 5000 MacArthur Blvd, Oakland, CA 94613.  Ms. Martin is being sued in her individual capacity only.

8.      Defendant Robin Holmes is, and was at all relevant times, Vice President for Student Life at the University of Oregon.  Dr. Holmes can be served with process at Division of Student Life, 5216 University of Oregon, 164 Oregon Hall, Eugene, OR 97403.  Dr. Holmes is being sued in her individual capacity only.

9.      Defendant Michael R. Gottfredson was the President of the University from August 1, 2012, through approximately August 6, 2014.  Dr. Gottfredson can be served with process at UC Irvine School of Social Ecology, 5300 Social and Behavioral Sciences Gateway, Irvine, CA 92697.  Dr. Gottfredson is being sued in his individual capacity only.

<u>**FACTS**</u>

**I.**

10.      During his high school basketball career at Imhotep Institute Charter High School in Philadelphia ("Imhotep"), Plaintiff Brandon Austin helped Imhotep win three straight Pennsylvania Interscholastic Athletic Association titles.

11.      As one of the top fifty or so prospects in the nation, Mr. Austin received offers to play basketball at multiple universities, and ultimately chose to attend Providence College ("Providence") and play basketball for the Providence Friars.

12.      During the Fall 2013 semester, Mr. Austin was suspended from the basketball team for thirty days.

Page 3 – PLAINTIFF'S SECOND AMENDED COMPLAINT

13.     Providence pleaded with Mr. Austin to stay, but Mr. Austin chose to transfer from Providence to University of Oregon.

14.     Prior to the Spring 2014 Semester, Mr. Austin matriculated at Oregon and became a member of the Oregon Ducks men's college basketball team ("Ducks"), which competes at the NCAA Division I level and is a member of the Pacific-12 Conference.[2]

15.     In order to induce Mr. Austin to attend Oregon, Oregon provided Mr. Austin with an athletic scholarship.

16.     The athletic scholarship contained both express terms and an implied covenant of good faith and fair dealing.

17.     Mr. Austin had the objectively reasonable expectation, based upon the express terms of the contractual relationship governing the athletic scholarship, that the University of Oregon would renew his scholarship, and not act so as to deprive Mr. Austin of the fruits of the scholarship, and otherwise act in good faith vis-à-vis his scholarship.

18.     Mr. Austin attended an off-campus party on or around March 8, 2014.

19.     After about an hour and a half, a female student approached Mr. Austin and another basketball player and began "twerking" for them.

20.     Subsequently, the female student went into a bathroom with Mr. Austin and the other basketball player and initiated consensual sexual activity.  The three individuals then left the bathroom together.

21.     Thereafter, a third basketball player approached them, whereupon the female student recognized that player as a member of the Oregon Ducks basketball team.

---

[2] Due to NCAA transfer rules, Mr. Austin was required to sit out of competition for one year.

22.    At that point, the four individuals went into the bathroom, whereupon the female student voluntarily performed a variety of sexual acts on the basketball players.  Among other things, the female student voluntarily performed oral sex on Mr. Austin, which oral sex was initiated by the female student.

23.    Numerous individuals at the party witnessed the female student interacting with Mr. Austin and the other basketball players both before and after the sexual activity in the bathroom, and would have testified under oath that the female student gave absolutely no indication that she was sexually assaulted, or even upset, and insisted on remaining with the basketball players even after they left the bathroom.

24.    Later in the evening, the female student chose to return to the apartment of one of the basketball players, along with all three basketball players (including Mr. Austin).  The female student was laughing and joking.

25.    Upon arrival, she stated that she needed to get into something comfortable.

26.    Subsequently, the student voluntarily took her clothes off, whereupon she voluntarily engaged in "group" sexual activity with the other players.

27.    At one point, the female student became teary-eyed, at which point the players chose to immediately cease any sexual activity.  Soon after, she was again laughing and joking.

28.    The female student chose to stay overnight at the apartment, and had sexual intercourse with one of the other players after waking up in the morning.

29.    Thereafter, the player sent the female student home in a cab, and she sent a text message stating "thanks for getting me home."

30.    At no point did the female student appear to be intoxicated.

31.    At no point did the female student say "no" about any sexual activity, even when she became teary-eyed (after which, in any event, the sexual activity immediately ceased).

Page 5 – PLAINTIFF'S SECOND AMENDED COMPLAINT

32.     The female student expressed verbal consent and/or gave unmistakable physical indications of her desire to participate in sexual contact with the young men at the times they were engaged in sexual conduct.

**II.**

33.     Within a day or two, however, the female student began making false, scandalous, and malicious accusations about all three basketball players, including the utterly false accusation that the players dragged her into the bathroom and assaulted her; the utterly false accusation that the players wrestled her into a car, forced her to get drunk, and drove her to the apartment; and the utterly false accusation that she was raped at the apartment.

34.     Thereafter, the accuser made numerous inconsistent statements to the Eugene Police Department regarding her sobriety, the events and conversations leading up to the sexual conduct, and the actual actions, words, and behavior of those involved during sexual contact.

35.     When the University learned that Mr. Austin had been accused of rape, Defendant Chicora Martin suspended Mr. Austin and the other two basketball players on an "emergency" basis, and scheduled an "emergency" hearing to expel Mr. Austin and the other two.

36.     That emergency suspension was then modified to allow Mr. Austin and the other two basketball players to attend classes, and practice.

37.     On April 14, 2014, the Lane County District Attorney determined that she would not be pressing charges against Mr. Austin or any of the basketball players "because the conflicting statements and actions by the victim make this case unprovable as a criminal case."  (Emphasis added.)

38.     In or around late April, the Oregonian published the police report that the female student had made.

39.     The next evening, presumably in response to the publication of the police report, the District Attorney's office issued a lengthy document outlining numerous weaknesses in the prosecution's case, as well as numerous inconsistencies in the accuser's statements, and concluding that those weaknesses presented "an insurmountable barrier to prosecution."

40.     At 11:00 a.m. on May 9, 2014, Defendant Michael R. Gottfredson in effect imposed discipline upon Mr. Austin without due process by holding a press conference and making a public statement condemning Mr. Austin and the other basketball players, even though the District Attorney had declined to prosecute Mr. Austin and the other basketball players, and the University had not started much less concluded the hearing process.

41.     Without limiting the generality of the foregoing, despite the fact that the District Attorney had cast significant doubt on whether the accuser was telling the truth, Dr. Gottfredson stated, "The type of behavior in the police report released this week is utterly unacceptable and will not be tolerated," and further stated, "I know it's frustrating, and we would like to say more, but we are not going to violate the laws that are in place to protect students' privacy or the rights of our students – *especially* the survivor."  (Italics in original University transcript.)

42.     Evidencing that the University had prejudged Mr. Austin's guilt, and done so on the basis of Mr. Austin's sex/gender, Dr. Gottfredson's statement included the conclusion that the female accuser was a "survivor," the statement that "as a father, I was appalled at what I read," and the statement that Mr. Austin would "not be playing basketball at Oregon again."

43.     At a proximate point in time, Ms. Martin again suspended Mr. Austin and the other two basketball players.

44.     Ms. Martin subsequently modified the suspensions of the other two basketball players, but refused to modify Mr. Austin's suspension. (Mr. Austin later learned that Ms. Martin

refused to modify Mr. Austin's suspension because he exercised his Miranda rights during the police investigation.)

45.     Almost concurrently, a University student came forward and told a University investigator that she personally interacted with the female student throughout the evening in question, the female student was not at all intoxicated, and the female student insisted on going home with the basketball players, to the point of refusing to leave with her friends.

### III.

46.     At all relevant times, Mr. Austin had a recognized property interest in (among other things) his status as an admitted, matriculated University student in good standing; his interest in pursuing public higher education and intercollegiate athletic participation; and the economic benefit to Mr. Austin in the form of his existing scholarship, a future scholarship at another Division I school, or a future contract with an NBA team.

47.     Additionally, at all relevant times, Mr. Austin also had a recognized liberty interest in (among other things) being in good standing at the University, and being free from the stigma associated with being suspended for disciplinary reasons.  Due process protection "is particularly necessary when, as here, the governmental action may damage the individual's standing in the community, academic or general, or may impose 'a stigma or other disability that foreclose[s] his freedom to take advantage' of other educational or future employment opportunities."  See, e.g., Marin v. University of Puerto Rico, 377 F. Supp. 613, 622-23 (D.P.R. 1974) (quoting Board of Regents v. Roth, 408 U.S. 564, 573 (1972)); accord Albert v. Carovano, 824 F.2d 1333, 1339 n.6 (2d Cir. 1987) (noting that "at a minimum, the students' protected liberty interest is at stake because of the 'stigma' attached to suspension from college for disciplinary reasons"); cf. Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971).

48.     At all relevant times, it was clearly established that, given the seriousness of the alleged infraction, the possible consequences to Mr. Austin, and the degree of sanction or penalty sought to be imposed, the Fourteenth Amendment to the United States Constitution's guarantee of procedural and substantive due process, and the Oregon Revised Statutes, required the Defendants to provide Mr. Austin with the right to representation by counsel, testimony of witnesses under oath, depositions, issuance of subpoenas, cross-examination of witnesses, a fundamentally fair proceeding, and other due process protections.

49.     Mr. Austin's counsel, however, was presented with two choices: (1) a "panel hearing" at which the University would not provide most or all of the foregoing due process protections, except for representation by counsel; or (2) an "administrative conference" at which the University would not provide most or all of the foregoing due process protections, except for representation by counsel.

50.     After the "panel hearing" was scheduled, Mr. Austin's counsel requested a "contested case hearing" which complies with the due process requirements set forth in ORS 351.088, and ORS 183.413-.497 and 183.502, including representation by counsel (ORS 183.417(1)), testimony of witnesses under oath (ORS 183.417(7)), depositions (ORS 183.425), issuance of subpoenas by a party (ORS 183.440), and cross-examination of witnesses (ORS 183.450(3)).

51.     Among other things, Mr. Austin's counsel further made clear that, in order to present a defense, Mr. Austin would need to subpoena the numerous witnesses who would testify that the female student gave absolutely no indication that she was sexually assaulted, or even upset, and insisted on remaining with the basketball players even after they left the bathroom, and two individuals with whom the female student had chosen to have sex after just meeting them, evidencing her willingness to engage in sexual activity with individuals who she just met.

Page 9 – PLAINTIFF'S SECOND AMENDED COMPLAINT

52.    The University and its representatives, however, failed to even directly respond to the request of Mr. Austin's counsel for a contested case hearing.

53.    Based upon the foregoing, it was clear to Mr. Austin's counsel that the University and its representatives were not going to grant her request for a contested case hearing.

54.    Ultimately, as the University was only providing two options, neither of which provided the requisite due process, and the University was requiring Mr. Austin to choose between one of the two options, Mr. Austin's counsel accepted the "administrative conference" option. Mr. Austin's counsel was not asked to sign, and did not sign, a waiver of Mr. Austin's due process rights, and would never have signed such a waiver. Moreover, Mr. Austin's counsel never waived Mr. Austin's due process rights by choosing the "administrative conference" option over the "panel hearing" option, neither of which provided the due process protections that Mr. Austin's counsel had expressly requested.

55.    The "administrative conference" turned out to be nothing less than an unconstitutional "kangaroo court" scenario of the very worst order, in which Mr. Austin was deprived of the foregoing rights, and not even provided with a basic opportunity to properly respond to all information provided, and to contact and call all relevant and necessary witnesses.

56.    The conference was ultimately scheduled for May 30, 2014.

57.    Defendant Sandy Weintraub ruled against Mr. Austin, suspending him from the University from four to ten years, long enough for the removal to be the functional equivalent of an expulsion from the University, and refused to provide due process to Mr. Austin generally and in the manner described in detail above.

58.    Defendant Robin Holmes was charged with the responsibility of hearing an appeal.

59.    Dr. Holmes, however, refused to respond to Mr. Austin's request for an appeal and did not return multiple phone calls from Mr. Austin's counsel, in violation of Mr. Austin's right to procedural and substantive due process.

60.    Mr. Austin was not required to take an administrative appeal in order to bring this court action.

61.    Without limiting the generality of the foregoing, neither Title IX nor 42 U.S.C. § 1983 nor the state-law causes of action alleged herein require the exhaustion of administrative remedies, if any, before bringing a court action.

62.    In addition, Dr. Holmes' refusal to respond to Mr. Austin's request for an appeal relieves Mr. Austin of any possible obligation to bring an administrative appeal, an administrative appeal would have been futile, and the Defendants are estopped from asserting that Mr. Austin was required to bring an administrative appeal.

63.    Additionally, the Defendants' actions before the hearing process, during the hearing process, and after the hearing process were motivated in whole or large part by the fact that Mr. Austin is a male and the accuser is a female.

64.    Based upon Mr. Austin's sex/gender, the University deprived Mr. Austin of basic due process rights, equal protection rights, and other rights guaranteed by Title IX, and its implementing regulations, and by the University's own stated policies and procedures.

65.    In or around January 2015, the female student filed a lawsuit against Oregon, alleging that her own Title IX rights had been violated due to Oregon's alleged "deliberate indifference" to the safety of its students.

66.    Astonishingly, Oregon's counsel contacted Mr. Austin's counsel, stated that had she been consulted as counsel things might have been handled differently, and asked for Mr. Austin's help in defending the suit.

67.     Prior to the Defendants' actions, Mr. Austin was regarded as one of the top amateur basketball players in the United States of America; on the men's basketball team at the Oregon, a Division I school within the Pac-12 Conference; and widely projected by experts in basketball and the NBA Draft to be selected in the first round of the NBA Draft, which would more likely than not be accompanied by a multi-million dollar guaranteed contract and tens of millions of dollars in prospective economic advantage.

68.     Prior to taking the actions alleged herein, the Defendants were aware of the foregoing facts.

69.     As a direct and proximate result of the Defendants' conduct, Mr. Austin no longer plays at a Division I school, has diminished chances of playing in the NBA, has been made to suffer the opprobrium associated with an suspension from a university, and the opprobrium associated with committing a sexual assault (when in fact he committed no sexual assault), and has as a result suffered personal and professional harm, including emotional distress, in the past, and will as a result suffer personal and professional harm in the future, including loss of income.

70.     Mr. Austin, through counsel, served timely (within 180 days of the events), proper notice of his claims in the manner required by ORS 30.275.

**COUNT 1**

**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,
20 U.S.C. § 1681, ET SEQ.
(AGAINST ALL DEFENDANTS)**

71.     Plaintiff Brandon Austin repeats the foregoing allegations as if fully set forth herein.

72.     Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681, et seq.) provides, in relevant part, as follows: "No person in the United States shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

73.     The University receives federal funding through various means including, without limitation, student loans provided to University students directly by the federal government and through other funds furnished by the federal government, and as such is subject to the strictures of Title IX and its implementing regulations.

74.     To assist schools with implementing Title IX and its regulations, the Office of Civil Rights of the United States Department of Education has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirements of the regulations.  The procedures adopted by a school must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved ... ."

75.     The University (by and through its agents and employees acting within the scope of their agency and employment, including the Defendants) deprived Mr. Austin, on the basis of his sex, of his Title IX rights to among other things due process and equal protection through the improper administration, and/or the existence, in its current state, of the University's policies and procedures.

76.     First, the University engaged in selective enforcement in violation of Title IX, and discriminated against Mr. Austin based on his sex and, as a result, Mr. Austin has been seriously and irreparably damaged.

77.     Regardless of his guilt or innocence (and, to be clear, Mr. Austin was and is innocent), the severity of the penalty (a suspension of between four and ten years), as well as the decision to initiate the proceeding in the first place, were affected by the fact that Mr. Austin is a male, and the accuser is a female.

78.    On April 14, 2014, the Lane County District Attorney determined that she would not be pressing charges against Mr. Austin or any of the basketball players "because the conflicting statements and actions by the victim make this case unprovable as a criminal case." (Emphasis added.)

79.    In or around early May 2014, presumably in response to the publication of the police report, the District Attorney's office issued a lengthy document outlining numerous weaknesses in the prosecution's case, as well as numerous inconsistencies in the accuser's statements, and concluding that those weaknesses presented "an insurmountable barrier to prosecution." (Emphasis added.)

80.    Dr. Gottfredson's pronouncement on behalf of the University at the outset of the disciplinary proceedings, however, included the conclusion that the female accuser was a "survivor," and the statement that "as a father, I was appalled at what I read."

81.    On information and belief, the University has never taken action against a female student for engaging in the type of conduct that Mr. Austin allegedly engaged in.

82.    On information and belief, the University has never taken action against a female student for making a false allegation of the kind involved in this matter.

83.    On information and belief, males invariably lose when charged with sexual misconduct at the University.

84.    Second, there was an erroneous outcome from a flawed proceeding, in violation of Title IX.

85.    The University discriminated against Mr. Austin by failing to comply with its own procedures and by failing to comply with the requirements of Title IX, in order to reach a pre-determined result, due to his sex, and gender stereotypes.

86.    The University created an environment in which Mr. Austin, an accused male student, was so fundamentally denied due process as to be virtually assured a finding of guilt.

87.    Such a biased and one-sided process deprived Mr. Austin, as a male student, of educational opportunities on the basis of sex.

88.    The University conducted its "investigation" and subsequent hearing in a manner that was biased against the accused, Mr. Austin, based on sex.

89.    From the outset, the investigation and hearing processes were slanted in favor of the female accuser, because of her sex.  The University's representatives, including its president, accepted her statements at face value despite the prosecutor's statements, and granted the female accuser the presumption of truth because she is female.

90.    Mr. Austin did not have an equal or fair opportunity to present relevant witnesses, to present evidence (as described above), and to present evidence about the accuser's motives to present false accusations.

91.    Those involved with the hearing process were improperly and/or insufficiently trained under Title IX.

92.    The University responded to the accuser's accusations with a series of arbitrary, capricious, discriminatory, and gender-based actions directed toward a predetermined outcome: Mr. Austin's suspension from the University.

93.    Third, the University, in violation of Title IX, demonstrated a deliberate and systematic indifference to the rights of Mr. Austin, due to his sex.

94.    The University's actions, and inactions, were unreasonable in light of the known circumstances, including but in no way limited to the District Attorney's office declining to prosecute, and issuing a document outlining numerous weaknesses in the case, and concluding that those weaknesses presented "an insurmountable barrier to prosecution." (Emphasis added.)

95.     But for the obvious gender bias, the outcome of the University proceeding would have been different.

96.     As a direct and proximate consequence of the University's Title IX violation, Mr. Austin has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly reflects that he was found to have committed sexual misconduct, harassment, and/or other related offenses.

97.     Additionally, as a direct and proximate consequence of the University's Title IX violation, Mr. Austin no longer plays at a Division I school, has diminished chances of playing in the NBA, has been made to suffer the opprobrium associated with an suspension from a university, and the opprobrium associated with committing a sexual assault (when in fact he committed no sexual assault), and has as a result suffered personal and professional harm, including emotional distress, in the past, and will as a result suffer personal and professional harm in the future, including loss of income.

98.     Without limiting the generality of the foregoing, as a result of the actions of the Defendants, Mr. Austin is likely to sustain economic damages in the form of lost income, and seeks at least $6 million for economic damages; and has sustained and will continue to sustain noneconomic damages, and seeks $1.5 million in noneconomic damages.

99.     Plaintiff was required to hire attorneys to represent him in this matter and is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and otherwise.

### COUNT 2

**LIABILITY UNDER 42 U.S.C. § 1983**
**(AND ATTORNEY'S FEES UNDER 42 U.S.C. § 1988)**
**(AGAINST ALL DEFENDANTS EXCEPT UNIVERSITY OF OREGON)**

100.    Plaintiff Brandon Austin repeats the foregoing allegations as if fully set forth herein.

101.    42 U.S.C. § 1983 provides, in pertinent part, as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress."

102.    The individually sued Defendants, in their individual capacities, are "persons" within the ambit of 42 U.S.C. § 1983.

103.    The Defendants, in their individual capacities, acted "under color of" state law because they exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." See West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).

104.    At all relevant times, it was clearly established that, given the seriousness of the alleged infraction, the possible consequences to Mr. Austin, and the degree of sanction or penalty sought to be imposed, the Fourteenth Amendment to the United States Constitution's guarantee of procedural and substantive due process, and the Oregon Revised Statutes, required the Defendants to provide Mr. Austin with the right to representation by counsel, testimony of witnesses under oath, depositions, issuance of subpoenas, and cross-examination of witnesses, and other due process protections.

105.    The Defendants' conduct, generally and as described above, deprived the Plaintiff of his procedural and substantive due process rights under the Fourteenth Amendment to the United States Constitution, and other rights secured by the Bill of Rights and the United States Constitution, as well as other federally secured rights and rights secured by Oregon and other law, and failed to protect the Plaintiff from injury.

Page 17 – PLAINTIFF'S SECOND AMENDED COMPLAINT

106.    The Fourteenth Amendment's due process protections secured Mr. Austin's property interests and liberty interests, generally and as described in detail above.

107.    The Defendants acted arbitrarily and capriciously, acted in a conscience-shocking manner, acted with deliberate indifference towards the Plaintiff's substantive and procedural due process rights, and acted with an improper motivation.

108.    There was a direct and proximate causal connection between the Defendants' wrongful conduct and the harm and damages that resulted.

109.    As a result of the Defendants' conduct, Mr. Austin has suffered and will continue to suffer personal and professional harm, as alleged supra.

110.    As a result of the actions of the Defendants, Mr. Austin is likely to sustain economic damages in the form of lost income, and seeks at least $6 million for economic damages; and has sustained and will continue to sustain noneconomic damages, and seeks $1.5 million in noneconomic damages.

111.    Plaintiff was required to hire attorneys to represent him in this matter and is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### COUNT 3

### NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

112.    Plaintiff Brandon Austin repeats the foregoing allegations as if fully set forth herein.

113.    The Defendants, individually and collectively, had a duty to Mr. Austin to conduct a campus investigation in a competent manner and in accordance with societal standards and norms governing such investigations, and to conduct a hearing in a competent manner and in accordance with societal standards and norms governing such hearings, and otherwise act in a reasonably

prudent manner with regard to Mr. Austin, and it was foreseeable that a breach of this duty would lead to the harm suffered by Mr. Austin.

114.    The Defendants (including Defendant University of Oregon, by and through its agents and employees acting within the scope of their agency and employment) breached their duty by (among other things) refusing to allow Mr. Austin to subpoena witnesses who would be supportive of his defense, refusing to provide unredacted reports, refusing to provide a contested case hearing, refusing to allow cross-examination, refusing to provide due process, and engineering a "kangaroo court" hearing with the purpose of finding that Mr. Austin committed a sexual assault that did not in reality occur.

115.    The Defendants' actions were in bad faith, and/or taken with malice.

116.    As a direct and proximate result of the Defendants' conduct, Mr. Austin has suffered and will continue to suffer personal and professional harm, including the property damage alleged supra.

117.    Without limiting the generality of the foregoing, as a result of the actions of the Defendants, Mr. Austin is likely to sustain economic damages in the form of lost income, and seeks at least $6 million for economic damages; and has sustained and will continue to sustain noneconomic damages, and seeks $1.5 million in noneconomic damages.

## COUNT 4

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

118.    Plaintiff Brandon Austin repeats the foregoing allegations as if fully set forth herein.

119.    The Defendants (including Defendant University of Oregon, by and through its agents and employees acting within the scope of their agency and employment) intended to inflict and cause Mr. Austin to suffer severe emotional distress by taking the actions set forth above.

120.    In the alternative, by taking the actions set forth above, the Defendants, individually and collectively, acted with reckless disregard towards Mr. Austin, causing Mr. Austin to suffer severe emotional distress.

121.    The Defendants' actions, as described and set forth above, constituted an extraordinary transgression of the bounds of socially tolerable conduct.

122.    The Defendants' actions were in bad faith, and/or taken with malice.

123.    As a result of the Defendants' conduct, Mr. Austin has suffered and will continue to suffer personal and professional harm, as alleged supra.

124.    As a result of the actions of the Defendants, Mr. Austin is likely to sustain economic damages in the form of lost income, and seeks at least $6 million for economic damages; and has sustained and will continue to sustain noneconomic damages, and seeks $1.5 million in noneconomic damages.

**COUNT 5**

**INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS/
TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
(AGAINST ALL DEFENDANTS)**

125.    Plaintiff Brandon Austin repeats the foregoing allegations as if fully set forth herein.

126.    The Defendants (including defendant University of Oregon, by and through its agents and employees acting within the scope of their agency and employment) intentionally, recklessly, and tortiously interfered with Mr. Austin's prospective relationship with NBA teams

Page 20 – PLAINTIFF'S SECOND AMENDED COMPLAINT

through the improper means described and set forth above, and with the improper purpose described and set forth above.

127.    The Defendants' actions were in bad faith, and/or taken with malice.

128.    As a result of the Defendants' conduct, Mr. Austin has suffered and will continue to suffer personal and professional harm, as alleged supra.

129.    As a result of the actions of the Defendants, Mr. Austin is likely to sustain economic damages in the form of lost income, and seeks at least $6 million for economic damages; and has sustained and will continue to sustain noneconomic damages, and seeks $1.5 million in noneconomic damages.

## COUNT 6

## BREACH OF CONTRACT
## (AGAINST DEFENDANT UNIVERSITY OF OREGON)

130.    Plaintiff Brandon Austin repeats the foregoing allegations as if fully set forth herein.

131.    At all relevant times, Mr. Austin was a recipient of an athletic scholarship from the University of Oregon, which contained both express terms and an implied covenant of good faith and fair dealing.

132.    Mr. Austin had the objectively reasonable expectation, based upon the express terms of the contractual relationship governing the athletic scholarship, that the University of Oregon would renew his scholarship, and not act so as to deprive Mr. Austin of the fruits of the scholarship, and otherwise act in good faith vis-à-vis his scholarship.

133.    The University's actions, as described and set forth above, constituted a breach of the terms of the contract, including the implied covenant of good faith and fair dealing.

134.    As a direct and proximate result of the University's breach of contract, Mr. Austin has been made suffer significant direct and consequential damages, including loss of future income as described and set forth above.

135.    As a result of the actions of the Defendants, plaintiff expects to sustain further economic damages, and will move to amend his complaint when and if those economic damages are incurred.

**WHEREFORE**, Plaintiff Brandon Austin requests a jury trial and prays for a judgment in his favor, damages in an appropriate amount to be determined by the trier of fact, his reasonable costs and attorneys' fees, and for any other relief deemed appropriate by the Court.

Dated: <u>Thursday, February 4, 2016</u>          Respectfully submitted,

LAW OFFICES OF MARIANNE DUGAN

By:    <u>/s/ Marianne Dugan</u>
Marianne Dugan
259 East 5th Avenue, Suite 200-D
Eugene, OR 97401
Telephone: 541-338-7072
Facsimile: 866-650-5213
E-Mail: mdugan@mdugan.com

*– and –*

Alan C. Milstein (<u>Pro</u> <u>Hac</u> <u>Vice</u>)
SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com

*Attorneys for Plaintiff Brandon Austin*