Alan C. Milstein (Pro Hac Vice)
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com

Marianne Dugan (OSB No. 932563)
259 E. 5th Avenue, Suite 200-D
Eugene, OR 97401
Telephone: 541-338-7072
Facsimile: 866-650-5213
E-Mail: mdugan@mdugan.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| BRANDON AUSTIN, | Case No. 6:15-cv-02257-MC |
| Plaintiff, | |
| v. | **PLAINTIFF BRANDON AUSTIN'S MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS** |
| UNIVERSITY OF OREGON; SANDY WEINTRAUB; CHICORA MARTIN; ROBIN HOLMES; and MICHAEL R. GOTTFREDSON, all in their individual capacities only, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

Introduction ................................................................................................. 1

Statement of the Facts .................................................................................. 3

Legal Argument ........................................................................................... 10

1.    Contrary to the Defendants' First Argument, Mr. Austin Has Stated a Claim
      for the Individual Defendants' Violations of 42 U.S.C. § 1983 ......................... 10

      a.    The Property and Liberty Interests Claimed by Mr. Austin are
            Well-Recognized .................................................................... 11

      b.    The Individual Defendants are Not Entitled to Qualified Immunity ....... 16

      c.    Mr. Austin Did Not Waive His Right to Due Process ........................... 17

      d.    Mr. Austin was Entitled to Far More than a Nominal "Notice
            and Opportunity to Be Heard" ................................................ 18

      e.    Finally, Mr. Austin Has Stated Claims for Violations of his
            Substantive Due Process Rights ............................................... 19

2.    Contrary to the Defendants' Second Argument, Mr. Austin Has Plausibly
      Alleged Violations of Title IX ..................................................................... 22

3.    This Court Should Reject the Defendants' Arguments About Preclusion ........... 29

4.    This Court Should Reject the Defendants' Arguments in Favor of Dismissing
      Mr. Austin's Tort Claims ........................................................................... 30

      a.    The Defendants Are Not Entitled to Immunity Under O.R.S. 30.265 ..... 30

      b.    Mr. Austin has Stated Claims for Negligence, Intentional Infliction
            of Emotional Distress, and Tortious Interference .......................... 31

5.    This Court Should Reject the Defendants' Arguments in Favor of Dismissing
      Mr. Austin's Breach of Contract Claim ....................................................... 34

Conclusion ................................................................................................... 35

# TABLE OF AUTHORITIES

## FEDERAL CASES

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) ........................................................................... 25

Black Coalition v. Portland School District No. 1,
    484 F.2d 1040 (9th Cir. 1973) ......................................................... 13

Blanton v. State University of New York,
    489 F.2d 377 (2d Cir. 1973) ................................................... 12, 14, 19

Board of Curators of University of Missouri v. Horowitz,
    435 U.S. 78 (1978) ......................................................................... 15, 20

Board of Regents v. Roth,
    408 U.S. 564 (1972) ........................................................................... 12

Brown v. Fortner,
    518 F.3d 552 (8th Cir. 2008) ........................................................... 16

Cannon v. University of Chicago,
    441 U.S. 677 ..................................................................................... 30

Cohen v. San Bernardino Valley Coll.,
    92 F.3d 968 (9th Cir. 1996) ............................................................. 16

Damico v. California,
    389 U.S. 416 (1967) ......................................................................... 30

Davies v. Grossmont Union High Sch. Dist.,
    930 F.2d 1390 (9th Cir. 1991) ......................................................... 18

Doe v. Brown University,
    Docket No. 15-144 S, 2016 U.S. Dist. LEXIS 21027 (D.R.I. February 22, 2016) .. *passim*

Doe v. Columbia University,
    101 F. Supp. 3d 356 (S.D.N.Y. 2015) ............................................. 28

Doe v. Salisbury University,
    Docket No. JKB-15-517, 2015 U.S. Dist. LEXIS 110772 (D. Md. August 21, 2015) ... 28

Doe v. United States,
    58 F.3d 494 (9th Cir. 1995) ............................................................. 28

Dixon v. Alabama State Board of Education,
    294 F.2d 150 (5th Cir. 1961), cert. denied, 368 U.S. 930 (1961) .............................. 12, 14

Eleldi v. University of Oregon,
    698 F.3d 715 (9th Cir. 2012) .......................................................................... 25

Garcia-Catalan v. U.S.,
    734 F.3d 100 (1st Cir. 2012) ......................................................................... 25

Gaspar v. Bruton,
    513 F.2d 843 (10th Cir. 1975) ....................................................................... 20

Gorman v. University of Rhode Island,
    837 F.2d 7 (1st Cir. 1988) ......................................................................... 18, 19

Goss v. Lopez,
    419 U.S. 565 (1975) ............................................................................... 12, 13

Grajales v. P.R. Ports Auth.,
    682 F.3d 40 (1st Cir. 2012) ........................................................................... 28

Hall v. University of Minnesota,
    530 F. Supp. 104 (D. Minn. 1982) ................................................................. 15

Harlow v. Fitzgerald,
    457 U.S. 800 (1982) ................................................................................... 16

Hart v. Ferris State College,
    557 F. Supp. 1379 (W.D. Mich. 1983) ............................................................ 14

Hope v. Pelzer,
    536 U.S. 730 (2002) ................................................................................... 17

In re Cincinnati Radiation Litigation,
    874 F. Supp. 796 (D. Ohio 1995) .................................................................. 16

Lawrence v. City of St. Paul,
    740 F. Supp. 2d 1026 (D. Minn. 2010) ........................................................... 16

Lewin v. Medical College,
    910 F. Supp. 1161 (E.D. Va. 1996) ................................................................ 13

Marin v. University of Puerto Rico,
    377 F. Supp. 613 (D.P.R. 1974) .............................................................. passim

Matthews v. Eldridge,
    424 U.S. 319 (1976) ................................................................................... 18

Morgan v. U.S. Postal Serv.,
    798 F.2d 1162 (8th Cir. 1986) ...................................................................... 30

NCAA v. Tarkanian,
    488 U.S. 179 (1988) ...................................................................................... 15

Nunez v. City of Los Angeles,
    147 F.3d 867 (9th Cir. 1998) ........................................................................ 20

Orneglas-Morales v. United States,
    Docket No. 3:15-cv-02304-SI, 2015 U.S. Dist. LEXIS 168575 (D. Ore. December
    17, 2015) ........................................................................................................ 3

Regents of University of Michigan v. Ewing,
    474 U.S. 214 (1985) ............................................................................... 15, 20

Sinaloa Lake Owners Ass'n v. City of Simi Valley,
    882 F.2d 1398 (9th Cir 1989) ....................................................................... 20

Stanley v. Trustees of California State University,
    433 F.3d 1129 (9th Cir 2006) ....................................................................... 22

Tigrett v. Rector and Visitors of University of Virginia,
    290 F.3d 620 (4th Cir. 2002) ........................................................................ 15

United States v. Salerno,
    481 U.S. 739 (1987) ...................................................................................... 20

Wells v. Xavier,
    7 F. Supp. 3d 746 (S.D. Ohio 2014) ............................................................ 26

West v. Atkins,
    487 U.S. 42 (1988) ......................................................................................... 1

Wilson v. Hewlett-Packard Co.,
    668 F.3d 1136 (9th Cir. 2012) ....................................................................... 3

Winnick v. Manning,
    460 F.2d 545, 550 (2d Cir. 1972)................................................................. 19

Wisconsin v. Constantineau,
    400 U.S. 433 (1972) ....................................................................................... 1

Yusuf v. Vassar Coll.,
    35 F.3d 709 (2d Cir. 1994) ..................................................................... 25, 26

**STATE CASES**

Kavanagh v. Trs. of Boston University,
    795 N.E.2d 1170 (Mass. 2003) ........................................................... 32

Lowrimore v. Dimmitt,
    797 P.2d 1027 (Ore. 1990) ........................................................... 31

Westfall v. State,
    324 P.3d 440 (Ore. 2014) ........................................................... 31

**FEDERAL STATUTES**

20 U.S.C. § 1681, et seq. ........................................................... *passim*

42 U.S.C. § 1983 ........................................................... *passim*

**STATE STATUTES**

O.R.S. 30.265(6)(c) ........................................................... 30, 31

O.R.S. 30.265(6)(f) ........................................................... 30, 31

**INTRODUCTION**

Plaintiff Brandon Austin, by and through his counsel, Alan C. Milstein of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. (admitted pro hac vice), and local counsel Marianne Dugan, respectfully submit this memorandum of law in opposition to the "Motion to Dismiss" ("Motion") filed on behalf of Defendants University of Oregon (when abbreviated, "University" or "Oregon"), Sandy Weintraub, Chicora Martin, Robin Holmes, and Michael R. Gottfredson (collectively, "Defendants").

As one of the top fifty or so high school basketball players in the nation, Mr. Austin received offers to play basketball at multiple universities, and initially chose to play for the Providence Friars. Prior to the Spring 2014 Semester, Mr. Austin transferred to Oregon, where he matriculated as an undergraduate and became a member of the Oregon Ducks men's college basketball team, which competes at the NCAA Division I level and is a member of the Pacific-12 Conference. Mr. Austin was widely projected by experts in basketball and the NBA Draft to be selected in the first round of the NBA Draft, which would more likely than not be accompanied by a multi-million dollar guaranteed contract and tens of millions of dollars in prospective economic advantage. In order to induce Mr. Austin to attend Oregon, Oregon provided Mr. Austin with an athletic scholarship.

At all relevant times, Mr. Austin had a recognized property interest in (among other things) his status as an admitted, matriculated University student in good standing; his interest in pursuing public higher education and intercollegiate athletic participation; and the economic benefit to him in the form of his existing scholarship, a future scholarship at another Division I school, or a future contract with an NBA team. Mr. Austin also had a recognized liberty interest in (among other things) being in good standing at the University, and being free from the stigma associated with being suspended for disciplinary reasons.

In 2014, Mr. Austin engaged in consensual "group" sexual activity with a female student and other basketball players. Subsequently, this student falsely claimed that she had been sexually assaulted. The District Attorney determined that she would not be pressing charges against Mr. Austin or any of the basketball players "because the conflicting statements and actions by the victim make this case unprovable as a criminal case," and presented "an insurmountable barrier to prosecution." The Defendants, however, on the basis of Mr. Austin's sex/gender, railroaded Mr. Austin, changing the course of Mr. Austin's life. So prejudged was Mr. Austin on the basis of his sex/gender that, before the hearing process even started, no one less than the President of the University, emphasizing to the entire University community that he is also a "father," held a press conference to condemn Mr. Austin and side with the "survivor."

Mr. Austin advances a claim under 42 U.S.C. § 1983, a claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"), and state-law claims for negligence, intentional infliction of emotional distress, tortious interference with prospective economic relations, and breach of contract.[1] The Defendants principally attack Mr. Austin's § 1983 claim on the ground that Mr. Austin has not pled a recognized property or liberty interest. In reality, since 1961, federal courts have continuously held or assumed that a property and a liberty interest exists in the circumstances presented here, and federal courts have consistently required students facing a long-term suspension to be provided with far more than a nominal "opportunity to be heard." Moreover, Mr. Austin's Title IX claim has been plausibly pled, as demonstrated by Doe v. Brown University, and the cases cited therein, which significantly undercut the Defendants' arguments.[2] The Defendants' remaining arguments fail as well.

---

[1] See generally Second Amended Complaint, a true and correct copy of which is attached to this memorandum as **Exhibit "A."**

[2] See generally Doe v. Brown University, Docket No. 15-144 S, 2016 U.S. Dist. LEXIS 21037 (D.R.I. February 22, 2016). Doe v. Brown University was issued on the same day that the Defendants filed their Motion.

## STATEMENT OF THE FACTS

"In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party."[3]    Notwithstanding this bedrock principle, the Defendants transparently attempt to downplay the compelling facts of this matter, and replace those facts with a narrative that clearly does not represent the facts of this matter viewed in the light most favorable to Mr. Austin.  The actual facts are as follows.

### I.

During his high school basketball career, Mr. Austin helped his school win three straight Pennsylvania Interscholastic Athletic Association titles.  As one of the top fifty or so prospects in the nation, Mr. Austin received offers to play basketball at multiple universities, and ultimately chose to attend Providence College ("Providence").  During the Fall 2013 semester, Mr. Austin was suspended from the basketball team for thirty days.  Providence pleaded with Mr. Austin to stay, but Mr. Austin chose to transfer to University of Oregon, an institution of higher education chartered and existing pursuant to the laws of the State of Oregon.[4]

Prior to the Spring 2014 Semester, Mr. Austin matriculated at Oregon and became a member of the Oregon Ducks men's college basketball team ("Ducks"), which competes at the NCAA Division I level and is a member of the Pacific-12 Conference.  In order to induce Mr. Austin to attend Oregon, Oregon provided Mr. Austin with an athletic scholarship.  The athletic scholarship contained both express terms and, Mr. Austin alleges, an implied covenant of good faith and fair dealing.  Mr. Austin had the objectively reasonable expectation, based upon the express terms of the contractual relationship governing the athletic scholarship, that the

---

[3] See, e.g., Orneglas-Morales v. United States, Docket No. 3:15-cv-02304-SI, 2015 U.S. Dist. LEXIS 168575, at *2 (D. Ore. December 17, 2015) (citing Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1140 (9th Cir. 2012)) (additional citation omitted).

[4] See Exhibit A, ¶¶ 5, 10-13.

University of Oregon would renew his scholarship, and not act so as to deprive Mr. Austin of the fruits of the scholarship, and otherwise act in good faith vis-à-vis his scholarship.[5]

## II.

Mr. Austin attended an off-campus party on or around March 8, 2014.  After about an hour and a half, a female student approached Mr. Austin and another basketball player and began "twerking" for them.  Subsequently, she went into a bathroom with Mr. Austin and the other basketball player and initiated consensual sexual activity. The three individuals then left the bathroom together. Thereafter, a third basketball player approached them, whereupon the female student recognized that player as a member of the Oregon Ducks basketball team.  At that point, the four individuals went into the bathroom, whereupon the female student voluntarily performed a variety of sexual acts on the basketball players, including oral sex on Mr. Austin, which oral sex was initiated by the female student.  Numerous individuals at the party witnessed the female student interacting with Mr. Austin and the other basketball players both before and after the sexual activity in the bathroom, and would have testified under oath that the female student gave absolutely no indication that she was sexually assaulted, or even upset, and insisted on remaining with the basketball players even after they left the bathroom.[6]

Later in the evening, the female student chose to return to the apartment of one of the basketball players, along with all three basketball players (including Mr. Austin).  The female student was laughing and joking.  Upon arrival, she stated that she needed to get into something comfortable.  Subsequently, the student voluntarily took her clothes off, whereupon she voluntarily engaged in "group" sexual activity with the other players.  At one point, the female student became teary-eyed, at which point the players chose to immediately cease any sexual activity.  Soon after, she was again laughing and joking.  The female student chose to stay

---

[5] See Exhibit A, ¶¶ 4, 14-17.
[6] See Exhibit A, ¶¶ 18-23.

overnight at the apartment, and had sexual intercourse with one of the other players after waking up in the morning.  Thereafter, the player sent the female student home in a cab, and she sent a text message stating "thanks for getting me home."  At no point did the female student appear to be intoxicated.  At no point did the female student say "no" about any sexual activity, even when she became teary-eyed (after which, in any event, it immediately ceased).  The female student expressed verbal consent and/or gave unmistakable physical indications of her desire to participate in sexual contact with the young men at the times they were engaged in sexual conduct.[7]

### III.

Within a day or two, however, the female student began making false, scandalous, and malicious accusations about all three basketball players, including the utterly false accusation that the players dragged her into the bathroom and assaulted her; the utterly false accusation that the players wrestled her into a car, forced her to get drunk, and drove her to the apartment; and the utterly false accusation that she was raped at the apartment.  Thereafter, the accuser made numerous inconsistent statements to the Eugene Police Department regarding her sobriety, the events and conversations leading up to the sexual conduct, and the actual actions, words, and behavior of those involved during sexual contact.[8]

When the University learned that Mr. Austin had been accused of rape, Defendant Chicora Martin, the Assistant Dean of Students at the University, suspended Mr. Austin and the other two basketball players on an "emergency" basis, and scheduled an "emergency" hearing to expel Mr. Austin and the other two.  That emergency suspension was then modified.[9]

---

[7] See Exhibit A, ¶¶ 24-32.
[8] See Exhibit A, ¶¶ 33-34.
[9] See Exhibit A, ¶¶ 7, 35-36.

On April 14, 2014, the Lane County District Attorney determined that she would not be pressing charges against Mr. Austin or any of the basketball players "because the conflicting statements and actions by the victim make this case unprovable as a criminal case." In or around late April, however, the Oregonian published the police report that the female student had made. The next evening, the District Attorney's office issued a lengthy document outlining numerous weaknesses in the prosecution's case, as well as numerous inconsistencies in the accuser's statements, and concluding that they presented "an insurmountable barrier to prosecution."[10]

At 11:00 a.m. on May 9, 2014, Defendant Michael R. Gottfredson, who served as the President of the University at all relevant times, in effect imposed discipline upon Mr. Austin without due process by holding a press conference and making a public statement condemning Mr. Austin and the other basketball players, even though the District Attorney had declined to prosecute Mr. Austin and the other basketball players, and the University had not started much less concluded the hearing process. Despite the fact that the District Attorney had cast significant doubt on whether the accuser was telling the truth, Dr. Gottfredson stated, "The type of behavior in the police report released this week is utterly unacceptable and will not be tolerated," and further stated, "I know it's frustrating, and we would like to say more, but we are not going to violate the laws that are in place to protect students' privacy or the rights of our students – *especially* the survivor." (The italics are found in the original University transcript.) Evidencing that the University had prejudged Mr. Austin's guilt, and done so on the basis of Mr. Austin's sex/gender, Dr. Gottfredson's statement included the statement that the female accuser was a "survivor," the statement that "as a father, I was appalled at what I read,"[11] and the

---

[10] See Exhibit A, ¶ 39. The prosecutor's analysis, which can be considered by this Court, is at http://kval.com/news/local/rape-accusation-faced-insurmountable-barrier-to-prosecution.

[11] The Los Angeles Times used this language about being "appalled" as a "father" as a "pull quote" in large, bold type. See http://www.latimes.com/nation/nationnow/la-na-nn-oregon-basketball-sexual-assault-20140509-story.html (last visted March 6, 2016).

statement that Mr. Austin would "not be playing basketball at Oregon again." Around this time, Ms. Martin again suspended Mr. Austin and the other two basketball players, and refused to modify Mr. Austin's suspension. Around this time, a student told a University investigator that she personally interacted with the female student throughout the evening in question, she was not at all intoxicated, and she insisted on going home with the basketball players.[12]

Mr. Austin alleges that, at all relevant times, he had a recognized property interest in (among other things) his status as an admitted, matriculated University student in good standing; his interest in pursuing public higher education and intercollegiate athletic participation; and the economic benefit to him in the form of his existing scholarship, a future scholarship at another Division I school, or a future contract with an NBA team. Mr. Austin further alleges that, at all relevant times, he also had a recognized liberty interest in (among other things) being in good standing at the University, and being free from the stigma associated with being suspended for disciplinary reasons. Mr. Austin further alleges that, at all relevant times, it was clearly established that, given the seriousness of the alleged infraction, the possible consequences to Mr. Austin, and the degree of sanction or penalty sought to be imposed, the Fourteenth Amendment to the United States Constitution's guarantee of procedural and substantive due process, and the Oregon Revised Statutes, required the Defendants to provide Mr. Austin with (among other things) the right to representation by counsel, testimony of witnesses under oath, depositions, issuance of subpoenas, cross-examination, a fundamentally fair proceeding.[13]

Mr. Austin's counsel, however, was presented with two unacceptable choices: (1) a "panel hearing" at which the University would not provide most or all of the foregoing due process protections, except for representation by counsel; or (2) an "administrative conference"

---

[12] See Exhibit A, ¶¶ 9, 40-45. Ms. Martin refused to modify Mr. Austin's suspension because he exercised his Miranda rights during the police investigation. See Exhibit A, ¶ 44.

[13] See Exhibit A, ¶¶ 46-48.

at which the University would not provide most or all of the foregoing due process protections, except for representation by counsel. After the "panel hearing" was scheduled, Mr. Austin's counsel requested a "contested case hearing" which complies with the due process requirements set forth in ORS 351.088, and ORS 183.413-.497 and 183.502, including representation by counsel (ORS 183.417(1)), testimony under oath (ORS 183.417(7)), depositions (ORS 183.425), issuance of subpoenas (ORS 183.440), and cross-examination (ORS 183.450(3)).[14]

Among other things, Mr. Austin's counsel further made clear that, in order to present a defense, Mr. Austin would need to subpoena the numerous witnesses who would testify that the female student gave absolutely no indication that she was sexually assaulted, or even upset, and insisted on remaining with the basketball players even after they left the bathroom, and two individuals with whom the female student had chosen to have sex after just meeting them.[15]

The University and its representatives, however, failed to even directly respond to the request of Mr. Austin's counsel for a contested case hearing. Based upon the foregoing, it was clear to Mr. Austin's counsel that the University and its representatives were not going to grant that request. Ultimately, as the University was only providing two options, neither of which provided the requisite due process, and the University was requiring Mr. Austin to choose between one of the two options, Mr. Austin's counsel accepted the "administrative conference" option. Mr. Austin's counsel was not asked to sign, and did not sign, a waiver of Mr. Austin's due process rights, and would never have signed such a waiver; moreover, Mr. Austin's counsel never waived Mr. Austin's due process rights by choosing the "administrative conference" option over the "panel hearing" option, neither of which provided the due process protections that Mr. Austin's counsel had expressly requested. [16]

---

[14] See Exhibit A, ¶¶ 49-50.
[15] See Exhibit A, ¶ 51.
[16] See Exhibit A, ¶¶ 52-54.

The "administrative conference" was ultimately scheduled for May 30, 2014.  It turned out to be nothing less than an unconstitutional "kangaroo court" scenario of the very worst order, in which Mr. Austin was deprived of the foregoing rights, and not even provided with a basic opportunity to properly respond to all information provided, and to contact and call all relevant and necessary witnesses.  Defendant Sandy Weintraub, who is, and was at all relevant times, the Director of Student Conduct & Community Standards at the University of Oregon, ruled against Mr. Austin, suspending him from the University from four to ten years, long enough for the removal to be the functional equivalent of an expulsion from the University, and refused to provide due process to Mr. Austin generally and in the manner described in detail above.[17]

Defendant Robin Holmes, Vice President for Student Life at the University of Oregon, was charged with the responsibility of hearing an appeal.  Dr. Holmes, however, refused to respond to Mr. Austin's request for an appeal and did not return multiple phone calls from Mr. Austin's counsel, in violation of Mr. Austin's right to procedural and substantive due process.[18]

Additionally, the Defendants' actions before, during, and after the hearing process were motivated in whole or large part by the fact that Mr. Austin is a male and the accuser is a female.  Based upon Mr. Austin's sex/gender, the University deprived Mr. Austin of basic due process rights, equal protection rights, and other rights guaranteed by Title IX, and its implementing regulations, and by the University's own stated policies and procedures.  In or around January 2015, the female student filed a lawsuit against Oregon, alleging that her own Title IX rights had been violated due to Oregon's alleged "deliberate indifference" to the safety of its students.  Oregon's counsel contacted Mr. Austin's counsel, stated that had she been consulted things might have been handled differently, and asked for Mr. Austin's help in defending the suit.[19]

---

[17] See Exhibit A, ¶¶ 6, 55-57.
[18] See Exhibit A, ¶¶ 8, 58-59.
[19] See Exhibit A, ¶¶ 63-66.

The University claims in its Motion that Mr. Austin's assertions about his basketball career are merely speculative. But, in Mr. Austin's Complaint, he plainly alleges that, prior to the Defendants' actions, Mr. Austin was regarded as one of the top amateur basketball players in the United States of America; on the men's basketball team at the Oregon, a Division I school within the Pac-12 Conference; and "widely projected by experts in basketball and the NBA Draft to be selected in the first round of the NBA Draft, which would more likely than not be accompanied by a multi-million dollar guaranteed contract and tens of millions of dollars in prospective economic advantage," and alleges, equally plainly, that "[p]rior to taking the actions alleged herein, the Defendants were aware of the foregoing facts.[20] Mr. Austin further alleges that, as a direct and proximate result of the Defendants' conduct, Mr. Austin no longer plays at a Division I school, has diminished chances of playing in the NBA, has been made to suffer the opprobrium associated with an suspension from a university, and the opprobrium associated with committing a sexual assault (when in fact he committed no sexual assault), and has as a result suffered personal and professional harm, including emotional distress, in the past, and will do so in the future.[21]

## LEGAL ARGUMENT

**1.    Contrary to the Defendants' First Argument, Mr. Austin Has Stated a Claim for the Individual Defendants' Violations of 42 U.S.C. § 1983**

In Count Two, Mr. Austin seeks to hold the individual defendants liable under § 1983. Among other things, Mr. Austin alleges that, at all relevant times, he had a recognized property interest in (among other things) his status as an admitted, matriculated University student in good standing; his interest in pursuing public higher education and intercollegiate athletic participation; and the economic benefit to him in the form of his existing scholarship, a future

---

[20] See Exhibit A, ¶¶ 67-68.
[21] See Exhibit A, ¶ 69.

scholarship at another Division I school, or a future contract with an NBA team, and also had a recognized liberty interest in (among other things) being in good standing at the University, and being free from the stigma associated with being suspended for disciplinary reasons.  Mr. Austin further alleges that, at all relevant times, it was clearly established that, given the seriousness of the alleged infraction, the possible consequences to him, and the degree of sanction or penalty sought to be imposed, the Fourteenth Amendment to the United States Constitution's guarantee of procedural and substantive due process, and the Oregon Revised Statutes, required the Defendants to provide Mr. Austin with the right to representation by counsel, testimony of witnesses under oath, depositions, issuance of subpoenas, cross-examination of witnesses, a fundamentally fair proceeding, and other due process protections, and the Defendants' failure to do so constitutes a violation of § 1983.[22]   In response, the individual Defendants principally argue that their actions did not implicate a recognized property or liberty interest.  They also argue that they are entitled to qualified immunity; Mr. Austin waived his right to the constitutional protections at issue; and Mr. Austin received a fair hearing consistent with due process.  They also argue that there is no substantive due process claim because their actions did not shock the conscience.  These arguments all fail.

> ### a.    The Property and Liberty Interests Claimed by Mr. Austin are Well-Recognized

42 U.S.C. § 1983 provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress … .

---

[22] See Exhibit A, ¶¶ 46-48, 100-111.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[23]

The Fourteenth Amendment forbids those acting under color of state law to deprive any person of "life, liberty, or property, without due process of law." Thus, "[t]he requirements of … due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."[24] Property interests, however, "take many forms," and liberty includes "the right … to engage in any of the common occupations of life, to acquite useful knowledge … and to generally enjoy those privileges long recognized … as essential to the orderly pursuit of happiness by free men."[25] Thus, "certainly where the State attaches 'a badge of infamy' to the citizen, due process comes into play."[26]

In the seminal case of <u>Dixon v. Alabama State Board of Education</u>, issued in 1961, the United States Court of Appeals for the Fifth Circuit made clear that students have both a liberty and property interest in "the right to remain at a public institution of higher learning in which the plaintiffs [are] students in good standing.'"[27] As the Supreme Court of the United States

---

[23] <u>See, e.g.</u>, <u>West v. Atkins</u>, 487 U.S. 42, 47 (1988) (multiple citations omitted).

[24] <u>See</u> <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569 (1972); <u>see also</u> <u>Marin v. University of Puerto Rico</u>, 377 F. Supp. 613 (D.P.R. 1974) ("The relevant inquiry is whether plaintiffs' interests affected here are within the concepts of 'liberty' or 'property' protected by the due process clause.").

[25] <u>See</u> <u>Roth</u> at 572, 576.

[26] <u>See</u> <u>Wisconsin v. Constantineau</u>, 400 U.S. 433, 437 (1972) (citation omitted); <u>accord</u> <u>Goss v. Lopez</u>, 419 U.S. 565, 573-75 (1975) (quoting <u>Constantineau</u>, 400 U.S. at 437) (observing that "[t]he Due Process Clause also forbids arbitrary deprivations of liberty," where "a person's good name, reutation, honor, or integrity is at stake because of what the government is doing to him.").

[27] <u>See</u> <u>Marin</u>, 377 F. Supp. at 621 (bracketing in original) (quoting <u>Dixon v. Alabama State Board of Education</u>, 294 F.2d 150 (5th Cir. 1961), <u>cert. denied</u>, 368 U.S. 930 (1961)); <u>Blanton v. State University of New York</u>, 489 F.2d 377, 385 (2d Cir. 1973) (characterizing <u>Dixon</u> as "the path-breaking decision recognizing the due process rights of students at a state university"); <u>cf.</u> <u>Goss</u>, 419 U.S. at 573-75 (secondary education case holding that "on the basis of state law, appellees plainly had legitimate claims of entitlement to a public education").

observed in Goss v. Lopez, a 1975 decision, "Since the landmark decision of the Court of Appeals for the Fifth Circuit in Dixon … , the lower federal courts have uniformly held the Due Process Clause applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion."[28] Indeed, in the words of one District Court, over forty years ago:

> The right to engage in a chosen occupation is meaningless if one is unable to obtain the training it requires; similarly, the right to acquire useful knowledge implies a right of access to institutions dispensing such knowledge.  It is too late in the day, now that the right privilege distinction is dead and buried, … to argue that the right to attend a public educational institution to which one is admitted or attending as a student in good standing is not within the "liberty" protected by the due process clause.  …
>
> Due process protection is particularly necessary when, as here, the governmental action may damage the individual's standing in the community, academic or general, or may impose a "stigma or other disability that foreclose[s] his freedom to take advantage" of other educational or future employment opportunities.  Roth, supra, 408 U.S. at 573.  Suspension from a public college is a mark on one's record that may well preclude further study at any public and many private institutions and limit the positions one can qualify for after termination of one's studies.  For all of these reasons, we hold that the due process clause applies to educational suspensions.[29]

Nearly twenty years later, another District Court, summarizing subsequently decided authorities, "found that Plaintiff had a protectible property interest in continued enrollment, free from arbitrary state action, at the Medical College," and denied a motion to dismiss.[30]

Against this backdrop, this Court should readily reject the Defendants' argument that Mr. Austin had neither a property nor a liberty interest at stake.  Contrary to the Defendants' argument about state law, these federal decisions provide ample support for the proposition that, at all relevant times, it was well-established that Mr. Austin had a constitutionally protected

---

[28] See Goss, 419 U.S. at 576 n.8 (citing Black Coalition v. Portland School District No. 1, 484 F.2d 1040 (9th Cir. 1973)) (multiple additional citations omitted).

[29] See Marin, 377 F. Supp. at 621-22 (bracketing in original) (multiple citations omitted).

[30] See Lewin v. Medical College, 910 F. Supp. 1161, 1164 (E.D. Va. 1996).

property and liberty interest in attending the University, having his scholarship renewed by the University, and being free from the stigma associated with a disciplinary suspension, and other state-imposed stigma.  Indeed, the Defendants essentially ignore the authorities cited above, and instead rely upon three unpublished, non-binding, and highly distinguishable decisions.

In the first decision, <u>Ryan v. Harlan</u>, this Court rejected a § 1983 claim brought by a part-time graduate student, not then enrolled in any graduate classes, alleging that the defendants violated "his due process rights by preventing him from receiving financial aid so that he could attend courses" and unlawfully arrested him.  In <u>Ryan</u>, this Court merely observed that "[c]ourts are split on the question of whether a graduate level student has a constitutionally protected interest in completing his education."   In the second decision, <u>Harrell v. Southern Oregon University</u>, the <u>pro se</u> plaintiff, who "lost no privileges" as a result of the defendant's conduct, sued Southern Oregon University.  This Court noted, incorrectly we would contend, that the Plaintiff had no property interest in his education; in any event, this Court held that, "[e]ven if Plaintiff did have a property interest, he cannot show that he suffered a deprivation."  Finally, in <u>Fernandez v. Rosenzwieg</u>, this Court stated, "There is no case holding that a student has a federally-protected due process, property or liberty interest in continued enrollment in or graduation from a state university.  This court will not so hold."  Again, with respect, from the Fifth Circuit's decision in <u>Dixon</u> on forward, numerous federal courts including the Supreme Court have recognized or assumed the existence of such interests.[31]

---

[31] <u>See, e.g.</u>, <u>Dixon</u>, 294 F.2d at 150 (seminal case, involving Alabama State College); <u>Blanton</u>, 489 F.2d at 385 (characterizing <u>Dixon</u> as "the path-breaking decision recognizing the due process rights of students at a state university"); <u>Marin</u>, 377 F. Supp. at 621 (bracketing in original) ("Suspension from a public college is a mark on one's record that may well preclude further study at any public and many private institutions and limit the positions one can qualify for after termination of one's studies.  For all of these reasons, we hold that the due process clause applies to educational suspensions."); <u>Hart v. Ferris State College</u>, 557 F. Supp. 1379, 1382 (W.D. Mich. 1983) (concluding that "the threat of suspension or expulsion implicates … property and liberty interests in public education and reputation, and that such interests are

For the same reasons, this Court should hold that Mr. Austin had property and liberty interest in playing for the University's basketball team, having his scholarship renewed by the University or receiving a scholarship from another Division I university, and receiving an NBA contract, certainly as they related to Mr. Austin's relationship with Oregon.  While we acknowledge the cases cited by the Defendants, those cases are non-binding and largely address suits by students against the NCAA, which the Supreme Court long ago ruled is not a state actor.[32]  In Hall v. University of Minnesota, by contrast, the District Court granted an injunction in favor of a student-athlete in circumstances analogous to the circumstances of this case:

> The private interest at stake here, although ostensibly academic, is the plaintiff's ability to obtain a "no cut" contract with the National Basketball Association.  The bachelor of arts, while a mark of achievement and distinction, does not in and of itself assure the applicant a means of earning a living.  This applicant seems to recognize this and has opted to use his college career as a means of entry into professional sports as do many college athletes.  His basketball career will be little affected by the absence or presence of a bachelor of arts degree.  This plaintiff has put all of his "eggs" into the "basket" of professional basketball.  The plaintiff would suffer a substantial loss if his career objectives were impaired.[33]

Finally, this Court should reject the Defendants' "thrown-in" argument that "the University was not bound to the administrative procedures provided by ORS 183.413-.497 because ORS 351.088 grants the University the authority to establish [its own] adjudicative

---

within the purview of the due process clause of the Fourteenth Amendment"); Hall v. University of Minnesota, 530 F. Supp. 104, 107 (D. Minn. 1982) ("A student's interest in attending a university is a property right protected by due process."); accord Board of Curators of University of Missouri v. Horowitz, 435 U.S. 78, 86 (1978) (academic dismissal case holding that, even assuming that a medical student has a liberty or property interest, "respondent has been awarded at least as much due process as the Fourteenth Amendment requires"); Regents of University of Michigan v. Ewing, 474 U.S. 214, 222 (1985) ("We therefore accept the University's invitation to assume the existence of a constitutionally protectible property right in Ewing's continued enrollment … ."); Tigrett v. Rector and Visitors of University of Virginia, 290 F.3d 620, 627 (4th Cir. 2002) (assuming a matriculated student's property interest in a university education without deciding whether one exists).

[32] See NCAA v. Tarkanian, 488 U.S. 179 (1988).
[33] See Hall, 530 F. Supp. at 108.

procedures." The University asserts, in a classic unsupported _ipse dixit_ on a motion to dismiss, that "the University established procedures for administrative conferences .. and panel hearings … as the exclusive procedures for adjudicating alleged violations of its Student Conduct Code." This is a motion to dismiss, not a motion for summary judgment, and without discovery, this assertion simply cannot be evaluated. Moreover, in footnote 2 to their brief, they appear to undercut this argument by stating: "At the time of the events relevant to the Complaint, the University's Student Conduct Code was subject to the 2014 edition of the Oregon Administrative Rules. The Student Conduct Code has since been amended and renamed as a University policy."

### b.    The Individual Defendants are Not Entitled to Qualified Immunity

Officials are only shielded by qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[34] Indeed, "[t]o defeat a qualified immunity defense, the officials need only have fair warning that their alleged conduct was unconstitutional."[35] Ultimately, "[c]ourts are charged with the responsibility of ensuring that the defense of qualified immunity gives no more protection than is necessary for the official in question to effectively fulfill his duties," because "[e]ach additional measure of protection afforded government officials inevitably divests individual citizens of some remedies for violations of their constitutional rights."[36]

Here, the individual Defendants argue it "could not have been apparent to Martin, Gottfredson, Holmes, or Weintraub that their alleged conduct violated the Constitution." This is simply untrue. As demonstrated by the authorities cited above, Mr. Austin's clearly established right to due process in the circumstances presented was violated from Dr. Gottfredson's initial

---

[34] See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).
[35] See Lawrence v. City of St. Paul, 740 F. Supp. 2d 1026, 1043 (D. Minn. 2010) (quoting Brown v. Fortner, 518 F.3d 552, 561 (8th Cir. 2008)) (internal quotation marks deleted); accord Cohen v. San Bernardino Valley Coll., 92 F.3d 968, 973 (9th Cir. 1996)).
[36] See In re Cincinnati Radiation Litigation, 874 F. Supp. 796, 807-08 (D. Ohio 1995).

press conference imposing discipline without a hearing, through Ms. Martin's suspension of Mr. Austin and refusal to modify that suspension on impermissible grounds, through Mr. Weintraub's actions in connection with conducting the hearing, through Dr. Holmes' refusal to hear an appeal.  As discussed in detail below, this right certainly included the right to confront and cross-examine witnesses, have access to statements, and have a true opportunity to defend himself, as opposed to the nominal "opportunity to be heard" urged by the Defendants.  Though the Defendants appear to claim that the circumstances were novel (a dubious claim), "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[37]

### c.    Mr. Austin Did Not Waive His Right to Due Process

The Defendants next argue that Mr. Austin waived his rights because, through counsel, he chose the "administrative conference" option.  In support of this argument, the Defendants rely upon Davies v. Grossmont Union High School District, which held that "constitutional rights may ordinarily be waived if it can be established by clear and convincing evidenc that the waiver is voluntary, knowing and intelligent."

Here, there is no evidence, much less "clear and convincing evidence," of voluntary, knowing, and intelligent waiver.  It was clear to Mr. Austin's counsel that the University and its representatives, who refused to even acknowledge the request of Mr. Austin's counsel for a contested case hearing, were not going to grant her request for a contested case hearing, which would have provided the requisite due process.[38]  Ultimately, as the University was only providing two vastly inferior options, a "panel hearing" and an "administrative conference," neither of which provided the requisite due process, and the University was requiring Mr. Austin to choose between one of the two options, Mr. Austin's counsel accepted the "administrative

---

[37] See Hope v. Pelzer, 536 U.S. 730, 741 (2002).
[38] See Exhibit A, ¶¶ 52-53.

conference" option.[39]   Mr. Austin's counsel was not asked to sign, and did not sign, a waiver of Mr. Austin's due process rights, and would never have signed such a waiver; moreover, Mr. Austin's counsel never waived Mr. Austin's due process rights by choosing the "administrative conference" option over the "panel hearing" option, neither of which provided the due process protections that Mr. Austin's counsel had expressly requested.[40]   It is simply nonsensical to suggest, as the Defendants apparently do, that they can be relieved of their constitutional obligations simply by providing two options, neither of which comports with applicable due process requirements.

Finally, though the Defendants fail to state so, <u>Davies</u> further provides that, even where there is a clear, voluntary, and intelligent waiver, a court must also consider whether public policy demands that the court not enforce the waiver.[41]   All of the policy reasons supporting a finding that Mr. Austin has a property and liberty interest make clear that any possible waiver, which in any event did not occur, should not be enforced by this Court.

### d.    Mr. Austin was Entitled to Far More than a Nominal "Notice and Opportunity to Be Heard"

The University next contends that Mr. Austin's "Fourteenth Amendment rights were not violated because he received constitutionally sufficient due process."  Tellingly, this argument is merely two paragraphs long and contains no analysis.

"Due process … in not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation."[42]   Among other things, courts have held that the right to cross-examine witnesses may be required in some school disciplinary hearings, namely where a disciplinary hearing "had

---

[39] <u>See</u> Exhibit A, ¶ 54.
[40] <u>See</u> Exhibit A, ¶ 54.
[41] <u>See</u> <u>Davies v. Grossmont Union High Sch. Dist.</u>, 930 F.2d 1390, 1394 (9th Cir. 1991).
[42] <u>See</u> <u>Gorman v. University of Rhode Island</u>, 837 F.2d 7 (1st Cir. 1988) (citing <u>Matthews v. Eldridge</u>, 424 U.S. 319, 334 (1976)).

resolved itself into a problem of credibility."[43]    Indeed, in <u>Winnick v. Manning</u>, the Second

Circuit held, in a case involving a substantial suspension of a state university student, as follows:

> Secondly, if this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing.  [Citation omitted.]  This was not a case, however, where the decision maker had to choose to believe either the accused or his accuser.  Rather, as the district court points out, Dean Hewes' credibility was not at issue.  The critical fact about Hewes' statement was that he witnessed appellant's presence and conduct in the vicinity of the disturbance.  Since this crucial fact was admitted by Winnick himself, cross-examination would have been a fruitless exercise.[44]

In <u>Marin</u>, the District Court similarly held that, "in the normal case," cross-examination

and other procedural safeguards would be required:

> But no sound reason appears why, in light of the individual's significant interest, these state goals, however, important, need be vindicated in the normal case without (1) adequate advance notice to the student of (a) the charges, (b) the specific, previously promulgated regulations under which the charges are brought, and (c) the evidence against the student; (2) a full, expedited evidentiary hearing (a) presided over by an impartial, previously uninvolved official, (b) the proceedings of which are transcribed, at which the student (c) can present evidence and (d) cross-examine opposing witnesses, (e) with the assistance of retained counsel; and (3) a written decision by the presiding official encompassing (a) findings of fact, (b) the substantial evidence on which the findings rest, and (c) reasons for the conclusion.[45]

Less process may be due in suspensions for academic reasons; indeed, in <u>Horowitz</u>, a

1977 decision, the Supreme Court observed, "Since the issue first arose 50 years ago, state and

---

[43] <u>See</u> <u>Winnick v. Manning</u>, 460 F.2d 545, 550 (2d Cir. 1972).

[44] <u>See</u> <u>id.</u>; <u>see also</u> <u>Blanton</u>, 489 F.2d at 385 (internal alterations and quotation marks omitted) (noting that, in <u>Winnick</u>, the Second Circuit made clear "that if a case of a substantial suspension of a state university student has resolved itself into a problem of credibility, cross-examination of witnesses might be essential to a fair hearing"); <u>Gorman</u>, 837 F.3d at 16 (holding that due process was provided because "Gorman had the opportunity to cross-examine his accusers as to the incidents and events in question, and there is no evidence that any limitation on Gorman's cross-examination prevented him from eliciting the truth about the facts and events in issue").

[45] <u>See</u> <u>Marin</u>, 377 F. Supp. at 623 (multiple citations omitted).

lower federal courts have recognized that there are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons which may call for hearings in connection with the former but not the latter."[46]

Thus, contrary to the Defendants' argument, at all relevant times, it was clearly established that, given the seriousness of the alleged infraction, the possible consequences to Mr. Austin, and the degree of sanction or penalty sought to be imposed, the Fourteenth Amendment to the United States Constitution's guarantee of procedural and substantive due process, and the Oregon Revised Statutes, required the Defendants to provide Mr. Austin with the right to representation by counsel, testimony of witnesses under oath, depositions, issuance of subpoenas, cross-examination of witnesses, a fundamentally fair proceeding, and other due process protections.

> ### e.    Finally, Mr. Austin Has Stated Claims for Violations of his Substantive Due Process Rights

"[T]he due process clause includes a substantive component which guards against arbitrary and capricious government action."[47]   "The concept of 'substantive due process,' semantically awkward as it may be, forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'"[48]   Of course, "[t]o establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government deprivation of life, liberty, or property."[49]

---

[46] See Horowitz, 435 U.S. at 86; accord Gaspar v. Bruton, 513 F.2d 843 (10th Cir. 1975). In Horowitz, the Supreme Court held that, even assuming that a medical student a liberty or property interest, "respondent has been awarded at least as much due process as the Fourteenth Amendment requires."  See id. at 85-86; accord Ewing, 474 U.S. at 222.

[47] See Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398 (9th Cir 1989).

[48] See, e.g., Nunez v. City of Los Angeles, 147 F.3d 867 (9th Cir. 1998) (quoting United States v. Salerno, 481 U.S. 739, 746 (1987)).

[49] See id.

Here, as discussed in detail above, Mr. Austin has demonstrated a deprivation of liberty and property by individuals acting under color of state law.  Moreover, this Court should find that the conduct of each of the individual Defendants is conscience-shocking:

•    The University's President, Dr. Gottfredson, in effect imposed discipline upon Mr. Austin without due process by holding a press conference and making a public statement condemning Mr. Austin.  Despite the "insurmountable" barrier to prosecution, and the fact that the University had not even started the hearing process, Dr. Gottfredson pronounced, "The type of behavior in the police report released this week is utterly unacceptable and will not be tolerated," and further stated, "I know it's frustrating, and we would like to say more, but we are not going to violate the laws that are in place to protect students' privacy or the rights of our students – *especially* the survivor."  The statement included the conclusion that the accuser was a "survivor," a loaded statement about Mr. Austin's gender ("as a father, I was appalled at what I read"), and the statement that Mr. Austin would "not be playing basketball at Oregon again."

•    At a proximate point in time, Defendant Chicora Martin, the Assistant Dean of Students at the University, who had initially scheduled the "emergency" hearing to expel Mr. Austin and the other two basketball players, and then modified the suspension, again suspended Mr. Austin and the other two basketball players, and then singled Mr. Austin out.

•    The "administrative conference" conducted by Defendant Sandy Weintraub, the Director of Student Conduct & Community Standards at the University of Oregon, was nothing less than an unconstitutional "kangaroo court" scenario of the very worst order, in which Mr. Austin was not even provided with a basic opportunity to properly respond to all information provided, and to contact and call all relevant and necessary witnesses.  Mr. Weintraub ruled against Mr. Austin, suspending him from the University from four to ten years, long enough for

the removal to be the functional equivalent of an expulsion from the University, and refused to provide due process to Mr. Austin generally and in the manner described in detail above.

- Last, but not least, Defendant Robin Holmes, Vice President for Student Life at the University of Oregon, was charged with the responsibility of hearing an appeal. Dr. Holmes, however, refused to respond to Mr. Austin's request for an appeal and did not return multiple phone calls from Mr. Austin's counsel. This is, indeed, outrageous.

### 2.    Contrary to the Defendants' Second Argument, Mr. Austin Has Plausibly Alleged Violations of Title IX

Mr. Austin acknowledges that his Title IX claim can only be directed at the University. The Defendants, conceding that Mr. Austin's Title IX claim is otherwise legally sound,[50] instead attack that claim factually, insiting that it has not been plausibly pled. This argument fails.

In Mr. Austin's Title IX claim, he incorporates his previous allegations and then alleges:

> 72.    Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681, et seq.) provides, in relevant part, as follows: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

> 73.    The University receives federal funding through various means including, without limitation, student loans provided to University students directly by the federal government and through other funds furnished by the federal government, and as such is subject to the strictures of Title IX and its implementing regulations.

---

[50] Indeed, he only other "legal" challenge raised by the Defendants is the contention, set forth in a footnote, that Stanley v. Trustees of California State University, 433 F.3d 1129 (9th Cir 2006), which held that a state's personal injury statute of limitations applies to Title IX claims, was incorrectly decided, and this Court should apply a different, "shorter" Oregon statute. Not only is Stanley binding upon this Court, it is consistent with all authority before it. Indeed, as the Ninth Circuit pointed out in Stanley, "every circuit to consider the issue has held that Title IX … borrows the relevant state's statute of limitations for personal injury," and "[t]he close similarity between Title VI and Title IX also supports applying the statute of limitations for personal injury." See Stanley, 433 F.3d at 1134-36.

74.    To assist schools with implementing Title IX and its regulations, the Office of Civil Rights of the United States Department of Education has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirements of the regulations. The procedures adopted by a school must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved ... ."

75.    The University (by and through its agents and employees acting within the scope of their agency and employment, including the Defendants) deprived Mr. Austin, on the basis of his sex, of his Title IX rights to among other things due process and equal protection through the improper administration, and/or the existence, in its current state, of the University's policies and procedures.

76.    <u>First</u>, the University engaged in selective enforcement in violation of Title IX, and discriminated against Mr. Austin based on his sex and, as a result, Mr. Austin has been seriously and irreparably damaged.

77.    Regardless of his guilt or innocence (and, to be clear, Mr. Austin was and is innocent), the severity of the penalty (a suspension of between four and ten years), as well as the decision to initiate the proceeding in the first place, were affected by the fact that Mr. Austin is a male, and the accuser is a female.

78.    On April 14, 2014, the Lane County District Attorney determined that she would not be pressing charges against Mr. Austin or any of the basketball players "because the conflicting statements and actions by the victim make this case <u>unprovable as a criminal case</u>." (Emphasis added.)

79.    In or around early May 2014, presumably in response to the publication of the police report, the District Attorney's office issued a lengthy document outlining numerous weaknesses in the prosecution's case, as well as numerous inconsistencies in the accuser's statements, and concluding that those weaknesses presented "<u>an insurmountable barrier to prosecution</u>." (Emphasis added.)

80.    Dr. Gottfredson's pronouncement on behalf of the University at the outset of the disciplinary proceedings, however, included the conclusion that the female accuser was a "survivor," and the statement that "as a father, I was appalled at what I read."

81.    On information and belief, the University has never taken action against a female student for engaging in the type of conduct that Mr. Austin allegedly engaged in.

82.    On information and belief, the University has never taken action against a female student for making a false allegation of the kind involved in this matter.

83.    On information and belief, males invariably lose when charged with sexual misconduct at the University.

84.    Second, there was an erroneous outcome from a flawed proceeding, in violation of Title IX.

85.    The University discriminated against Mr. Austin by failing to comply with its own procedures and by failing to comply with the requirements of Title IX, in order to reach a pre-determined result, due to his sex, and gender stereotypes.

86.    The University created an environment in which Mr. Austin, an accused male student, was so fundamentally denied due process as to be virtually assured a finding of guilt.

87.    Such a biased and one-sided process deprived Mr. Austin, as a male student, of educational opportunities on the basis of sex.

88.    The University conducted its "investigation" and subsequent hearing in a manner that was biased against the accused, Mr. Austin, based on sex.

89.    From the outset, the investigation and hearing processes were slanted in favor of the female accuser, because of her sex.  The University's representatives, including its president, accepted her statements at face value despite the prosecutor's statements, and granted the female accuser the presumption of truth because she is female.

90.    Mr. Austin did not have an equal or fair opportunity to present relevant witnesses, to present evidence (as described above), and to present evidence about the accuser's motives to present false accusations.

91.    Those involved with the hearing process were improperly and/or insufficiently trained under Title IX.

92.    The University responded to the accuser's accusations with a series of arbitrary, capricious, discriminatory,

and gender-based actions directed toward a predetermined outcome: Mr. Austin's suspension from the University.

93.    <u>Third</u>, the University, in violation of Title IX, demonstrated a deliberate and systematic indifference to the rights of Mr. Austin, due to his sex.

94.    The University's actions, and inactions, were unreasonable in light of the known circumstances, including but in no way limited to the District Attorney's office declining to prosecute, and issuing a document outlining numerous weaknesses in the case, and concluding that those weaknesses presented "<u>an insurmountable barrier to prosecution</u>." (Emphasis added.)

95.    But for the obvious gender bias, the outcome of the University proceeding would have been different. …[51]

Under the federal pleading standard, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."[52]  We could not locate a Ninth Circuit opinion directly addressing the pleading standard in a Title IX claim, and neither could the Defendants.  We do note that, in <u>Emeldi v. University of Oregon</u>, Chief Judge Kozinski, dissenting from the denial of a petition for <u>en banc</u> rehearing, observed that the panel's opinion implied "that the Title VII pleading standard applies to Title IX cases."[53]

In <u>Doe v. Brown University</u>, the District Court pointed out that "cases attacking university disciplinary proceedings on the ground of gender bias … fall generally within two categories … 'erroneous outcome' and 'selective enforcement.'"[54]  In the first category, "erroneous outcome" cases, the plaintiff must first "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and must next

---

[51] <u>See</u> Exhibit A, ¶¶ 71-99 (underlining in original).  Mr. Austin's allegations regarding the damages flowing from the Title IX violation appear in ¶¶ 96-99.

[52] <u>See</u> Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

[53] <u>See</u> <u>Eleldi v. University of Oregon</u>, 698 F.3d 715, 720 (9th Cir. 2012) (Kozinski, C.J., dissenting) ("Even accepting that the Title VII pleading standard applies to Title IX cases … ."); <u>accord</u> <u>Garcia-Catalan v. U.S.</u>, 734 F.3d 100, 104 (1st Cir. 2012) (noting that the plausibility standard must be treated flexibly in situations where a plaintiff is alleging discrimination).

[54] <u>See</u> <u>Doe</u>, 2016 U.S. Dist. LEXIS 21027, at *15 (some internal quotation marks omitted) (quoting <u>Yusuf v. Vassar Coll.</u>, 35 F.3d 709, 715 (2d Cir. 1994)).

"allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."[55]  "Such allegations might include, <u>inter alia</u>, statements by members of the disciplinary tribunal, <u>statements by pertinent university officials</u>, or patterns of decision-making <u>that also tend to show the influence of gender</u>."[56]  Thus, in <u>Wells v. Xavier</u>, the District Court denied a motion to dismiss the plaintiff's Title IX claim, finding that his complaint "<u>recounts Defendants having rushed to judgment, having failed to train UCB members, having ignored the Prosecutor</u>, having denied Plaintiff counsel, <u>and having denied Plaintiff witnesses</u>.  These actions came against Plaintiff, he contends, because he was a male accused of sexual assault."[57]

Here, Mr. Austin has plainly alleged particular facts sufficient to cast articulable doubt upon the accuracy of the outcome of the disciplinary proceeding.  Most significantly, Mr. Austin's Second Amended Complaint alleges numerous facts making it very clear that the sexual activity that occurred was completely consensual.  He also alleges that he was prepared to call disinterested third-party witnesses who would have supported him.  Indeed, the District Attorney determined that she would not be pressing charges against Mr. Austin because the accuser's story made little sense, and the evidence did not warrant prosecution.[58]

Similarly, Mr. Austin has alleged particular circumstances suggesting that gender bias was a motivating factor.  He plausibly alleges that the University created an environment in which Mr. Austin, an accused male student, was so fundamentally denied due process as to be virtually assured a finding of guilt, and such a biased and one-sided process deprived Mr. Austin, as a male student, of educational opportunities on the basis of sex.  He plausibly alleges that the University conducted its "investigation" and subsequent hearing in a manner that was biased against the accused, Mr. Austin, based on sex.  Indeed, from the outset, the investigation and

---

[55] <u>See</u> <u>id.</u> (quoting <u>Yusuf</u>, 35 F.3d at 715).
[56] <u>See</u> <u>id.</u> (quoting <u>Yusuf</u>, 35 F.3d at 715) (emphasis added).
[57] <u>See</u> <u>Wells v. Xavier</u>, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014) (emphasis added).
[58] See Exhibit A, ¶¶ 37, 39.

hearing processes were slanted in favor of the female accuser, because of her sex.  Just as Mr. Austin plausibly pleads, all of the University's representatives, from Ms. Martin, who immediately suspended Mr. Austin, who had done nothing wrong, rather than the accuser, for making a false report; to Dr. Gottfredson, who held a press conference to condemn Mr. Austin notwithstanding the prosecutor's statements just the night before; to Mr. Weintraub, who presided over the hearing and refused to provide due process; to Dr. Holmes, who refused to hear the appeal, accepted the female accuser's statements at face value, and granted the female accuser the presumption of truth because she is female.  Evidencing that the University had prejudged Mr. Austin's guilt, and done so on the basis of Mr. Austin's sex/gender, no one less than the President of the University held a press conference which announced the gender-based, loaded view that the female accuser was a "survivor," made the gender-based, loaded statement that "as a father, I was appalled at what I read," and summarily concluded that Mr. Austin was guilty.  Mr. Austin plausibly alleges that, with regard to the hearing, he did not have an equal or fair opportunity to present relevant witnesses, and to present evidence, including evidence about the accuser's motives to present false accusations.   Mr. Austin plausibly pleads that those involved with the process were improperly and/or insufficiently trained under Title IX, and the University responded to the accusations with a series of arbitrary, capricious, discriminatory, and gender-based actions directed toward a predetermined outcome: his suspension.

In the second category, "selective enforcement" cases, the plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."[59]   Here, Mr. Austin plausibly alleges that, regardless of his guilt or innocence, the severity of the penalty, as well as the decision to initiate the proceeding in the first place, were affected by the fact that Mr. Austin is a

---

[59] See Doe, 2016 U.S. Dist. LEXIS 21027, at *17.

male, and the accuser is a female.  Besides being supported by Dr. Gottfredson's shocking pronouncement on behalf of the University, Mr. Austin alleges three things "on information and belief": "the University has never taken action against a female student for engaging in the type of conduct that Mr. Austin allegedly engaged in," "the University has never taken action against a female student for making a false allegation of the kind involved in this matter," and "males invariably lose when charged with sexual misconduct at the University."  The undersigned believes these facts to be true, but they cannot be confirmed without discovery solely in possession of the University.  Though the University takes issue with "on information and belief," the District Court in <u>Doe v. Brown</u> made clear that "[t]his manner of pleading is a permissible way to indicate a factual connection that a plaintiff reasonably believes is true but for which the plaintiff may need discovery to gather and confirm its evidentiary basis.'"[60]  Indeed, as one District Court analyzing an "erroneous outcome" claim recently explained:

> Plaintiffs' erroneous outcome allegations would be insufficient if they had simply stated something akin to: "Upon information and belief, procedural defects were motivated by gender bias."  However, in this case Plaintiffs have pleaded specific factual allegations.  … The fact that they are pleaded upon information and belief is of no moment because the alleged facts are peculiarly within the possession or control of SU Defendants.[61]

For the same reasons, Mr. Austin's allegations of "deliberate indifference" have been plausibly pled.  If this Court believes there is a pleading deficiency within this or any other portion of the Second Amended Complaint, it should provide an opportunity to amend.[62]

---

[60] <u>See Doe</u>, 2016 U.S. Dist. LEXIS 21027, at *27 (internal quotation marks omitted). <u>Doe v. Columbia University</u>, 101 F. Supp. 3d 356, 374 (S.D.N.Y. 2015), which Oregon heavily relies upon here, is believed to be on appeal to the Second Circuit.

[61] <u>Doe v. Salisbury University</u>, Docket No. JKB-15-517, 2015 U.S. Dist. LEXIS 110772, at *41 (D. Md. August 21, 2015); <u>see also Grajales v. P.R. Ports Auth.</u>, 682 F.3d 40, 49 (1st Cir. 2012) ("Smoking gun proof of discrimination is rarely available ... at the pleading stage … .").

[62] <u>See, e.g.</u>, <u>Doe v. United States</u>, 58 F.3d 494, 497 (9th Cir. 1995) (providing that, ordinarily, a District Court should provide leave to amend unless it "determines that the pleading could not possibly be cured by the allegation of other facts").

### 3.    This Court Should Reject the Defendants' Arguments About Preclusion

The Defendants next argue that the Plaintiff's suspension from the University was a final administrative order, and therefore the doctrine of issue preclusion prevents Mr. Austin from "re-litigating" his claims in this Court.  Self-evidently, every factor governing an issue preclusion analysis weighs against issue preclusion even possibly being applicable here.  First, the issues in this case (e.g., the issue of whether Mr. Austin's § 1983 rights were violated, whether the University violated Title IX, and whether the Defendants are liable under the state-law theories asserted in the Second Amended Complaint) have never been litigated.  Second, Mr. Austin has certainly never had a full and fair opportunity to be heard on the issues.  Third, the Defendants were not parties in the alleged prior proceeding.  Indeed, we have located absolutely no case, and the Defendants cite no case, in which the result of a hearing that lacks the requisite due process could possibly be given preclusive effect in a subsequent challenge to the process provided.

Of course, there is no such case: if a defendant could escape § 1983 liability for failure to provide due process by providing a hearing without due process, and then claiming the outcome precludes any challenge, there would be no such thing as a § 1983 claim for failure to provide due process.  Similarly, if a university could escape liability under Title IX by engaging in selective enforcement on the basis of gender, and conducting a flawed proceeding that leads to an erroneous outcome, and then claiming that the outcome precludes any challenge, there would be no such thing as a Title IX claim for selective enforcement, or an erroneous outcome from a flawed proceeding.  This Court should reject such circular logic on the part of the Defendants.

Similarly, this Court need not labor long on the Defendants' argument that Mr. Austin was required to take an appeal before bringing this case.  Tellingly, the Defendants cite no case providing that an appeal is required before a § 1983, Title IX, or even a state-law cause of action can be brought.  In fact, the Supreme Court long ago made clear that, because one of the

purposes underlying 42 U.S.C. § 1983 was "to provide a remedy in the federal courts supplementary to any remedy any State might have," a plaintiff is not required to exhaust any administrative remedies before pursuing a § 1983 claim.[63]    Similarly, the Supreme Court long ago made clear that exhaustion of administrative remedies is not required with regard to Title IX claims.[64]    Even if Mr. Austin were somehow required to exhaust administrative remedies with regard to his federal claims or his state-law claims (and of course he was not), Dr. Holmes, the individual tasked by the University with handling an appeal, refused to respond to Mr. Austin's request for an appeal and did not return multiple phone calls from Mr. Austin's counsel.[65] Moreover, as Mr. Austin plausibly alleges in his Second Amended Complaint, an appeal would have plainly been futile.[66]

### 4.    This Court Should Reject the Defendants' Arguments in Favor of Dismissing Mr. Austin's Tort Claims

In Counts Three, Four, and Five of Mr. Austin's Second Amended Complaint, he advances state-law claims for negligence, intentional infliction of emotional distress, and tortious interference with prospective economic relations.    In their Motion, the Defendants assert that they are entitled to immunity under O.R.S. 30.265(6)(c) and (f), and further challenge the legal sufficiency of each of those counts, as well Mr. Austin's prayer for damages.[67]

### a.    The Defendants Are Not Entitled to Immunity Under O.R.S. 30.265

O.R.S. 30.265(6)(c) provides that "[e]very public body and its officers, employees and agents acting within the scope of their employment or duties … are immune from liability for: …

---

[63] See Damico v. California, 389 U.S. 416, 417 (1967) (citations omitted).
[64] See Cannon v. University of Chicago, 441 U.S. 677, 687 n.8, 706 n.41 (1979); see also Morgan v. U.S. Postal Serv., 798 F.2d 1162, 1165 (8th Cir. 1986) (affirming that Title IX does not include an exhaustion-of-administrative-remedies requirement).
[65] See Exhibit A, ¶ 59.
[66] See Exhibit A, ¶ 62.
[67] The Defendants do not challenge the damages asserted in Mr. Austin's claims under 42 U.S.C. § 1983 and Title IX.

[a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."  According to the Oregon Supreme Court, it has "has struggled with the concept over the years."[68]  These facts do not present a close case and therefore this Court need not "struggle": the Defendants' only argument that they are immune from liability under O.R.S. 30.265(6)(c) is "because their decisions involved public policy and were made under the apparent authority of law."  The Defendants' argument is utterly at odds with the plain language of the 30.265(6)(c), which provides no immunity in the circumstances presented.  Certainly, the record as it stands at the motion-to-dismiss stage does not come close to supporting dismissal on discretionary immunity grounds.

The Defendants then argue that, because the University is a public body, and the individual Defendants were at all relevant times employees of the University acting within the course and scope of their employment, "[a]ny decision or action of Defendants made under the apparent authority of law was therefore immune from tort liability."  In so arguing, the Defendants ignore that O.R.S. 30.265(6)(f) in actuality provides immunity against "[a]ny claim arising out of an act done or omitted under apparent authority of a law, resolution, rule or regulation that is unconstitutional, invalid or inapplicable except to the extent that they would have been liable had the law, resolution, rule or regulation been constitutional, valid and applicable."  (Emphasis added.)  The Defendants fail to cite what "law, resolution, rule or regulation" they seek shelter under, and are indeed simply attempting to fit a square peg into a round hole.  Moreover, Mr. Austin plausibly alleges that the Defendants acted in bad faith or with malice, and Mr. Austin expressly pleads as much.[69]

---

[68] See Westfall v. State, 324 P.3d 440 (Ore. 2014).  Certainly, discretionary immunity does not apply to "routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action." Lowrimore v. Dimmitt, 797 P.2d 1027 (Ore. 1990).

[69] See Exhibit A, ¶ 115.

### b.    Mr. Austin has Stated Claims for Negligence, Intentional Infliction of Emotional Distress, and Tortious Interference

In Count Three, for negligence, Mr. Austin alleges that the Defendants "had a duty to Mr. Austin to conduct a campus investigation in a competent manner and in accordance with societal standards and norms governing such investigations, and to conduct a hearing in a competent manner and in accordance with societal standards and norms governing such hearings, and otherwise act in a reasonably prudent manner with regard to Mr. Austin," and failed to do so, leading to the damages set forth with specificity above.

In their Motion, the Defendants argue that Mr. Austin cannot recover damages for "purely economic loss" or emotional distress because there is no "special relationship" between a school and its students.   In arguing that the "economic loss" doctrine should apply, the Defendants ignore that numerous courts have held that student-athletes, as opposed to students generally, do have "special relationships" with the schools they attend.[70]  Mr. Austin's pleading contains ample facts supporting a "special relationship" between Oregon and a student-athlete who had been recruited to transfer to Oregon to play college basketball.

Finally, the Defendants briefly argue that what occurred was not a foreseeable risk.  But Mr. Austin alleges that, prior to the Defendants' actions, he was regarded as one of the top amateur basketball players in the country; on the team at Oregon; and widely projected to "be selected in the first round of the NBA Draft, which would more likely than not be accompanied by a multi-million dollar guaranteed contract and tens of millions of dollars in prospective economic advantage," and further alleges that at all relevant times "the Defendants were aware of the foregoing facts.[71]  It should have been foreseeable to the Defendants that their careless

---

[70] See generally Kavanagh v. Trs. of Boston University, 795 N.E.2d 1170 (Mass. 2003).
[71] See Exhibit A, ¶¶ 67-68.

conduct with regard to Mr. Austin would stigmatize him and cause the harm claimed.   As discussed above, Mr. Austin did not waive this claim when counsel agreed to the conference.

In Count Four, for intentional infliction of emotional distress, Mr. Austin alleges that the Defendants' conduct "constituted an extraordinary transgression of the bounds of socially tolerable conduct," and "were in bad faith, and/or taken with malice."

For the reasons set forth above, there was a special relationship between Mr. Austin and the Defendants.   Moreover, Mr. Austin alleges outrageous conduct: the University, through its agents and employees, railroaded Mr. Austin on the basis of sex/gender.   Mr. Austin was prejudged despite the prosecutor's statements.   No one less than the University's President, acting with the course and scope of his employment, held a press conference to publicly condem Mr. Austin, characterizing the accuser a "victim" when in fact that was untrue, and stating that he was "appalled."   The University's agents and employees refused to provide Mr. Austin with anything close to fair process or a fair hearing (from refusing to modify Mr. Austin's suspension because he had asserted his <u>Miranda</u> rights, to the hearing that lacked virtually any of the required procedural safeguards), concluded that he had engaged in a sexual assault when he had in fact done no such thing, and refused to even consider an appeal, stamping him with a "badge of infamy" that has followed him.   This transgresses all bounds of socially tolerable conduct.

In Count Five, Mr. Austin alleges that the Defendants "intentionally, recklessly, and tortiously interfered with Mr. Austin's prospective relationship with NBA teams" through the conduct described above, causing Mr. Austin to sustain significant damages.

The University first argues that Mr. Austin cannot show a relationship with another party that would have "very likely resulted in a pecuniary benefit … but for the defendant's interference."   In reality, Mr. Austin alleges objectively verifiable monetary losses: he "was widely projected by experts in basketball and the NBA Draft to be selected in the first round of

the NBA Draft, which would more likely than not be accompanied by a multi-million dollar guaranteed contract and tens of millions of dollars in prospective economic advantage."[72]   Mr. Austin further alleges that, as a direct and proximate result of the Defendants' conduct, Mr. Austin no longer plays at a Division I school [and] has diminished chances of playing in the NBA … ."   Mr. Austin was not required to have "a business relationship with any NBA team at the time of his alleged injury."   Surely, the University is not suggesting that its players must have business relationships with NBA teams!   Mr. Austin also plausibly alleges that the University and other Defendants acted with an improper purpose or used improper means.   For the same reasons, Mr. Austin has plausibly alleged damages with regard to all of his tort claims.

Moreover, this Court should reject the Defendants' "thrown-in" argument that Mr. Austin is precluded from bringing a tortious interference claim because it was not mentioned in the notice.   As the Defendants concede, the notice was not required to specifically specify "the precise legal claim (e.g. tortious interference) that the plaintiff intends to assert."   As for the damages associated with the tortious intereference claim, plainly the notice, which stated that Mr. Austin "has been damaged by these actions," made the University aware that damages claims were being asserted.   No law says that more was required.   The University also makes no showing as to what evidence it would have "collected" if the NBA had been mentioned.

### 5.    This Court Should Reject the Defendants' Arguments in Favor of Dismissing Mr. Austin's Breach of Contract Claim

The University concludes by lodging two challenges to Mr. Austin's breach of contract claim against it, which, and as a result of the Defendants' breach suffered direct and consequential damages.

---

[72] See Exhibit A, ¶¶ 67-68 (emphasis added).   To be clear about this language, it is beyond dispute that the applicable CBA (http://www.nba.com/media/CBA101.pdf) guarantees a multi-million dollar salary for any individual drafted in the first round of the NBA Draft, and a player drafted in the first round would very likely receive "tens of millions of dollars in prospective economic advantage."

The University concedes the scholarship agreement is a contract, but first argues that nothing within the scholarship agreement guarantees renewal.  Mr. Austin, however, plausibly alleges that the University induced him to transfer from Providence (which had pleaded with Mr. Austin to stay) with the scholarship, and Mr. Austin had the objectively reasonable expectation, based upon the express terms of the scholarship, that the University of Oregon would renew his scholarship, and not act so as to deprive him of the fruits of the scholarship, and otherwise act in good faith vis-à-vis his scholarship.  This Mr. Austin has more than plausibly pled, and this the University failed to do.

The University further argues that Mr. Austin would only be entitled to expectation damages.  Even if this is true, which it is not, that provides no reason for dismissing the claim.  Moreover, in so arguing, the University ignores that Mr. Austin has pled an entitlement to consequential damages.  As the University concedes, such damages are recoverable if they are foreseeable.  Mr. Austin plainly alleges that the University and its agents and employees were fully aware of his NBA prospects and yet chose to act in the manner in which he did, making the damages foreseeable.  And, again, those damages are not speculative.  Prior to transferring to Oregon and the Defendants' wrongful conduct, Mr. Austin was "widely projected by experts in basketball and the NBA Draft" to be drafted in the first round and receive guaranteed millions, and very likely receive endorsements worth much more.  Mr. Austin alleges that, as a result of the breach, this has not occurred.

## **CONCLUSION**

For the foregoing reasons, this Court should deny the Motion.

Dated: <u>Tuesday, March 8, 2016</u>               Respectfully submitted,

                                          LAW OFFICES OF MARIANNE DUGAN

                              By:    <u>/s/ Marianne Dugan</u>
                                     Marianne Dugan
                                     259 East 5th Avenue, Suite 200-D
                                     Eugene, OR 97401
                                     Telephone: 541-338-7072
                                     Facsimile: 866-650-5213
                                     E-Mail: mdugan@mdugan.com

                                     – *and* –

                                     Alan C. Milstein (<u>Pro</u> <u>Hac</u> <u>Vice</u>)
                                     SHERMAN, SILVERSTEIN, KOHL,
                                     ROSE & PODOLSKY, P.A.
                                     308 Harper Drive, Suite 200
                                     Moorestown, NJ 08057
                                     Telephone: 856-662-0700
                                     Facsimile: 856-488-4744
                                     E-Mail: amilstein@shermansilverstein.com

                                     *Attorneys for Plaintiff Brandon Austin*

<u>**CERTIFICATE OF SERVICE**</u>

I, Marianne Dugan, hereby certify that, on the date set forth below, I served a copy of the foregoing memorandum upon the following counsel of record via this Court's mandatory Electronic Case Filing system:

Michelle Barton Smigel, P.C. (OSB No. 045530)
Michael Porter, P.C. (OSB No. 003560)
MILLER NASH GRAHAM & DUNN LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204

*Attorneys for the Defendants*

Dated: <u>Tuesday, March 8, 2016</u>          Respectfully submitted,

LAW OFFICES OF MARIANNE DUGAN

By:    /s/ Marianne Dugan
       Marianne Dugan
       259 East 5th Avenue, Suite 200-D
       Eugene, OR 97401
       Telephone: 541-338-7072
       Facsimile: 866-650-5213
       E-Mail: mdugan@mdugan.com

       *– and –*

       Alan C. Milstein (<u>Pro</u> <u>Hac</u> <u>Vice</u>)
       SHERMAN, SILVERSTEIN, KOHL,
       ROSE & PODOLSKY, P.A.
       308 Harper Drive, Suite 200
       Moorestown, NJ 08057
       Telephone: 856-662-0700
       Facsimile: 856-488-4744
       E-Mail: amilstein@shermansilverstein.com

       *Attorneys for Plaintiff Brandon Austin*