Alex Spiro, Esq.
Brafman & Associates, P.C.
767 Third Avenue, 26th Fl
New York, NY 10017
Phone: (212)-750-7800
Fax: (212)-750-3906

Brian Michaels, Attorney at Law, OSB
No. 925607
259 East Fifth Ave.
Eugene, OR  97401
Phone: (541)-687-0578
Fax: (541)-686-2137

Attorneys for Plaintiffs


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION


| | | |
|---|---|---|
| DOMINIC ARTIS and DAMYEAN DOTSON, | ) | Case No. 16-CV-647 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | PLAINTIFFS' MEMORANDUM IN |
| v. | ) | OPPOSITION TO THE DEFENDANTS' |
| | ) | MOTION TO DISMISS |
| UNIVERSITY OF OREGON; SANDY WEINTRAUB; CHICORA MARTIN; | ) | |
| ROBIN HOLMES; and MICHAEL R. GOTTFREDSON, | ) | DEMAND FOR JURY TRIAL |
| all in their individual capacities only, | ) | |
| | ) | |
| | ) | |
| Defendants . | ) | |
| | ) | |

EXHIIBIT A - PAGE 1

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Statement of the Facts ........................................................................................................ 3

Legal Argument ................................................................................................................ 10

    1.    Contrary to the Defendants' First Argument, Mr. Artis and Mr.
Dotson Have Stated a Claim for the Individual Defendants'
Violations of 42 U.S.C. § 1983 ............................................................... 10

        a.    The Property and Liberty Interests Claimed by Mr. Artis and Mr.
Dotson are Well-Recognized ................................................................ 11

        b.    The Property Interest in Plaintiffs' Scholarships, and All Financial Benefits,
Claimed by Mr. Artis and Mr. Dotson are Well Recognized ................................ 14

        c.    Plaintiff's Property Interest in His Residency ....................................... 14

        d.    The Process Which Is Due .................................................................... 15

        e.    The Individual Defendants are Not Entitled to Qualified Immunity .................... 17

        f.    Mr. Artis and Mr. Dotson Did Not Waive Their Rights to Due
Process ................................................................................................... 18

        g.    Mr. Artis and Mr. Dotson were Entitled to Far More than a
Nominal "Notice and Opportunity to Be Heard" .................................. 19

        h.    Finally, Mr. Artis and Mr. Dotson Have Stated Claims for
Violations of their Substantive Due Process Rights ............................. 21

            i.    Procedural Fairness ................................................................ 22

    2.    Contrary to the Defendants' Second Argument, Mr. Artis and Mr.
Dotson Have Plausibly Alleged Violations of Title IX ......................... 24

    3.    This Court Should Reject the Defendants' Arguments About
Preclusion ............................................................................................... 31

    4.    This Court Should Reject the Defendants' Arguments in Favor of
Dismissing Mr. Artis' and Mr. Dotson's Tort Claims .......................... 33

        a.    The Defendants Are Not Entitled to Immunity Under
O.R.S. 30.265 ....................................................................................... 33

        b.    Mr. Artis and Mr. Dotson have Stated Claims for
Negligence, Intentional Infliction of Emotional Distress,
and Tortious Interference ...................................................................... 34

5.    This Court Should Reject the Defendants' Arguments in Favor of
       Dismissing Mr. Artis' and Mr. Dotson's Breach of Contract Claim ..................... 37

Conclusion ........................................................................................................................... 39

## TABLE OF AUTHORITIES

### FEDERAL CASES

Black Coalition v. Portland School District No. 1, 484 F.2d 1040 (9th Cir. 1973)......................12

Blanton v. State University of New York, 489 F.2d 377 (2d Cir. 1973).............................. *passim*

Board of Curators of University of Missouri v. Horowitz, 435 U.S. 78 (1978).....................14, 20

Board of Regents v. Roth, 408 U.S. 564 (1972).....................................................................12, 14

Brown v. Fortner, 518 F.3d 552 (8th Cir. 2008).............................................................................17

Cannon v. University of Chicago, 441 U.S. 677 ..........................................................................33

Cloud v. Trustees of Boston University, 720 F.2d 721 ..........................................................21, 23

Cohen v. San Bernardino Valley Coll., 92 F.3d 968 (9th Cir. 1996) ...........................................17

Damico v. California, 389 U.S. 416 (1967)....................................................................................33

Davies v. Grossmont Union High Sch. Dist., 930 F.2d 1390 (9th Cir. 1991) ........................18, 19

Doe v. Brown University, Docket No. 15-144 S, 2016 U.S. Dist. LEXIS 21027
(D.R.I. February 22, 2016) ..................................................................................... *passim*

Doe v. Columbia University, 101 F. Supp. 3d 356 (S.D.N.Y. 2015) ...........................................31

Doe v. Salisbury University, Docket No. JKB-15-517, 2015 U.S. Dist. LEXIS
110772 (D. Md. August 21, 2015)...................................................................................31

Doe v. United States, 58 F.3d 494 (9th Cir. 1995) .......................................................................31

Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961), cert.
denied, 368   U.S. 930 (1961) ................................................................................. *passim*

Emeldi v. University of Oregon, 673 F.3d 1218 (9th Cir. 2012)............................................27, 28

Gaspar v. Bruton, 513 F.2d 843 (10th Cir. 1975)........................................................................20

Gorman v. University of Rhode Island, 837 F.2d 7 (1st Cir. 1988) .......................................19, 20

Goss v. Lopez, 419 U.S. 565 (1975)................................................................................ *passim*

Grajales v. P.R. Ports Auth., 682 F.3d 40 (1st Cir. 2012) ...........................................................31

Hall v. University of Minnesota, 530 F. Supp. 104 (D. Minn. 1982)................................... *passim*

Harlow v. Fitzgerald, 457 U.S. 800 (1982)...................................................................................17

Hart v. Ferris State College, 557 F. Supp. 1379 (W.D. Mich. 1983) ...........................................14

Hope v. Pelzer, 536 U.S. 730 (2002) ...........................................................................................18

In re Cincinnati Radiation Litigation, 874 F. Supp. 796 (D. Ohio 1995) .....................................17

Lawrence v. City of St. Paul, 740 F. Supp. 2d 1026 (D. Minn. 2010) ..........................................17

Lewin v. Medical College, 910 F. Supp. 1161 (E.D. Va. 1996)....................................................13

Marin v. University of Puerto Rico, 377 F. Supp. 613 (D.P.R. 1974)................................. passim

Matthews v. Eldridge, 424 U.S. 319 (1976) ................................................................................19

Morgan v. U.S. Postal Serv., 798 F.2d 1162 (8th Cir. 1986).......................................................33

NCAA v. Tarkanian, 488 U.S. 179 (1988) ...................................................................................16

Nunez v. City of Los Angeles, 147 F.3d 867 (9th Cir. 1998).......................................................21

Orneglas-Morales v. United States, Docket No. 3:15-cv-02304-SI, 2015
U.S. Dist.LEXIS 168575 (D. Ore. December 17, 2015) ...............................................................4

Regents of University of Michigan v. Ewing, 474 U.S. 214 (1985)......................................14, 20

Rendell-Baker v. Kohn, 457 U.S. 830 (1982)...............................................................................23

Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398 (9th Cir 1989) ....................21

Stanley v. Trustees of California State University, 433 F.3d 1129 (9th Cir 2006) .......................25

Stretten v. Wadesworth Veterans Hospital, 537 F2d 361 (9th Cir 1976) .....................................14

Tigrett v. Rector and Visitors of University of Virginia, 290 F.3d 620 (4th Cir. 2002)...............14

United States v. Salerno, 481 U.S. 739 (1987) ............................................................................21

Wells v. Xavier, 7 F. Supp. 3d 746 (S.D. Ohio 2014) .................................................................29

West v. Atkins, 487 U.S. 42 (1988)..............................................................................................12

Wilson v. Hewlett-Packard Co., 668 F.3d 1136 (9th Cir. 2012) ...................................................3

Winnick v. Manning, 460 F.2d 545, 550 (2d Cir. 1972) ........................................................19, 20

Wisconsin v. Constantineau, 400 U.S. 433 (1972).......................................................................12

Yusuf v. Vassar College, 35 F.3d 709 (2d Cir. 1994) ..................................................................28

**STATE CASES**

Kavanagh v. Trs. of Boston University, 795 N.E.2d 1170 (Mass. 2003) ......................................35

Lowrimore v. Dimmitt, 797 P.2d 1027 (Ore. 1990) ......................................................................34

Schaer v. Brandeis University, 432 Mass. 474 (2000) ............................................................21, 23

Westfall v. State, 324 P.3d 440 (Ore. 2014) ................................................................................34

**FEDERAL STATUTES**

20 U.S.C. § 1681, et seq. ....................................................................................................... *passim*

42 U.S.C. § 1983 .................................................................................................................... *passim*

**STATE STATUTES**

30.265(6)(c) ...........................................................................................................................33, 34

30.265(6)(f) ................................................................................................................................34

## **INTRODUCTION**

Plaintiffs Dominic Artis and Damyean Dotson, by and through their counsel, Alex Spiro of Brafman & Associates, P.C. *(pro hac vice* petition forthcoming), and local counsel Brian Michaels respectfully submit this memorandum of law in opposition to the "Motion to Dismiss" ("Motion") filed on behalf of Defendants University of Oregon (when abbreviated, "University" or "Oregon"), Sandy Weintraub, Chicora Martin, Robin Holmes, and Michael R. Gottfredson (collectively, "Defendants"). Plaintiffs join the response of Brandon Austin, and are authorized to state that Brandon Austin joins this Response.

Dominic Artis went to Salesian High School in Richmond CA until 11th grade. His basketball team won a state championship his freshman year (2009) and went to the state championship his junior year. His junior year (2011) he also won Division IV Player of the Year in California. For his senior year, he went to Findlay Prep High School in Henderson, Nevada. Again, they won the national championship that year (2012). For the Nationally televised Hoop Hall Classic he received 'player of the game.' And for the nationally televised game against Bishop Gorman he received 'most inspirational.' He was also ranked 62nd on the ESPN 100 (#5 in state) coming out of high school and he was ranked the #8 point guard in the country and #1 in California as well. Mr. Artis was #32 in some mock drafts as a freshman in college. He was also invited to, and attended, the prestigious Darron Williams Nike Skills camp his senior year of high-school, and the notable Kyrie Irving Skills camp his freshman year of college which was composed of the top 20 point guards in college at the time.

Damyean Dotson went to Jack Yates High School, a top basketball school in Texas. As a junior, he was recognized as the District 21 Newcomer of the Year and an All-District performer. In his senior season, he was captain of the team averaging 21 points and 5 rebounds per game which led to him being one of the top ranked players in Houston and leading his team to two state

finals.   The Houston Chronicle named him 2012 Greater Houston Player of the Year and he was selected All-District 21, All-Region 3 and 4A All-State after his impressive senior year. Mr. Dotson was slated for a Shooting Guard position, having been recruited at Oregon, Colorado, George Town, Texas Tech, Dayton, Arkansas, Texas Southern, Texas A&M.   In his freshmen season at Oregon he was named to the 2013 Kyle Macy Freshman All-American Team, All-Tournament team and Pac-12 Freshman team and was invited to the Kevin Durant and Lebron James basketball camp and well as a finalist on the Team USA U19 Squad. How the actions on the part of the Defendants not occurred, he would currently be an NBA player making millions of dollars per year.

At all relevant times, Mr. Artis and Mr. Dotson had a recognized property interest in (among other things) their status as admitted, matriculated University students in good standing; their interest in pursuing public higher education and intercollegiate athletic participation; and the economic benefit to them in the form of their existing scholarship and all aid related thereto[1], future scholarships at another Division I school, or a future contract with an NBA or other professional team. Mr. Artis and Mr. Dotson also had a recognized liberty interest in (among other things) being in good standing at the University, and being free from the stigma associated with being suspended for disciplinary reasons.

In 2014, Mr. Artis and Mr. Dotson engaged in consensual "group" sexual activity with a female student and other basketball players. Subsequently, this student falsely claimed that she had been sexually assaulted. The District Attorney determined that the office would not be pressing charges against Mr. Artis and Mr. Dotson or any of the basketball players "because the conflicting statements and actions by the victim make this case unprovable as a criminal case," and presented "an insurmountable barrier to prosecution." The Defendants, however, on the basis of Mr. Artis'

---

[1] This includes housing and dining, which are independently actionable interests.

and Mr. Dotson's sex/gender, railroaded Mr. Artis and Mr. Dotson, changing the course of their lives. So prejudged were Mr. Artis and Mr. Dotson on the basis of their sex/gender that, before the hearing process even started, no one less than the President of the University, emphasizing to the entire University community that he is also a "father," held a press conference to condemn Mr. Artis and Mr. Dotson and side with the "survivor."

Mr. Artis and Mr. Dotson advance claims under 42 U.S.C. § 1983, claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"), and state-law claims for negligence, intentional infliction of emotional distress, tortious interference with prospective economic relations, and breach of contract.[2] The Defendants principally attack Mr. Artis' and Mr. Dotson's § 1983 claim on the ground that Mr. Artis and Mr. Dotson have not pled a recognized property or liberty interest.  In reality, since 1961, federal courts have continuously held or assumed that a property and a liberty interest exists in the circumstances presented here, and federal courts have consistently required students facing a long-term suspension to be provided with far more than a nominal "opportunity to be heard." Moreover, Mr. Artis' and Mr. Dotson's Title IX claim has been plausibly pled, as demonstrated by Doe v. Brown University, and the cases cited therein, which significantly undercut the Defendants' arguments.[3] The Defendants' remaining arguments fail as well.

## STATEMENT OF THE FACTS

"In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most

---

[2] See generally Complaint, a true and correct copy of which is attached to this memorandum as Exhibit "A."
[3] See generally Doe v. Brown University, Docket No. 15-144 S, 2016 U.S. Dist. LEXIS 21027 (D.R.I. February 22, 2016). Doe v. Brown University was issued on the same day that the Defendants filed their Motion.

3

favorable to the non-moving party."[4] Notwithstanding this bedrock principle, the Defendants transparently attempt to downplay the compelling facts of this matter, and replace those facts with a narrative that clearly does not represent the facts of this matter viewed in the light most favorable to Mr. Artis and Mr. Dotson.   The actual facts are as follows.

## I.

As two of the top hundred or so high school basketball prospects in the nation, Mr. Artis and Mr. Dotson received offers to play basketball at multiple universities, and ultimately chose to attend Oregon. Mr. Artis and Mr. Dotson matriculated at Oregon and became a member of the Oregon Ducks men's college basketball team ("Ducks"), which competes at the NCAA Division I level and is a member of the Pacific-12 Conference. In order to induce plaintiffs to attend Oregon, Oregon provided Mr. Artis and Mr. Dotson with athletic scholarships. The athletic scholarships contained both express terms and, Mr. Artis and Mr. Dotson allege, an implied covenant of good faith and fair dealing. Mr. Artis and Mr. Dotson had the objectively reasonable expectations, based upon the express terms of the contractual relationship governing the athletic scholarship, that the University of Oregon would renew their scholarship, and not act so as to deprive Mr. Artis and Mr. Dotson of the fruits of the scholarship, and otherwise act in good faith vis-à-vis their scholarship.

## II.

Mr. Artis and Mr. Dotson attended an off-campus party on or around March 8, 2014. After about an hour and a half, a female student approached members of the basketball team, including plaintiffs, and a separate related plaintiff, Brandon Austin, and began dancing for and flirting with them. Subsequently, the female student went into a bathroom with plaintiffs and Mr. Austin and initiated consensual sexual activity. The individuals then left the bathroom together. Numerous individuals at the party witnessed the female student interacting with the basketball players both

---

[4] See, e.g., Orneglas-Morales v. United States, Docket No. 3:15-cv-02304-SI, 2015 U.S. Dist. LEXIS 168575, at *2 (D. Ore. December 17, 2015) (citing Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1140 (9th Cir. 2012)) (additional citation omitted).

EXHIIBIT A - PAGE 10

before and after the sexual activity in the bathroom, and would have testified under oath that the female student gave absolutely no indication that she was sexually assaulted, or even upset, and insisted on remaining with the basketball players even after they left the bathroom.

Later in the evening, the female student chose to return to the apartment of one of the basketball players, along with all three basketball players. The female student was laughing and joking. The female student chose to stay overnight at the apartment, and had sexual intercourse with one of the other players after waking up in the morning. Thereafter, the player sent the female student home in a cab, and she sent a text message stating "thanks for getting me home." At no point did the female student appear to be intoxicated. At no point did the female student say "no" about any sexual activity. The female student expressed verbal consent and/or gave unmistakable physical indications of her desire to participate in sexual contact with the young men at the times they were engaged in sexual conduct.

**III.**

Within a day or two, however, the female student began making false, scandalous, and malicious accusations about all three basketball players, including the utterly false accusation that the players dragged her into the bathroom and assaulted her; the utterly false accusation that the players wrestled her into a car, forced her to get drunk, and drove her to the apartment; and the utterly false accusation that she was raped at the apartment. Thereafter, the accuser made numerous inconsistent statements to the Eugene Police Department regarding her sobriety, the events and conversations leading up to the sexual conduct, and the actual actions, words, and behavior of those involved during sexual contact.

On April 14, 2014, the Lane County District Attorney determined that she would not be pressing charges against Mr. Artis and Mr. Dotson "because the conflicting statements and actions by the victim make this case unprovable as a criminal case." In or around late April, however, the

Oregonian published the police report that the female student had made. The next evening, presumably in response to the publication of the police report, the District Attorney's office issued a document outlining numerous weaknesses in the case, and concluding that those weaknesses presented "an insurmountable barrier to prosecution."

At a proximate point in time, Defendant Michael R. Gottfredson, who served as the President of the University at all relevant times, in effect imposed discipline upon Mr. Artis and Mr. Dotson without due process by making a public statement condemning the basketball players, even though the District Attorney had declined to prosecute, and the University had not started, much less concluded, the hearing process. Despite the fact that the District Attorney had cast significant doubt on whether the accuser was telling the truth, Dr. Gottfredson stated, "The type of behavior in the police report released this week is utterly unacceptable and will not be tolerated," and further stated, "I know it's frustrating, and we would like to say more, but we are not going to violate the laws that are in place to protect students' privacy or the rights of our students – *especially* the survivor." (The italics are found in the original University transcript.)   Evidencing that the University had prejudged Mr. Artis' and Mr. Dotson's guilt, and done so on the basis of plaintiffs' sex/gender, Dr. Gottfredson's statement included the statement that the female accuser was a "survivor,"  and the statement that "as a father, I was appalled at what I read,"[5] and the statement that the players would "not be playing basketball at Oregon again." This public statement preordained and dictated the outcome of any 'due process' hearing, thereby immediately sealing their fate without a stitch of investigation. Around this time, Ms. Martin again suspended Mr. Artis and Mr. Dotson, and refused to modify their suspension. Around this time, a student told a University investigator that she personally interacted with the female student throughout the evening in question, she was not at all intoxicated, and she insisted on going home with the basketball players.

---

[5]  The Los Angeles Times used this language about being "appalled" as a "father" as a "pull quote" in large, bold type. See http://www.latimes.com/nation/nationnow/la-na-nn-oregonbasketball-sexual-assault-20140509-story.html (last visted March 6, 2016).

EXHIIBIT A - PAGE 12

Rather than allow the school's insufficient process, and the laws required process to take its course, the university prejudged and prejudiced our clients.

What voluntariness could be said to exist against the backdrop of Dr. Gottfredson's pre-investigation public proclamation that the players would "not be playing basketball at Oregon again." This public statement preordained and dictated the outcome of any 'due process' hearing, thereby immediately sealing their fate without a stitch of investigation.   All voluntariness of choice was quashed at the very outset of this University's proceedings.

Mr. Artis and Mr. Dotson both allege that, at all relevant times, they had a recognized property interest in (among other things) their status as admitted, matriculated University students in good standing; their interest in pursuing public higher education and intercollegiate athletic participation; and the economic benefit to them in the form of their existing scholarship and all aid related thereto, future scholarships at another Division I school, or a future contract with an NBA or other professional team. Mr. Artis and Mr. Dotson further allege that, at all relevant times, they also had a recognized liberty interest in (among other things) being in good standing at the University, and being free from the stigma associated with being suspended for disciplinary reasons. Mr. Artis and Mr. Dotson further allege that, at all relevant times, it was clearly established that, given the seriousness of the alleged infraction, the possible consequences to Mr. Artis and Mr. Dotson, and the degree of sanction or penalty sought to be imposed, the Fourteenth Amendment to the United States Constitution's guarantee of procedural and substantive due process, Title IX itself, and the Oregon Revised Statutes, required the Defendants to provide Mr. Artis and Mr. Dotson with (among other things) the right to representation by counsel, testimony of witnesses under oath, depositions, issuance of subpoenas, cross-examination, a fundamentally fair proceeding.

Mr. Artis' and Mr. Dotson's counsel, however, was presented with two unacceptable

choices: (1) a "panel hearing" at which the University would not provide most or all of the foregoing due process protections, except for representation by counsel; or (2) an "administrative conference" at which the University would not provide most or all of the foregoing due process protections, except for representation by counsel. After the "panel hearing" was scheduled, plaintiffs' counsel requested a "contested case hearing" which complies with the due process requirements set forth in ORS 351.088, and ORS 183.413-.497 and 183.502, including representation by counsel (ORS 183.417(1)), testimony under oath (ORS 183.417(7)), depositions (ORS 183.425), issuance of subpoenas (ORS 183.440), and cross-examination (ORS 183.450(3)).

Among other things, plaintiffs' counsel further made clear that, in order to present a defense, the plaintiffs would need to subpoena the numerous witnesses who would testify that the female student gave absolutely no indication that she was sexually assaulted, or even upset, and insisted on remaining with the basketball players even after they left the bathroom, and two individuals with whom the female student had chosen to have sex after just meeting them.

The University and its representatives, however, failed to even directly respond to the request of Mr. Artis' and Mr. Dotson's counsel for a contested case hearing. Based upon the foregoing, it was clear to Mr. Artis' and Mr. Dotson's counsel that the University and its representatives were not going to grant that request. Ultimately, as the University was only providing two options, neither of which provided the requisite due process, and the University was requiring Mr. Artis and Mr. Dotson to choose between one of the two options plaintiffs' counsel accepted the "administrative conference" option. Mr. Artis' and Mr. Dotson's counsel was not asked to sign, and did not sign, a waiver of Mr. Artis' and Mr. Dotson's due process rights, and would never have signed such a waiver; moreover, Mr. Artis' and Mr. Dotson's counsel never waived plaintiffs' due process rights by choosing the "administrative conference" option over the "panel hearing" option, neither of which provided the due process protections that plaintiffs'

counsel had expressly requested.

The "administrative conference" was ultimately scheduled for May 30, 2014. It turned out to be nothing less than an unconstitutional "kangaroo" proceeding of the very worst order, in which Mr. Artis and Mr. Dotson were deprived of the foregoing rights, and not even provided with a basic opportunity to properly respond to all information provided, and to contact and call all relevant and necessary witnesses. Defendant Sandy Weintraub, who is, and was at all relevant times, the Director of Student Conduct & Community Standards at the University of Oregon, ruled against Mr. Artis and Mr. Dotson, suspending them from the University from four to ten years, long enough for the removal to be the functional equivalent of an expulsion from the University, and refused to provide due process to Mr. Artis and Mr. Dotson, in all manner described in detail above.

Defendant Robin Holmes, Vice President for Student Life at the University of Oregon, was charged with the responsibility of hearing an appeal. Dr. Holmes, however, refused to respond to plaintiffs' request for an appeal and did not return multiple phone calls from plaintiffs' counsel, in violation of Mr. Artis' and Mr. Dotson's right to procedural and substantive due process.

Additionally, Defendants' actions before, during, and after the hearing process were motivated in whole or in large part by the fact plaintiffs are male and the accuser is a female. Just listening to the President's derisive remarks about the horrors of 'group sex,' it is clear that a female who consents is not equally horrible. Indeed, his remarks could easily be interpreted to mean a female would never consent to such a thing, therefore it has to be without her consent, sexual preferences notwithstanding. Based upon Mr. Artis' and Mr. Dotson's sex/gender, the University deprived plaintiffs of basic due process rights, equal protection rights, and other rights guaranteed by Title IX, and its implementing regulations, and by the University's own stated policies and procedures. In or around January 2015, the female student filed a lawsuit against

Oregon, alleging that her own Title IX rights had been violated due to Oregon's alleged "deliberate indifference" to the safety of its students. Oregon's counsel contacted plaintiffs' counsel, stated that had she been consulted things might have been handled differently, and asked for Mr. Artis' and Mr. Dotson's help in defending the suit.

The University claims in its Motion that Mr. Artis' and Mr. Dotson's assertions about their basketball career are merely speculative. Not only is this a question for the jury, but, in plaintiffs' Complaint, they plainly allege that, prior to the Defendants' actions, Mr. Artis also ranked 62nd on the ESPN 100 (#5 in state) coming out of high school and he was ranked the #8 point guard in the country and #1 in California. The Houston Chronicle named Mr. Dotson 2012 Greater Houston Player of the Year and he was selected All-District 21, All-Region 3 and 4A All-State after his impressive senior year; In Mr. Dotson's freshmen season at Oregon he was named to the 2013 Kyle Macy Freshman All-American Team, All-Tournament team and Pac-12 Freshman team. Mr. Artis and Mr. Dotson further allege that, as a direct and proximate result of the Defendants' conduct, Mr. Artis and Mr. Dotson no longer play at a Division I school, have diminished chances of playing in the NBA, have been made to suffer the opprobrium associated with an suspension from a university, and the opprobrium associated with committing a sexual assault (when in fact they committed no sexual assault), and have as a result suffered personal and professional harm, including emotional distress, in the past, and will do so in the future.

## **LEGAL ARGUMENT**

**1.    Contrary to the Defendants' First Argument, Mr. Artis and Mr. Dotson Have Stated a Claim for the Individual Defendants' Violations of 42 U.S.C. § 1983**

In Count Two, Mr. Artis and Mr. Dotson seek to hold the individual defendants liable under § 1983.  Among other things, Mr. Artis and Mr. Dotson allege that, at all relevant times, they had a recognized property interest in (among other things) their status as an admitted,

matriculated University student in good standing; their interest in pursuing public higher education and intercollegiate athletic participation; and the economic benefit they had in the form of their existing scholarship and all aid related thereto, future scholarships at another Division I school, or future contracts with an NBA or other professional team, and they also had a recognized liberty interest in (among other things) being in good standing at the University, and being free from the stigma associated with being suspended for disciplinary reasons. Mr. Artis and Mr. Dotson further allege that, at all relevant times, it was clearly established that, given the seriousness of the alleged infraction, the possible consequences they faced, and the degree of sanction or penalty sought to be imposed, the Fourteenth Amendment to the United States Constitution's guarantee of procedural and substantive due process, and the Oregon Revised Statutes, required the Defendants to provide Mr. Artis and Mr. Dotson with the right to representation by counsel, testimony of witnesses under oath, depositions, issuance of subpoenas, cross-examination of witnesses, a fundamentally fair proceeding, and other due process protections, and the Defendants' failure to do so constitutes a violation of § 1983. In response, the individual Defendants principally argue that their actions did not implicate a recognized property or liberty interest. They also argue that they are entitled to qualified immunity; Mr. Artis and Mr. Dotson waived their right to the constitutional protections at issue; and Mr. Artis and Mr. Dotson received a fair hearing consistent with due process. They also argue that there is no substantive due process claim because their actions did not shock the conscience. These arguments all fail.

  **a.**  **The Property and Liberty Interests Claimed by Mr. Artis and Mr. Dotson are Well-Recognized**

42 U.S.C. § 1983 provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress … .

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[6]

The Fourteenth Amendment forbids those acting under color of state law to deprive any person of "life, liberty, or property, without due process of law." Thus, "[t]he requirements of … due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."[7] Property interests, however, "take many forms," and liberty includes "the right … to engage in any of the common occupations of life, to acquite useful knowledge … and to generally enjoy those privileges long recognized … as essential to the orderly pursuit of happiness by free men."[8] Thus, "certainly where the State attaches 'a badge of infamy' to the citizen, due process comes into play."[9]

In the seminal case of <u>Dixon v. Alabama State Board of Education</u>, issued in 1961, the United States Court of Appeals for the Fifth Circuit made clear that students have both a liberty and property interest in "the right to remain at a public institution of higher learning in which the plaintiffs [are] students in good standing.'"[10] As the Supreme Court of the United States observed in <u>Goss v. Lopez</u>, a 1975 decision, "Since the landmark decision of the Court of Appeals for the Fifth Circuit in <u>Dixon</u> … , the lower federal courts have uniformly held the Due Process Clause

---

[6] <u>See, e.g.</u>, <u>West v. Atkins</u>, 487 U.S. 42, 47 (1988) (multiple citations omitted).

[7] <u>See Board of Regents v. Roth</u>, 408 U.S. 564, 569 (1972); <u>see also Marin v. University of Puerto Rico</u>, 377 F. Supp. 613 (D.P.R. 1974) ("The relevant inquiry is whether plaintiffs' interests affected here are within the concepts of 'liberty' or 'property' protected by the due process clause.").

[8] <u>See Roth</u> at 572, 576.

[9] <u>See Wisconsin v. Constantineau</u>, 400 U.S. 433, 437 (1972) (citation omitted); <u>accord Goss v. Lopez</u>, 419 U.S. 565, 573-75 (1975) (quoting <u>Constantineau</u>, 400 U.S. at 437) (observing that "[t]he Due Process Clause also forbids arbitrary deprivations of liberty," where "a person's good name, reutation, honor, or integrity is at stake because of what the government is doing to him.").

[10] <u>See Marin</u>, 377 F. Supp. at 621 (bracketing in original) (quoting <u>Dixon v. Alabama State Board of Education</u>, 294 F.2d 150 (5th Cir. 1961), <u>cert. denied</u>, 368 U.S. 930 (1961)); <u>Blanton v. State University of New York</u>, 489 F.2d 377, 385 (2d Cir. 1973) (characterizing <u>Dixon</u> as "the path-breaking decision recognizing the due process rights of students at a state university"); <u>cf. Goss</u>, 419 U.S. at 573-75 (secondary education case holding that "on the basis of state law, appellees plainly had legitimate claims of entitlement to a public education").

12

applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion."[11]

Indeed, in the words of one District Court, over forty years ago:

> The right to engage in a chosen occupation is meaningless if one is unable to obtain the training it requires; similarly, the right to acquire useful knowledge implies a right of access to institutions dispensing such knowledge. It is too late in the day, now that the right privilege distinction is dead and buried, … to argue that the right to attend a public educational institution to which one is admitted or attending as a student in good standing is not within the "liberty" protected by the due process clause.   …
>
> Due process protection is particularly necessary when, as here, the governmental action may damage the individual's standing in the community, academic or general, or may impose a "stigma or other disability that foreclose[s] his freedom to take advantage" of other educational or future employment opportunities. Roth, supra, 408 U.S. at 573. Suspension from a public college is a mark on one's record that may well preclude further study at any public and many private institutions and limit the positions one can qualify for after termination of one's studies. For all of these reasons, we hold that the due process clause applies to educational suspensions.[12]

Nearly twenty years later, another District Court, summarizing subsequently decided authorities, "found that Plaintiff had a protectible property interest in continued enrollment, free from arbitrary state action, at the Medical College," and denied a motion to dismiss.[13]

Against this backdrop, this Court should readily reject the Defendants' argument that Mr. Artis and Mr. Dotson had neither a property nor a liberty interest at stake. Contrary to the Defendants' argument about state law, these federal decisions provide ample support for the proposition that, at all relevant times, it was well-established that Mr. Artis and Mr. Dotson had a constitutionally protected property and liberty interest in attending the University, having their scholarship renewed by the University, and being free from the stigma associated with a

---

[11] See Goss, 419 U.S. at 576 n.8 (citing Black Coalition v. Portland School District No. 1, 484 F.2d 1040 (9th Cir. 1973)) (multiple additional citations omitted).

[12] See Marin, 377 F. Supp. at 621-22 (bracketing in original) (multiple citations omitted).

[13] See Lewin v. Medical College, 910 F. Supp. 1161, 1164 (E.D. Va. 1996).

disciplinary suspension, and other state-imposed stigma. Indeed, the Defendants essentially ignore the authorities cited above, and instead rely upon three unpublished, non-binding, distinguishable decisions.   Again, with respect, from the Fifth Circuit's decision in <u>Dixon</u> on forward, numerous federal courts including the Supreme Court have recognized or assumed the existence of such interests.[14]

> **b.      The Property Interest in Plaintiffs' Scholarships, And All Financial Benefits, Claimed by Mr. Artis and Mr. Dotson are Well-Recognized**

For the same reasons, this Court should hold that Mr. Artis and Mr. Dotson had property and liberty interest in playing for the University's basketball team, having their scholarships renewed by the University or receiving scholarships from another Division I university, and each receiving an NBA contract, certainly as they related to Mr. Artis' and Mr. Dotson's relationship with Oregon. In <u>Stretten v. Wadesworth Veterans Hosp.</u>,   537 F2d 361,366- 367 (9th Cir 1976), the Ninth Circuit found a property interest in a medical resident's continued education in the property interests of his residency.

> **c.      Plaintiff's Property Interest in His Residency**

It is clear from the Supreme Court decision in <u>Board of Regents v. Roth</u> that the Constitution protects interests not embraced within the traditional notions of real or personal property. However, the Court indicated that a benefit which merits protection as a property interest

---

[14] <u>See, e.g.</u>, <u>Dixon</u>, 294 F.2d at 150 (seminal case, involving Alabama State College); <u>Blanton</u>, 489 F.2d at 385 (characterizing <u>Dixon</u> as "the path-breaking decision recognizing the due process rights of students at a state university"); <u>Marin</u>, 377 F. Supp. at 621 (bracketing in original) ("Suspension from a public college is a mark on one's record that may well preclude further study at any public and many private institutions and limit the positions one can qualify for after termination of one's studies. For all of these reasons, we hold that the due process clause applies to educational suspensions."); <u>Hart v. Ferris State College</u>, 557 F. Supp. 1379, 1382 (W.D. Mich. 1983) (concluding that "the threat of suspension or expulsion implicates … property and liberty interests in public education and reputation, and that such interests are within the purview of the due process clause of the Fourteenth Amendment"); <u>Hall v. University of Minnesota</u>, 530 F. Supp. 104, 107 (D. Minn. 1982) ("A student's interest in attending a university is a property right protected by due process."); <u>accord Board of Curators of University of Missouri v. Horowitz</u>, 435 U.S. 78, 86 (1978) (academic dismissal case holding that, even assuming that a medical student has a liberty or property interest, "respondent has been awarded at least as much due process as the Fourteenth Amendment requires"); <u>Regents of University of Michigan v. Ewing</u>, 474 U.S. 214, 222 (1985) ("We therefore accept the University's invitation to assume the existence of a constitutionally protectible property right in Ewing's continued enrollment … ."); <u>Tigrett v. Rector and Visitors of University of Virginia</u>, 290 F.3d 620, 627 (4th Cir. 2002) (assuming a matriculated student's property interest in a university education without deciding whether one exists).

14

must be one to which there is more than a "unilateral expectation." 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 560. Rather there must exist rules or understandings which allow the claimant's expectations to be characterized as "a legitimate claim of entitlement to (the benefit)." Id.

* * * *

Moreover, we believe <u>Roth</u> recognized that rehire rates under some circumstances may evidence a "common law of employment" sufficient to support the finding of a property interest. See <u>Board of Regents v. Roth</u>, 408 U.S. at 578 n. 16, 92 S.Ct. at 2710, 33 L.Ed.2d at 561. But we need not rest rejection of the defendant's position on this interpretation of Roth. Certainly nothing in <u>Roth</u> precludes the use of historical termination patterns as evidence that a plaintiff's claim is a property interest deserving of the protection of due process.

However, in holding that Dr. Stretten's claim to his residency is a property interest, we need not place primary reliance on the fact that no one had been officially terminated in the 20-year, 5,000-physician history of the program. Such reliance is unnecessary because Dr. Stretten, at the time of his appointment, was advised that he would be employed for the "duration of this training unless sooner terminated, and subject to periodic review by resident review board" and, as found by the district court, the duration of the training was four years. We rely primarily on these facts in finding no error in the district court's conclusion that Dr. Stretten's claim to his residency is a property interest deserving of appropriate due process before it is removed.

###    d.    The Process Which is Due.

Recently the Supreme Court has enunciated the factors which are to be balanced in determining the process which is appropriate to protect a property interest. *Mathews v. Eldridge*, --- U.S. ----, 96 S.Ct. 893, 96 S.Ct. 893, 47 L.Ed.2d 18, 44 U.S.L.W. 4224 (1976). The court held that such a determination:

> . . . generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of (a property) interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Id. at ----, 96 S.Ct. at 893, 47 L.Ed.2d at 33, 44 U.S.L.W. at 4229.

15

We will discuss each of these factors in the context of Dr. Stretten's situation at Wadsworth VA Hospital. The balance among these factors must be used to determine both the extent and the timing of the procedures necessary to protect Dr. Stretten's property interest in his position as a resident pathologist.

In terms of a recognized property interest, there can be no distinctive difference between Dr. Stretten's residency and plaintiffs' scholarships, which also include room and board and other financial benefits.

While we acknowledge the cases cited by the Defendants, those cases are non-binding and largely address suits by students against the NCAA, which the Supreme Court long ago ruled is not a state actor.[15]  In Hall v. University of Minnesota, by contrast, the District Court granted an injunction in favor of a student-athlete in circumstances analogous to the circumstances of this case:

> The private interest at stake here, although ostensibly academic, is the plaintiff's ability to obtain a "no cut" contract with the National Basketball Association. The bachelor of arts, while a mark of achievement and distinction, does not in and of itself assure the applicant a means of earning a living. This applicant seems to recognize this and has opted to use his college career as a means of entry into professional sports as do many college athletes. His basketball career will be little affected by the absence or presence of a bachelor of arts degree. This plaintiff has put all of his "eggs" into the "basket" of professional basketball. The plaintiff would suffer a substantial loss if his career objectives were impaired.[16]

Finally, this Court should reject the Defendants' "thrown-in" argument that "the University was not bound to the administrative procedures provided by ORS 183.413-.497 because ORS 351.088 grants the University the authority to establish [its own] adjudicative procedures." The University asserts, in a classic unsupported ipse dixit on a motion to dismiss, that "the University established procedures for administrative conferences .. and panel hearings … as

---

[15] See NCAA v. Tarkanian, 488 U.S. 179 (1988).

[16] See Hall, 530 F. Supp. at 108.

the exclusive procedures for adjudicating alleged violations of its Student Conduct Code." This is

a motion to dismiss, not a motion for summary judgment, and without discovery, this assertion

simply cannot be evaluated. Moreover, in footnote 2 to their brief, they appear to undercut this

argument by stating: "At the time of the events relevant to the Complaint, the University's Student

Conduct Code was subject to the 2014 edition of the Oregon Administrative Rules.   The Student

Conduct Code has since been amended and renamed as a University policy."

### e.    The Individual Defendants are Not Entitled to Qualified Immunity

Officials are only shielded by qualified immunity "insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known."[17] Indeed, "[t]o defeat a qualified immunity defense, the officials need only have fair

warning that their alleged conduct was unconstitutional."[18] Ultimately, "[c]ourts are charged with

the responsibility of ensuring that the defense of qualified immunity gives no more protection than

is necessary for the official in question to effectively fulfill his duties," because "[e]ach additional

measure of protection afforded government officials inevitably divests individual citizens of some

remedies for violations of their constitutional rights."[19]

Here, the individual Defendants argue it "could not have been apparent to Martin,

Gottfredson, Holmes, or Weintraub that their alleged conduct violated the Constitution." This is

simply untrue. As demonstrated by the authorities cited above, Mr. Artis' and Mr. Dotson's clearly

established right to due process in the circumstances presented was violated from Dr.

Gottfredson's initial press conference imposing discipline without a hearing, through Ms. Martin's

suspension of Mr. Artis and Mr. Dotson and refusal to modify that suspension on impermissible

grounds, through Mr. Weintraub's actions in connection with conducting the hearing, through Dr.

---

[17]  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).
[18]  See Lawrence v. City of St. Paul, 740 F. Supp. 2d 1026, 1043 (D. Minn. 2010)   (quoting Brown v. Fortner, 518 F.3d 552, 561 (8th Cir. 2008)) (internal quotation marks deleted); accord Cohen v. San Bernardino Valley Coll., 92 F.3d 968, 973 (9th Cir. 1996)).
[19]  See In re Cincinnati Radiation Litigation, 874 F. Supp. 796, 807-08 (D. Ohio 1995).

Holmes' refusal to hear an appeal. As discussed in detail below, this right certainly included the right to confront and cross-examine witnesses, have access to statements, and have a true opportunity to defend himself, as opposed to the nominal "opportunity to be heard" urged by the Defendants. Though the Defendants appear to claim that the circumstances were novel (a dubious claim), "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[20]

### f.     Mr. Artis and Mr. Dotson Did Not Waive Their Right to Due Process

The Defendants next argue that Mr. Artis and Mr. Dotson waived their rights because, through counsel, they chose the "administrative conference" option. In support of this argument, the Defendants rely upon <u>Davies v. Grossmont Union High School District</u>, which held that "constitutional rights may ordinarily be waived if it can be established by clear and convincing evidence that the waiver is voluntary, knowing and intelligent."

Here, there is no evidence, much less "clear and convincing evidence," of voluntary, knowing, and intelligent waiver. It was clear to plaintiffs' counsel that the University and its representatives, who refused to even acknowledge the request of plaintiffs' counsel for a contested case hearing, were not going to grant their request for a contested case hearing, which would have provided the requisite due process. Ultimately, as the University was only providing two vastly inferior options, a "panel hearing" and an "administrative conference," neither of which provided the requisite due process, and the University was requiring Mr. Artis and Mr. Dotson to choose between one of the two options, plaintiffs' counsel accepted the "administrative conference" option. Mr. Artis' and Mr. Dotson's counsel was not asked to sign, and did not sign, a waiver of plaintiffs' due process rights, and would never have signed such a waiver; moreover, plaintiffs' counsel never waived Mr. Artis' and Mr. Dotson's due process rights by choosing the

---

[20] <u>See Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).

"administrative conference" option over the "panel hearing" option, neither of which provided the due process protections that plaintiffs' counsel had expressly requested. It is simply nonsensical to suggest, as the Defendants apparently do, that they can be relieved of their constitutional obligations simply by providing two options, neither of which comports with applicable due process requirements.

Finally, though the Defendants fail to state so, <u>Davies</u> further provides that, even where there is a clear, voluntary, and intelligent waiver, a court must also consider whether public policy demands that the court not enforce the waiver.[21] All of the policy reasons supporting a finding that Mr. Artis and Mr. Dotson have a property and liberty interest make clear that any possible waiver, which in any event did not occur, should not be enforced by this Court.

g.     **Mr. Artis and Mr. Dotson were Entitled to Far More than a Nominal "Notice and Opportunity to Be Heard"**

The University next contends that Mr. Artis' and Mr. Dotson's "Fourteenth Amendment rights were not violated because [they] received constitutionally sufficient due process." Tellingly, this argument is merely two paragraphs long and contains no analysis.

"Due process … in not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation."[22] Among other things, courts have held that the right to cross-examine witnesses may be required in some school disciplinary hearings, namely where a disciplinary hearing "had resolved itself into a problem of credibility."[23] Indeed, in <u>Winnick v. Manning</u>, the Second Circuit held, in a case involving a substantial suspension of a state university student, as follows:

> Secondly, if this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing. [Citation omitted.] This was not a case,

---

[21] <u>See Davies v. Grossmont Union High Sch. Dist.</u>, 930 F.2d 1390, 1394 (9th Cir. 1991).
[22] <u>See Gorman v. University of Rhode Island</u>, 837 F.2d 7 (1st Cir. 1988) (citing <u>Matthews v. Eldridge</u>, 424 U.S. 319, 334 (1976)).
[23] <u>See Winnick v. Manning</u>, 460 F.2d 545, 550 (2d Cir. 1972).

however, where the decision maker had to choose to believe either the accused or his accuser. Rather, as the district court points out, Dean Hewes' credibility was not at issue. The critical fact about Hewes' statement was that he witnessed appellant's presence and conduct in the vicinity of the disturbance. Since this crucial fact was admitted by Winnick himself, cross-examination would have been a fruitless exercise.[24]

In Marin, the District Court similarly held that, "in the normal case," cross-examination and other procedural safeguards would be required:

> But no sound reason appears why, in light of the individual's significant interest, these state goals, however, important, need be vindicated in the normal case without (1) adequate advance notice to the student of (a) the charges, (b) the specific, previously promulgated regulations under which the charges are brought, and (c) the evidence against the student; (2) a full, expedited evidentiary hearing (a) presided over by an impartial, previously uninvolved official, (b) the proceedings of which are transcribed, at which the student (c) can present evidence and (d) cross-examine opposing witnesses, (e) with the assistance of retained counsel; and (3) a written decision by the presiding official encompassing (a) findings of fact, (b) the substantial evidence on which the findings rest, and (c) reasons for the conclusion.[25]

Less process may be due in suspensions for academic reasons; indeed, in Horowitz, a 1977 decision, the Supreme Court observed, "Since the issue first arose 50 years ago, state and lower federal courts have recognized that there are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons which may call for hearings in connection with the former but not the latter."[26]

Thus, contrary to the Defendants' argument, at all relevant times, it was clearly established that, given the seriousness of the alleged infraction, the possible consequences to Mr. Artis and Mr.

---

[24] See id.; see also Blanton, 489 F.2d at 385 (internal alterations and quotation marks omitted) (noting that, in Winnick, the Second Circuit made clear "that if a case of a substantial suspension of a state university student has resolved itself into a problem of credibility, cross-examination of witnesses might be essential to a fair hearing"); Gorman, 837 F.3d at 16 (holding that due process was provided because "Gorman had the opportunity to cross-examine his accusers as to the incidents and events in question, and there is no evidence that any limitation on Gorman's cross-examination prevented him from eliciting the truth about the facts and events in issue").

[25] See Marin, 377 F. Supp. at 623 (multiple citations omitted).

[26] See Horowitz, 435 U.S. at 86; accord Gaspar v. Bruton, 513 F.2d 843 (10th Cir. 1975).  In Horowitz, the Supreme Court held that, even assuming that a medical student a liberty or property interest, "respondent has been awarded at least as much due process as the Fourteenth Amendment requires." See id. at 85-86; accord Ewing, 474 U.S. at 222.

Dotson, and the degree of sanction or penalty sought to be imposed, the Fourteenth Amendment to the United States Constitution's guarantee of procedural and substantive due process, and the Oregon Revised Statutes, required the Defendants to provide Mr. Artis and Mr. Dotson with the right to representation by counsel, testimony of witnesses under oath, depositions, issuance of subpoenas, cross-examination of witnesses, a fundamentally fair proceeding, and other due process protections.

> ### h.    Finally, Mr. Artis and Mr. Dotson Have Stated Claims for Violations of their Substantive Due Process Rights

"[T]he due process clause includes a substantive component which guards against arbitrary and capricious government action."[27] "The concept of 'substantive due process,' semantically awkward as it may be, forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'"[28] Of course, "[t]o establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government deprivation of life, liberty, or property."[29]

Defendants violated 1983 because they subjected plaintiffs to a fundamentally unfair proceeding, depriving plaintiffs of their liberty and property interests. School disciplinary hearings must be "conducted with basic fairness." Cloud v. Trustees of Boston Univ., 720 F.2d at 725 (citing Coveney, 388 Mass. at 20); Schaer v. Brandeis Univ., 432 Mass. at 481. Defendant's provided two options, a "panel hearing" and an "administrative conference", neither of which provided basic fairness in its proceedings.

"Basic fairness" is an uncertain and elastic concept, and there is little case law to serve as guideposts in conducting the fairness inquiry. Nonetheless, the concept must be given some

---

[27] See Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398 (9th Cir 1989).
[28] See, e.g., Nunez v. City of Los Angeles, 147 F.3d 867 (9th Cir. 1998) (quoting United States v. Salerno, 481 U.S. 739, 746 (1987)).
[29] See id.

meaning, and the requirement that a university provide some level of "fairness" clearly suggests that there is such a thing as an unfair proceeding, and that a failure to provide such a proceeding may be actionable under certain circumstances.

There is, however, no one-size-fits-all answer to the question what of constitutes the "basic fairness" that a student is due. The case law appears to indicate, and common sense and experience would likewise suggest, that the answer may vary depending upon the competing interests at stake, include such factors as the magnitude of the alleged violation, the likely sanctions and other consequences of a finding of guilt, and the university's experience and aptitude in resolving disputes of that nature. *See* Goss v. Lopez, 419 U.S. 565, 579 (1975) (addressing requirements for disciplinary process in a public high school: "the timing and context of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved"). Here, Mr. Artis and Mr. Dotson faced serious charges and the consequences of a finding of "responsibility" for those offenses were substantial off- and on-campus.

There are two principal threads to the "fairness" inquiry. The first is procedural fairness—that is, whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself. The second is substantive fairness—that is, even if the procedure was fair, whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness.

### i.      Procedural Fairness

The first question is whether the procedures employed by Oregon met the test of "basic fairness." When the school at issue is a public institution, the accused student must, at a minimum, receive protections consistent with the Due Process Clause of the Fourteenth Amendment. *See, e.g.*, Goss, 419 U.S. at 574-85 (holding that due process requires notice and opportunity for a hearing where public high school students face suspension of less than ten days). Indeed, due

EXHIIBIT A - PAGE 28

process is required even at private universities. <u>Schaer</u>, 432 Mass. at 482 (2000); <u>Cloud</u>, 720 F.2d at 725; *see* <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 837-38 (1982).

In <u>Cloud</u>, a third-year law student was charged with misconduct for looking under the skirts of female students in the school's library. 720 F.2d at 723. In a subsequent civil suit, Cloud challenged the fairness of the process used in his case. *Id*. at 724. Under the university's rules, Cloud was afforded a hearing in front of an impartial panel at which he was represented by counsel, and had the opportunity to cross-examine the witnesses against him. *Id*. at 723. The First Circuit found that the process afforded Cloud comported with basic fairness but did not attempt to identify which procedures, if any, were necessary to a finding that the process was "fair."

Defendants failed to provide a variety of procedural protections to Mr. Artis and Mr. Dotson, many of which, in the criminal context, are the most basic and fundamental components of due process of law.

Here, as discussed in detail above, Mr. Artis and Mr. Dotson have demonstrated a deprivation of liberty and property by individuals acting under color of state law. Moreover, this Court should find that the conduct of each of the individual Defendants is conscience-shocking:

- The University's President, Dr. Gottfredson, in effect imposed discipline upon Mr. Artis and Mr. Dotson without due process by holding a press conference and making a public statement condemning Mr. Artis and Mr. Dotson. Despite the "insurmountable" barrier to prosecution, and the fact that the University had not even started the hearing process, Dr. Gottfredson pronounced, "The type of behavior in the police report released this week is utterly unacceptable and will not be tolerated," and further stated, "I know it's frustrating, and we would like to say more, but we are not going to violate the laws that are in place to protect students' privacy or the rights of our students – *especially* the survivor." The statement included the conclusion that the accuser was a "survivor," a loaded statement

EXHIIBIT A - PAGE 29

about Mr. Artis' and Mr. Dotson's gender ("as a father, I was appalled at what I read"), and the statement that Mr. Artis and Mr. Dotson would "not be playing basketball at Oregon again."

- At a proximate point in time, Defendant Chicora Martin, the Assistant Dean of Students at the University, who had initially scheduled the "emergency" hearing to expel Mr. Artis and Mr. Dotson, and then modified the suspension, again suspended Mr. Artis and Mr. Dotson and one other basketball player.

- The "administrative conference" conducted by Defendant Sandy Weintraub, the Director of Student Conduct & Community Standards at the University of Oregon, was nothing less than an unconstitutional "sham court" scenario of the very worst order, in which Mr. Artis and Mr. Dotson were not even provided with a basic opportunity to properly respond to all information provided, and to contact and call all relevant and necessary witnesses. Mr. Weintraub ruled against Mr. Artis and Mr. Dotson, suspending them from the University from four to ten years, long enough for the removal to be the functional equivalent of an expulsion from the University, and refused to provide due process to Mr. Artis and Mr. Dotson generally and in the manner described in detail above.

- Last, but not least, Defendant Robin Holmes, Vice President for Student Life at the University of Oregon, was charged with the responsibility of hearing an appeal. Dr. Holmes, however, refused to respond to Mr. Artis' and Mr. Dotson's request for an appeal and did not return multiple phone calls from Mr. Artis' and Mr. Dotson's counsel. This is, indeed, outrageous.

**2.      Contrary to the Defendants' Second Argument, Mr. Artis and Mr. Dotson Have Plausibly Alleged Violations of Title IX**

Mr. Artis and Mr. Dotson acknowledge that their Title IX claim can only be directed at the

University. The Defendants, conceding that plaintiffs' Title IX claim is otherwise legally sound,[30]

instead attack that claim factually, insisting that it has not been plausibly pled. This argument fails.

In addition to alleging the following facts in their Title IX claim, as University president,

Defendant Gottfredson publicly proclaimed the players would "not be playing basketball at

Oregon again," thereby prejudging, if not dictating, the outcome of any future proceeding, sealing

the fate of these men. Without any investigation, these men were deemed guilty by virtue of the

facts they were men. He then suspended plaintiffs immediately. Incorporating all previous

allegations, Plaintiffs' Title IX claim then alleges:

> 46.    Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681, et seq.) provides, in relevant part, as follows: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

> 47.    The University receives federal funding through various means including, without limitation, student loans provided to University students directly by the federal government and through other funds furnished by the federal government, and as such is subject to the strictures of Title IX and its implementing regulations.

> 48.    To assist schools with implementing Title IX and its regulations, the Office of Civil Rights of the United States Department of Education has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirements of the regulations. The procedures adopted by a school must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved ... ."

> 49.    The University (by and through its agents and employees acting within the scope of their agency and employment, including these Defendants) deprived each of these Plaintiffs, on the basis of their gender, of his Title IX rights to, among other things, due process and equal protection through the improper administration, and/or the existence, in its current state, of the University's policies and procedures.

---

[30] Indeed, he only other "legal" challenge raised by the Defendants is the contention, set forth in a footnote, that Stanley v. Trustees of California State University, 433 F.3d 1129 (9th Cir 2006), which held that a state's personal injury statute of limitations applies to Title IX claims, was incorrectly decided, and this Court should apply a different, "shorter" Oregon statute. Not only is Stanley binding upon this Court, it is consistent with all authority before it. Indeed, as the Ninth Circuit pointed out in Stanley, "every circuit to consider the issue has held that Title IX ... borrows the relevant state's statute of limitations for personal injury," and "[t]he close similarity between Title VI and Title IX also supports applying the statute of limitations for personal injury." See Stanley, 433 F.3d at 1134-36.

50.    <u>First</u>, from the very beginning of these horrific accusations of sexual assault, the University engaged in selective enforcement in violation of Title IX, and discriminated against each of these Plaintiffs based solely upon their gender and, as a result, each of these Plaintiffs has been seriously and irreparably damaged.

51.    Regardless of his guilt or innocence (and, to be clear, each of these Plaintiffs was and is innocent), the severity of the penalty (a suspension of between four and ten years), as well as the decision to initiate the proceeding in the first place, were affected by the fact that each of these Plaintiffs is male, and the accuser is female.

52.    On April 14, 2014, the Lane County District Attorney determined that she would not be pressing charges against Mr. Austin or any of the basketball players "because the conflicting statements and actions by the victim make this case <u>unprovable as a criminal case</u>."   (Emphasis added.)

53.    In or around early May 2014, presumably in response to the publication of the police report, the District Attorney's office issued a lengthy document outlining numerous weaknesses in the prosecution's case, as well as numerous inconsistencies in the accuser's statements, and concluding that those weaknesses presented "<u>an insurmountable barrier to prosecution</u>."   (Emphasis added.)

54.    Dr. Gottfredson's pronouncement on behalf of the University at the outset of the disciplinary proceedings, however, included the conclusion that the female accuser was a "survivor," and the statement that "as a father, I was appalled at what I read."

55.    On information and belief, the University has never taken action against a female student for engaging in the type of conduct each of these Plaintiffs have been so accused.

56.    On information and belief, the University has never taken action against a female student for making a false allegation of the kind involved in this matter.

57.    On information and belief, in large part due to the lack of any opportunity to defend themselves, accused males invariably lose when charged with sexual misconduct at the University.

58.    <u>Second</u>, there was an erroneous outcome from a flawed proceeding, in violation of Title IX.

59.    The University discriminated against each of these Plaintiffs by failing to comply with its own procedures and by failing to comply with the requirements of Title IX, in order to reach a predetermined result, due to his sex, and gender stereotypes.

60.    The University created an environment in which each of these Plaintiffs, as an accused male student, was so fundamentally denied due process as to be presumed guilty and thereby assured a finding of guilt.

61.     Such a biased and one-sided process deprived each of these Plaintiffs, as a male student, of educational opportunities based exclusively upon their gender.

62.     The University conducted its "investigation" and subsequent hearing in a manner that was biased against these accused, based exclusively upon their gender.

63.     From the outset, the investigation and hearing processes were slanted in favor of the female accuser, because of her gender. The University's representatives, including its president, accepted her statements at face value despite the prosecutor's statements, and granted the female accuser the presumption of truth because she is female.

64.     Each of these Plaintiffs did not have an equal or fair opportunity to present relevant witnesses, to present evidence (as described above), and to present evidence about the accuser's motives to present false accusations.

65.     Those involved with the hearing process were improperly and/or insufficiently trained under Title IX.

66.     The University responded to the accuser's accusations with a series of arbitrary, capricious, discriminatory, and gender-based actions directed toward a predetermined outcome: each of these Plaintiffs' suspension from the University.

67.     <u>Third</u>, the University, in violation of Title IX, demonstrated a deliberate and systemic indifference to the rights of each of these Plaintiffs based exclusively upon their gender.

68.     The University's actions, and inactions, were unreasonable in light of the known circumstances, including but in no way limited to the District Attorney's office declining to prosecute, and issuing a document outlining numerous weaknesses in the case, and concluding that those weaknesses presented "an insurmountable barrier to prosecution."

69.     But for the obvious gender bias, the outcome of the University proceeding would have been different.

In <u>Emeldi v. Univ. of Oregon</u>, 673 F.3d 1218, 1226-27 (9th Cir., 2012), the court examined the

facts needed to survive summary judgment in a Title IX retaliation claim.   Following full

discovery by both parties, the court held this as the standard, without any direct evidence to

support plaintiff's claims:

First, the **proximity in time** between Emeldi's complaint to Friestad about Horner and Horner's resignation as her dissertation chair **is strong**

EXHIIBIT A - PAGE 33

**circumstantial evidence of causation.**    * * *

 Second, Emeldi has articulated a theory of how Horner found out about her complaints: * * *   **Stated another way, a jury reasonably could infer** that Friestad passed Emeldi's complaint on to Horner, and that Horner's resignation not long thereafter as Emeldi's dissertation chair was a response to Emeldi's complaint.

 Third, Emeldi offered evidence that Horner exhibited gender-based animus in other contexts. * * * * She gave specific examples of Horner's male students being given opportunities that were not available to his female students. For example, Horner allegedly gave one male student access to more office space and better technology for collecting data than similar female students.

 As the above discussion reveals, **there is ample circumstantial evidence to establish causation. Emeldi also points to other evidence in the record that would support a jury inference of causation**: * * *

(Emphasis added; internal citations omitted.)

 Given that we are merely at the pleading stage, the standard is far less than 'strong circumstantial evidence for a jury to infer.'   Under this standard for summary judgment, the facts as pled are sufficiently pled to proceed.

 In <u>Doe v. Brown University</u>, the District Court pointed out that "cases attacking university disciplinary proceedings on the ground of gender bias … fall generally within two categories … 'erroneous outcome' and 'selective enforcement.'"[31] In the first category, "erroneous outcome" cases, the plaintiff must first "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and must next "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."[32] "Such allegations might include, <u>inter alia</u>, statements by members of the disciplinary tribunal, <u>statements by pertinent university officials</u>, or patterns of decision-making <u>that also tend to show</u>

---

[31] <u>See Doe</u>, 2016 U.S. Dist. LEXIS 21027, at *15 (some internal quotation marks omitted) (quoting <u>Yusuf v. Vassar Coll.</u>, 35 F.3d 709, 715 (2d Cir. 1994)).

[32] <u>See id.</u> (quoting <u>Yusuf</u>, 35 F.3d at 715).

the influence of gender."[33] Thus, in <u>Wells v. Xavier</u>, the District Court denied a motion to dismiss the plaintiff's Title IX claim, finding that his complaint "<u>recounts Defendants having rushed to judgment, having failed to train UCB members, having ignored the Prosecutor</u>, having denied Plaintiff counsel, <u>and having denied Plaintiff witnesses</u>. These actions came against Plaintiff, he contends, because he was a male accused of sexual assault."[34]

Here, Mr. Artis and Mr. Dotson have plainly alleged particular facts sufficient to cast articulable doubt upon the accuracy of the outcome of the disciplinary proceeding. Most significantly, Mr. Artis' and Mr. Dotson's Complaint alleges numerous facts making it very clear that the sexual activity that occurred was completely consensual. Plaintiffs also allege that they were prepared to call disinterested third-party witnesses who would have supported them. Indeed, the District Attorney determined that she would not be pressing charges against Mr. Artis and Mr. Dotson because the accuser's story made little sense, and the evidence did not warrant prosecution.

Similarly, Mr. Artis and Mr. Dotson have alleged particular circumstances suggesting that gender bias was a motivating factor. Plaintiffs plausibly allege that the University created an environment in which Mr. Artis and Mr. Dotson, accused male students, were so fundamentally denied due process as to be virtually assured a finding of guilt, and such a biased and one-sided process deprived Mr. Artis and Mr. Dotson, as male students, of educational opportunities on the basis of sex/gender. Plaintiffs plausibly allege that the University conducted its "investigation" and subsequent hearing in a manner that was biased against the accused, Mr. Artis and Mr. Dotson, based on sex/gender. Indeed, from the outset, the investigation and hearing processes were slanted in favor of the female accuser, because of her sex. Just as plaintiffs plausibly plead, all of the University's representatives, from Ms. Martin, who immediately suspended Mr. Artis and Mr.

---

[33] <u>See id.</u> (quoting <u>Yusuf</u>, 35 F.3d at 715) (emphasis added).
[34] <u>See Wells v. Xavier</u>, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014) (emphasis added).

EXHIIBIT A - PAGE 35

Dotson, who had done nothing wrong, rather than the accuser, for making a false report; to Dr. Gottfredson, who held a press conference to condemn Mr. Artis and Mr. Dotson notwithstanding the prosecutor's statements just the night before; to Mr. Weintraub, who presided over the hearing and refused to provide due process; to Dr. Holmes, who refused to hear the appeal, accepted the female accuser's statements at face value, and granted the female accuser the presumption of truth because she is female. Evidencing that the University had prejudged Plaintiffs' guilt, and done so on the basis of Mr. Artis' and Mr. Dotson's sex/gender, no one less than the President of the University held a press conference which announced the gender-based, loaded view that the female accuser was a "survivor," made the gender-based, loaded statement that "as a father, I was appalled at what I read," and summarily concluded that Mr. Artis and Mr. Dotson were guilty. Mr. Artis and Mr. Dotson plausibly allege that, with regard to the hearing, he did not have an equal or fair opportunity to present relevant witnesses, and to present evidence, including evidence about the accuser's motives to present false accusations. Plaintiffs plausibly plead that those involved with the process were improperly and/or insufficiently trained under Title IX, and the University responded to the accusations with a series of arbitrary, capricious, discriminatory, and gender-based actions directed toward a predetermined outcome: his suspension.

In the second category, "selective enforcement" cases, the plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." [35] Here, Plaintiffs plausibly allege that, regardless of guilt or innocence, the severity of the penalty, as well as the decision to initiate the proceeding in the first place, were affected by the fact that Mr. Artis and Mr. Dotson are male, and the accuser is a female. Besides being supported by Dr. Gottfredson's shocking pronouncement on behalf of the University, Plaintiffs allege three things "on information and belief": "the University

---

[35] See Doe, 2016 U.S. Dist. LEXIS 21027, at *17.

has never taken action against a female student for engaging in the type of conduct each of these Plaintiffs have been so accused," "the University has never taken action against a female student for making a false allegation of the kind involved in this matter," and "males invariably lose when charged with sexual misconduct at the University." The undersigned believes these facts to be true, but they cannot be confirmed without discovery solely in possession of the University. Though the University takes issue with "on information and belief," the District Court in <u>Doe v. Brown</u> made clear that "[t]his manner of pleading is a permissible way to indicate a factual connection that a plaintiff reasonably believes is true but for which the plaintiff may need discovery to gather and confirm its evidentiary basis.'"[36] Indeed, as one District Court analyzing an "erroneous outcome" claim recently explained:

> Plaintiffs' erroneous outcome allegations would be insufficient if they had simply stated something akin to: "Upon information and belief, procedural defects were motivated by gender bias." However, in this case Plaintiffs have pleaded specific factual allegations. … The fact that they are pleaded upon information and belief is of no moment because the alleged facts are peculiarly within the possession or control of SU Defendants.[37]

For the same reasons, Plaintiffs' allegations of "deliberate indifference" have been plausibly pled. If this Court believes there is a pleading deficiency within this or any other portion of the Complaint, it should provide an opportunity to amend.[38]

### 3.    This Court Should Reject the Defendants' Arguments About Preclusion

The Defendants next argue that the Plaintiff's suspension from the University was a final administrative order, and therefore the doctrine of issue preclusion prevents Mr. Artis and Mr.

---

[36] <u>See Doe</u>, 2016 U.S. Dist. LEXIS 21027, at *27 (internal quotation marks omitted).   <u>Doe v. Columbia University</u>, 101 F. Supp. 3d 356, 374 (S.D.N.Y. 2015), which Oregon heavily relies upon here, is believed to be on appeal to the Second Circuit.

[37] <u>Doe v. Salisbury University</u>, Docket No. JKB-15-517, 2015 U.S. Dist. LEXIS 110772, at *41 (D. Md. August 21, 2015); <u>see also Grajales v. P.R. Ports Auth.</u>, 682 F.3d 40, 49 (1st Cir. 2012) ("Smoking gun proof of discrimination is rarely available ... at the pleading stage … .").

[38] <u>See, e.g.</u>, <u>Doe v. United States</u>, 58 F.3d 494, 497 (9th Cir. 1995) (providing that, ordinarily, a District Court should provide leave to amend unless it "determines that the pleading could not possibly be cured by the allegation of other facts").

Dotson from "relitigating" their claims in this Court. Self-evidently, every factor governing an issue preclusion analysis weighs against issue preclusion even possibly being applicable here. First, the issues in this case (e.g., the issue of whether Mr. Artis' and Mr. Dotson's § 1983 rights were violated, whether the University violated Title IX, and whether the Defendants are liable under the state-law theories asserted in the Complaint) have never been litigated. Second, Mr. Artis and Mr. Dotson have certainly never had a full and fair opportunity to be heard on the issues. Third, the Defendants were not parties in the alleged prior proceeding. Indeed, we have located absolutely no case, and the Defendants cite no case, in which the result of a hearing that lacks the requisite due process could possibly be given preclusive effect in a subsequent challenge to the process provided.

Of course, there is no such case: if a defendant could escape § 1983 liability for failure to provide due process by providing a hearing without due process, and then claiming the outcome precludes any challenge, there would be no such thing as a § 1983 claim for failure to provide due process. Similarly, if a university could escape liability under Title IX by engaging in selective enforcement on the basis of gender, and conducting a flawed proceeding that leads to an erroneous outcome, and then claiming that the outcome precludes any challenge, there would be no such thing as a Title IX claim for selective enforcement, or an erroneous outcome from a flawed proceeding. This Court should reject such circular logic on the part of the Defendants.

Similarly, this Court need not labor long on the Defendants' argument that Mr. Artis and Mr. Dotson were required to take an appeal before bringing this case. Tellingly, the Defendants cite no case providing that an appeal is required before a § 1983, Title IX, or even a state-law cause of action can be brought. In fact, the Supreme Court long ago made clear that, because one of the purposes underlying 42 U.S.C. § 1983 was "to provide a remedy in the federal courts supplementary to any remedy any State might have," a plaintiff is not required to exhaust any

administrative remedies before pursuing a § 1983 claim.[39] Similarly, the Supreme Court long ago made clear that exhaustion of administrative remedies is not required with regard to Title IX claims.[40] Even if Plaintiffs were somehow required to exhaust administrative remedies with regard to his federal claims or his state-law claims (and of course he was not), Dr. Holmes, the individual tasked by the University with handling an appeal, refused to respond to Plaintiffs' request for an appeal and did not return multiple phone calls from Mr. Artis' and Mr. Dotson's counsel. Moreover, as Plaintiffs plausibly allege in their Complaint, an appeal would have plainly been futile.

### 4. This Court Should Reject the Defendants' Arguments in Favor of Dismissing Mr. Artis' and Mr. Dotson's Tort Claims

In Counts Four, Five and Six of Mr. Artis' and Mr. Dotson's Complaint, they advance state-law claims for negligence, intentional infliction of emotional distress, and tortious interference with prospective economic relations. In their Motion, the Defendants assert that they are entitled to immunity under O.R.S. 30.265(6)(c) and (f), and further challenge the legal sufficiency of each of those counts, as well as Mr. Artis' and Mr. Dotson's prayer for damages.[41]

#### a. The Defendants Are Not Entitled to Immunity Under O.R.S. 30.265

O.R.S. 30.265(6)(c) provides that "[e]very public body and its officers, employees and agents acting within the scope of their employment or duties … are immune from liability for: … [a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." According to the Oregon Supreme

---

[39] See Damico v. California, 389 U.S. 416, 417 (1967) (citations omitted).
[40] See Cannon v. University of Chicago, 441 U.S. 677, 687 n.8, 706 n.41 (1979); see also Morgan v. U.S. Postal Serv., 798 F.2d 1162, 1165 (8th Cir. 1986) (affirming that Title IX does not include an exhaustion-of-administrative-remedies requirement).
[41] The Defendants do not challenge the damages asserted in Mr. Artis' and Mr. Dotson's claims under 42 U.S.C. § 1983 and Title IX.

Court, it "has struggled with the concept over the years."[42] These facts do not present a close case and therefore this Court need not "struggle": the Defendants' only argument that they are immune from liability under O.R.S. 30.265(6)(c) is "because their decisions involved public policy and were made under the apparent authority of law." The Defendants' argument is utterly at odds with the plain language of the 30.265(6)(c), which provides no immunity in the circumstances presented. Certainly, the record as it stands at the motion-to-dismiss stage does not come close to supporting dismissal on discretionary immunity grounds.

The Defendants then argue that, because the University is a public body, and the individual Defendants were at all relevant times employees of the University acting within the course and scope of their employment, "[a]ny decision or action of Defendants made under the apparent authority of law was therefore immune from tort liability." In so arguing, the Defendants ignore that O.R.S. 30.265(6)(f) in actuality provides immunity against "[a]ny claim arising out of an act done or omitted under apparent authority of a law, resolution, rule or regulation that is unconstitutional, invalid or inapplicable except to the extent that they would have been liable had the law, resolution, rule or regulation been constitutional, valid and applicable." (Emphasis added.) The Defendants fail to cite what "law, resolution, rule or regulation" they seek shelter under, and are indeed simply attempting to fit a square peg into a round hole. Moreover, Mr. Artis and Mr. Dotson plausibly allege that the Defendants acted in bad faith or with malice, and Mr. Artis and Mr. Dotson expressly plead as much.

**b.    Mr. Artis and Mr. Dotson have Stated Claims for Negligence, Intentional Infliction of Emotional Distress, and Tortious Interference**

In Count Four, for negligence, Plaintiffs allege that the Defendants "had a duty to Dominic Artis and Damyean Dotson to conduct a campus investigation in a competent manner and in

---

[42] See Westfall v. State, 324 P.3d 440 (Ore. 2014). Certainly, discretionary immunity does not apply to "routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action." Lowrimore v. Dimmitt, 797 P.2d 1027 (Ore. 1990).

EXHIIBIT A - PAGE 40

accordance with societal standards and norms governing such investigations, and to conduct a hearing in a competent manner and in accordance with societal standards and norms governing such hearings, and otherwise act in a reasonably prudent manner with regard to Dominic Artis and Damyean Dotson," and failed to do so, leading to the damages set forth with specificity above.

In their Motion, the Defendants argue that Mr. Artis and Mr. Dotson cannot recover damages for "purely economic loss" or emotional distress because there is no "special relationship" between a school and its students. In arguing that the "economic loss" doctrine should apply, the Defendants ignore that numerous courts have held that student-athletes, as opposed to students generally, do have "special relationships" with the schools they attend.[43] Plaintiffs' pleading contains ample facts supporting a "special relationship" between Oregon and a student-athlete who had been recruited to transfer to Oregon to play college basketball.

Finally, the Defendants briefly argue that what occurred was not a foreseeable risk. But Plaintiffs allege that, prior to the Defendants' actions, he was regarded as one of the top amateur basketball players in the country; on the team at Oregon; and widely projected to "be selected in the first round of the NBA Draft, which would more likely than not be accompanied by a multi-million dollar guaranteed contract and tens of millions of dollars in prospective economic advantage," and further alleges that at all relevant times "the Defendants were aware of the foregoing facts. It should have been foreseeable to the Defendants that their careless conduct with regard to Mr. Artis and Mr. Dotson would stigmatize them and cause the harm claimed. As discussed above, Mr. Artis and Mr. Dotson did not waive their claim when counsel agreed to the conference.

In Count Five, for intentional infliction of emotional distress, Mr. Artis and Mr. Dotson alleges that the Defendants' conduct "constituted an extraordinary transgression of the bounds of

---

[43] See generally Kavanagh v. Trs. of Boston University, 795 N.E.2d 1170 (Mass. 2003).

socially tolerable conduct," and "were in bad faith, and/or taken with malice."

For the reasons set forth above, there was a special relationship between Mr. Artis and Mr. Dotson and the Defendants. Moreover, Plaintiffs allege outrageous conduct: the University, through its agents and employees, railroaded Mr. Artis and Mr. Dotson on the basis of sex/gender. Mr. Artis and Mr. Dotson were prejudged despite the prosecutor's statements. No one less than the University's President, acting with the course and scope of his employment, held a press conference to publicly condemn Mr. Artis and Mr. Dotson, characterizing the accuser a "victim" when in fact that was untrue, and stating that he was "appalled." The University's agents and employees refused to provide Mr. Artis and Mr. Dotson with anything close to fair process or a fair hearing (from refusing to modify Mr. Artis' and Mr. Dotson's suspension because they had asserted their Miranda rights, to the hearing that lacked virtually any of the required procedural safeguards), concluded that Plaintiffs had engaged in a sexual assault when they had in fact done no such thing, and refused to even consider an appeal, stamping Plaintiffs with a "badge of infamy" that has followed them. This transgresses all bounds of socially tolerable conduct.

In Count Six, Mr. Artis and Mr. Dotson allege that the Defendants "intentionally, recklessly, and tortiously interfered with Plaintiffs' prospective relationship with NBA teams" through the conduct described above, causing Mr. Artis and Mr. Dotson to sustain significant damages.

The University first argues that Mr. Artis and Mr. Dotson cannot show a relationship with another party that would have "very likely resulted in a pecuniary benefit … but for the defendant's interference." In reality, Mr. Artis and Mr. Dotson allege objectively verifiable monetary losses: he "was widely projected by experts in basketball and the NBA Draft to be selected in the first round of the NBA Draft, which would more likely than not be accompanied by a multi-million dollar guaranteed contract and tens of millions of dollars in prospective economic

36

advantage."[44] Plaintiffs further allege that, as a direct and proximate result of the Defendants'

conduct, Mr. Artis and Mr. Dotson no longer play at a Division I school [and] have diminished

chances of playing in the NBA … ." Mr. Artis and Mr. Dotson were not required to have a business

relationship with any NBA team at the time of their alleged injury. Surely, the University is not

suggesting that its players must have business relationships with NBA teams! Mr. Artis and Mr.

Dotson also plausibly allege that the University and other Defendants acted with an improper

purpose or used improper means. For the same reasons, Mr. Artis and Mr. Dotson have plausibly

alleged damages with regard to all of his tort claims.

Moreover, this Court should reject the Defendants' "thrown-in" argument that Mr. Artis

and Mr. Dotson are precluded from bringing a tortious interference claim because it was not

mentioned in the notice. As the Defendants concede, the notice was not required to specifically

specify "the precise legal claim (e.g. tortious interference) that the plaintiff intends to assert." As

for the damages associated with the tortious intereference claim, plainly the notice, which stated

that Mr. Artis and Mr. Dotson "have been damaged by these actions," made the University aware

that damages claims were being asserted. No law says that more was required. The University also

makes no showing as to what evidence it would have "collected" if the NBA had been mentioned.

### 5. This Court Should Reject the Defendants' Arguments in Favor of Dismissing Mr. Artis' and Mr. Dotson's Breach of Contract Claim

The University concludes by lodging two challenges to Plaintiffs' breach of contract claim

against it, which, and as a result of the Defendants' breach suffered direct and consequential

damages.

The University concedes the scholarship agreement is a contract, but first argues that

nothing within the scholarship agreement guarantees renewal. Mr. Artis and Mr. Dotson, however,

---

[44]    To be clear about this language, it is beyond dispute that the applicable CBA (http://www.nba.com/media/CBA101.pdf) guarantees a multi-million dollar salary for any individual drafted in the first round of the NBA Draft, and a player drafted in the first round would very likely receive "tens of millions of dollars in prospective economic advantage."

EXHIIBIT A - PAGE 43

plausibly allege that Plaintiffs had the objectively reasonable expectation, based upon the express terms of the scholarship, that the University of Oregon would renew their scholarships, and not act so as to deprive them of the fruits of the scholarship, and otherwise act in good faith vis-à-vis his scholarship. This Mr. Artis and Mr. Dotson have more than plausibly pled, and this the University failed to do.

The University further argues that Mr. Artis and Mr. Dotson would only be entitled to expectation damages. Even if this is true, which it is not, that provides no reason for dismissing the claim. Moreover, in so arguing, the University ignores that Mr. Artis and Mr. Dotson have pled an entitlement to consequential damages. As the University concedes, such damages are recoverable if they are foreseeable. Mr. Artis and Mr. Dotson plainly allege that the University and its agents and employees were fully aware of his NBA prospects and yet chose to act in the manner in which he did, making the damages foreseeable. And, again, those damages are not speculative. Prior to transferring to Oregon and the Defendants' wrongful conduct, Mr. Artis and Mr. Dotson were "widely projected by experts in basketball and the NBA Draft" to be drafted in the first round and receive guaranteed millions, and very likely receive endorsements worth much more. Mr. Artis and Mr. Dotson allege that, as a result of the breach, this has not occurred.

## CONCLUSION

For the foregoing reasons, this Court should deny the Motion.


Dated: Friday, June 17, 2016                    Respectfully submitted,


                          By:

                              s/Alex Spiro
                              _____
                              Alex Spiro, Esq.
                              Brafman & Associates, P.C.
                              767 Third Avenue, 26th Floor
                              New York, NY 10017

                              s/Brian Michaels
                              _____
                              Brian Michaels, Esq.
                              259 East Fifth Ave.
                              Eugene, OR  97401

                              *Attorneys for Plaintiffs Dominic Artis and Damyean Dotson*

EXHIIBIT A - PAGE 45

## CERTIFICATE OF SERVICE

I, Alex Spiro, hereby certify that, on the date set forth below, I served a copy of the

foregoing memorandum upon the following counsel of record via this Court's mandatory

Electronic Case Filing system:

Attorney/Defendants
Michelle B. Smigel
Michelle Barton Smigel, P.C., OSB No. 045530
michelle.smigel@millernash.com
Michael Porter, P.C., OSB No. 003560
 mike.porter@millernash.com
Phone: 503.224.5858
Fax: 503.224.0155


Dated: Friday, June 17, 2016                    Respectfully submitted,

                                                s/Alex Spiro
                                                _____
                                                Alex Spiro, Esq.
                                                Brafman & Associates, P.C.
                                                767 Third Avenue, 26th Floor
                                                New York, NY 10017


                                                s/Brian Michaels
                                                _____
                                                Brian Michaels, Esq.
                                                259 East Fifth Ave.
                                                Eugene, OR  97401

                                                *Attorneys for Plaintiffs Dominic Artis and Damyean*
                                                *Dotson*

EXHIIBIT A - PAGE 46