IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRANDON AUSTIN,

      Plaintiff,

v.

UNIVERSITY OF OREGON; SANDY
WEINTRAUB; CHICORA MARTIN;
ROBIN HOLMES; and MICHAEL R.
GOTTFREDSON, all in their individual
capacities only,

      Defendants.

Case No. 6:15-cv-02257-MC (Lead Case)
Case No. 6:16-cv-00647-MC (Member Case)

OPINION AND ORDER

DOMINIC ARTIS and DAMYEAN
DOTSON,

      Plaintiffs,

v.

UNIVERSITY OF OREGON; SANDY
WEINTRAUB; CHICORA MARTIN;
ROBIN HOLMES; and MICHAEL R.
GOTTFREDSON,

      Defendants.

MCSHANE, Judge:

Plaintiffs Brandon Austin, Dominic Artis, and Damyean Dotson, were student athletes at

the University of Oregon. Following allegations that the three sexually assaulted a female

Page 1 – OPINION AND ORDER

student, the University conducted an investigation and held administrative hearings to determine

whether Plaintiffs violated the University of Oregon's Student Conduct Code. Upon finding that

Plaintiffs violated the Code, the University issued lengthy suspensions and opted not to renew

Plaintiffs' athletic scholarships. Plaintiffs claim that (1) the individually named Defendants

violated their due process rights under the 14th Amendment and are therefore liable under 42

U.S.C. § 1983; (2) the University of Oregon violated Title IX of the Education Amendments of

1972, 20 U.S.C., *et seq.* (Title IX) by discriminating against them on the basis of their gender;

and (3) all Defendants committed various state law torts against them, including negligence,

intentional infliction of emotional distress, intentional interference with economic relations, and

breach of contract.

This Court is now asked to consider whether Plaintiffs have stated cognizable claims

under Federal Rule of Civil Procedure 12(b)(6). Because the individual defendants are entitled to

qualified immunity and because the University afforded the Plaintiffs appropriate process

without regard to gender, Defendants' Motion to Dismiss is GRANTED.

## BACKGROUND[1]

Plaintiffs Brandon Austin, Dominic Artis, and Damyean Dotson are former students at

the University of Oregon ("University"), Pl. Austin's Compl., ¶ 4, ECF No. 12; Pl. Artis' Compl.,

¶ 2, ECF No. 1–1, where they played NCAA Division I men's basketball, Pl. Austin's Compl., ¶

14, ECF No. 12; Pl. Artis' Compl, ¶ 11, ECF No. 1–1. In March 2014, a female student made

allegedly false accusations that the three basketball players sexually assaulted her at a party and

later at an apartment, Pl. Austin's Compl., ¶ 18, 33, ECF No. 12. Plaintiffs allege that, in

---

[1] **Error! Main Document Only.**The court expresses no opinion as to the veracity of the sexual assault accusations underlying this case; rather, when considering the factual allegations on a Rule 12(b)(6) motion to dismiss, the court must take the complaint's allegations of material fact as true and construe them in the light most favorable to the nonmoving party. *Grosz v. Lassen Community College Dist.*, 360 Fed. Appx. 795 (9th Cir. 2009) (citing *Kearns v. Tempe Technical Inst., Inc.*, 39 F.3d 222, 224 (9th Cir. 1994)). I construe the facts with these standards in mind.

responding to these accusations, the University deprived them of due process, equal protection, and other rights guaranteed by Title IX based upon their sex/gender. *Id.* at ¶ 64; Pl. Artis' Compl, ¶ 34, ECF No. 1–1. The named defendants, in addition to the University itself, include the Director of Student Conduct & Community Standards Sandy Weintraub, Assistant Dean of Students Chicora Martin, Vice President for Student Life Robin Holmes, and President Michael R. Gottfredson. Pl. Austin's Compl., ¶ 4–9, ECF No. 12; Pl. Artis' Compl., ¶ 5–9, ECF No. 1–1.

The Plaintiffs' version of the incident describes a consensual sexual encounter between the three men and their accuser. Austin alleges that the female student approached him and another basketball player at a party and began to "twerk" for them. Pl. Austin's Compl., ¶ 19, ECF No. 12. The three then entered a bathroom together where they participated in consensual sexual activity. *Id.* at ¶ 20. After they left the bathroom, a third player that the female recognized approached them. *Id.* at ¶ 21. All four then returned to the bathroom where the female performed various sexual acts with the basketball players and initiated oral sex on Austin. *Id.* at ¶ 22; Pl. Artis' Compl., ¶ 15, ECF No. 1–1. Plaintiffs claim that numerous witnesses saw the female student interacting with the basketball players before and after the sexual activity and that they would have testified that she gave no indication that she was upset or had been sexually assaulted. Pl. Austin's Compl., ¶ 23, ECF No. 12; Pl. Artis' Compl., ¶ 16, ECF No. 1–1.

Later that evening, the female went with all three Plaintiffs to one of their apartments, where she took her clothes off and engaged in group sexual activity. Pl. Austin's Compl., ¶ 24–26, ECF No. 12. Austin claims that when she became teary-eyed they ceased sexual activity and that she was laughing and joking again soon after. *Id.* at ¶ 27. Plaintiffs also allege that the female chose to stay overnight, had intercourse with one of the basketball players the next morning, took a cab home that the player had called, and texted the player to thank him for

Page 3 – OPINION AND ORDER

getting her home. *Id.* at ¶ 28; Pl. Artis' Compl., ¶ 17–19, ECF No. 1–1. Plaintiffs allege that the female did not appear to be intoxicated nor did she say no to any of the sexual activity at any point. Pl. Austin's Compl., ¶ 30–31, ECF No. 12; Pl. Artis' Compl., ¶ 20–21, ECF No. 1–1. Plaintiffs claim that she expressed verbal consent and/or physical indications of her desire to participate in sexual activity with them while they were engaged in such conduct. Pl. Austin's Compl., ¶ 32, ECF No. 12; Pl. Artis' Compl., ¶ 22, ECF No. 1–1.

A day or two later, the female began making what Plaintiffs allege were false accusations that they dragged her into the bathroom, assaulted her, wrestled her into a car, forced her to get drunk, drove her to the apartment, and raped her. Pl. Austin's Compl., ¶ 33, ECF No. 12; Pl. Artis' Compl., ¶ 23, ECF No. 1–1. The female then made inconsistent statements to police regarding her sobriety, the events and conversations of the party, and the basketball players' actions, words, and behavior during the sexual activity. Pl. Austin's Compl., ¶ 34, ECF No. 12; Pl. Artis' Compl., ¶ 24, ECF No. 1–1.

On a motion to dismiss, the Court may consider, in addition to the complaint, materials incorporated into the complaint or matters of public record. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). The police report prepared by the Eugene Police Department, ECF No. 21-1, is both a public record and is relied upon factually in the Second Amended Complaint. *See* ECF No. 12 at ¶¶ 39, 41, 79. The police report includes both an extensive interview with the female as well as a summary of the phone conversations between the female and the Plaintiffs following the incident. Those recordings were submitted by the female to the Eugene Police Department following the investigating officer's request. *Id.* at 16. In those conversations, the Plaintiffs attested to the fact that the female "started crying during sex" and that was "the first time any of them knew she did not want to continue." *Id.* One of the Plaintiffs

stated that he "regretted the situation, and could understand why she felt like she was taken

advantage of, given what she remembered of the situation." *Id.* The report includes one of the

Plaintiffs admitting to feeling that he did something wrong. *Id.* at 17. Another Plaintiff admits

that "he was sorry, and said what he did was very inappropriate, and again mentioned he would

not want anyone to do that to his mom or sister" and that "he had never done anything like this

before, and would never do it again." *Id.* at 18. The same Plaintiff stated that the incident "was

an experience no one should have to [go] through, and called it a lesson learned for him." *Id.*

Ultimately, the Lane County District Attorney decided not to press charges against

Plaintiffs due to the victim's conflicting statements and actions, Pl. Austin's Compl., ¶ 37, ECF

No. 12; Pl. Artis' Compl., ¶ 25, ECF No. 1–1, and "insurmountable" barriers to prosecution, Pl.

Austin's Compl., ¶ 39, ECF No. 12; Pl. Artis' Compl., ¶ 27, ECF No. 1–1. Despite the lack of

criminal prosecution, President Gottfredson condemned Plaintiffs actions at a press conference

prior to the University's separate hearing process, calling the female a "survivor" and stating that

Austin in particular would not play basketball at the University again. Pl. Austin's Compl., ¶ 40,

ECF No. 12; Pl. Artis' Compl., ¶ 28, ECF No. 1–1.

The University presented Plaintiffs with notice of their alleged Student Conduct Code

violations and provided a Special Choice of Resolution Form, ECF No. 20-3, which described

the options of hearings that were available to them: specifically, a special administrative

conference or a panel hearing. Decl. of Lisa Thornton, Ex. C, 2, ECF No. 20-3.[2] The

administrative conference option allowed a right to an immediate hearing, no right to appeal, and

no right to have the accuser at the conference. *Id.* The panel hearing option allowed a mixed

---

[2] The Special Choice of Resolution Form also included a summary of alleged violations, including a description of "Sexual Misconduct" as defined in the University's Student Conduct Code and the Oregon Administrative Rules. ECF No. 20-3 at 1.

panel of students, staff, and faculty, a delay time of 21–30 weeks, a full range of sanctions, the right to appeal, the presence of an advisor, and allowed cross-examination. *Id.*; *Id.* Ex. F, 4.

Plaintiffs, with advice of counsel, ultimately chose the administrative conference option, partly because expulsion was removed as a possible sanction. ECF No. 20-3 at 2 (Lead case); ECF No. 13-3 at 3 (Member case). They claim that the University deprived them of their rights at the conference by failing to provide them with the opportunity to respond or call relevant and necessary witnesses. *Id.* at ¶ 55, 56; Pl. Artis' Compl., ¶ 34, ECF No. 1–1. Following the administrative conference, defendant Weintraub ruled against Plaintiffs, finding that they had engaged in sexual misconduct as defined by the Student Conduct Code. They were suspended for four to ten years, effectively expelling them from the University. Pl. Austin's Compl., ¶ 57, ECF No. 12; Pl. Artis' Compl., ¶ 37, ECF No. 1–1. Defendant Holmes allegedly refused to respond to Plaintiffs' request for an appeal and ignored their counsels' attempts to reach her. Pl. Austin's Compl., ¶ 59, ECF No. 12; Pl. Artis' Compl., ¶ 39, ECF No. 1–1.

Plaintiffs contend that they were regarded as three of the top amateur basketball players in the country and were widely projected to be selected in the first round of the NBA Draft, leading to multi-million dollar contracts and further economic gains. Pl. Austin's Compl., ¶ 67, ECF No. 12; Pl. Artis' Compl., ¶ 42, ECF No. 1–1. Plaintiffs claim that the Defendants' conduct has stripped them of their positions at the Division I school, ruined their chances with the NBA, associated them with suspension and sexual assault, and caused them past and future personal and professional harm. Pl. Austin's Compl., ¶ 69, ECF No. 12; Pl. Artis' Compl., ¶ 43, ECF No. 1–1.

## STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

While considering a motion to dismiss, the Court must accept all allegations of material fact as true and construe them in the light most favorable to the non-movant. *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). If the complaint is dismissed, leave to amend should be granted unless the court "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (citations and internal quotation marks omitted).

## DISCUSSION

### I. Qualified Immunity and Due Process

As a preliminary matter, I address qualified immunity as it applies to the due process claims alleged against the four individually named defendants ("Individual Defendants"). Because it comprises immunity from *suit* rather than immunity from protracted litigation, qualified immunity is properly addressed at the earliest possible stage of litigation. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534 (1991); *Dunn v. Castro*, 621 F.3d 1196, 1198 (9th Cir. 2010).

Qualified immunity in this case hinges on whether the Individual Defendants violated a clearly established constitutional right in their individual capacities. An official's conduct will only violate a "clearly established" right when "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034 (1987)) (internal bracketing and quotations omitted). Existing precedent "must have placed the statutory or constitutional question beyond debate." *Id.* at 741. The Supreme Court, in analyzing qualified immunity and the "clearly established" requirement, looks to whether precedent that directly establishes a right exists, and does not account for emergent or theoretical rights. *Id.*

The Due Process Clause of the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that no person may be deprived of life, liberty, or property without due process of law. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal citations and quotations omitted). Further, a "constitutionally cognizable property interest in a benefit requires more than 'an abstract need or desire' or a 'unilateral expectation of it'—rather, there must be 'a legitimate claim of entitlement.' This typically requires an individual to demonstrate that an existing law, rule, or understanding makes the conferral of a benefit 'mandatory.'" *United States v. Guillen–Cervantes,* 748 F.3d 870, 872 (9th Cir. 2014) (quoting *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 756, 760 (2005)).

Plaintiffs assert that they had a right to due process prior to potential deprivation of a property interest in their status as admitted university students in good standing, their ability to

Page 8 – OPINION AND ORDER

pursue public higher education and athletic participation, the economic benefit from an existing

scholarship, a hypothetical future scholarship at another school, and future potential NBA careers.

*See* Austin's Opp., 10, ECF No. 22. While the right to due process is "clearly established," the

same cannot be said of the proposed interests, whether they be characterized as property or

liberty interests, at issue in this case, as they have no parallels "beyond debate" in relevant

precedent.

The parties dispute whether there exists such precedent here, but the answer is clear:

there is no Supreme Court, Ninth Circuit, or Oregon District Court case that, at the time of the

events giving rise to this case, clearly establishes the property rights Plaintiffs assert, nor is there

any apposite statute establishing the same. While Plaintiffs point to a number of out-of-district

cases that, at best, indirectly establish such a right, the parties correctly turn their focus to one

Ninth Circuit case, *Stretten v. Wadsworth Veterans Hosp.,* 538 F.2d 361 (9th Cir. 1976) (an

appointed and employed medical resident had an interest in his position and continued education

derived therefrom), and one Supreme Court case, *Goss v. Lopez*, 419 U.S. 565, 95 S. Ct. 729

(1975) (a junior high school student had a right to not be subject to a prolonged suspension,

based on an Ohio education statute), which arguably come the closest to recognizing these rights.

I find that *Goss* does not clearly establish the rights asserted here, given that it involved middle

school public education under a relatively broad Ohio state statute establishing a right to such

education.[3] There is no analogous Oregon law applicable to college education that would create a

corollary to *Goss* in this case.

---

[3] I recognize that *Goss* mentions *Dixon v. Alabama State Board of Education,* 294 F.2d 150 (5th Cir. 1961), and a collection of cases from lower federal courts excluding the District of Oregon and the Ninth Circuit, in finding the suspended child in that case had a due process right. This does not create a right, beyond debate, in this district or circuit, in the higher education and student athlete property rights that plaintiffs now assert here.

Turning to *Stretten*, I find that case can only *arguably* be interpreted to confer a right similar to that at issue. While I agree that *Stretten* is the more analogous of the two cases, as it involves a right to higher education, I find that it is sufficiently distinct so as to fall short of the "beyond debate" standard articulated in *Al-Kidd*. Namely, the medical resident from *Stretten* was appointed to a four-year position but terminated allegedly without process after only one. The Ninth Circuit found that the plaintiff in that case had an interest in keeping his position to maintain his income, complete his residency, continue to benefit from the education derived from the residency, and protect his professional reputation. *Stretten*, 537 F.3d at 368. Here, the Plaintiffs are unpaid college student athletes who were denied the renewal on the subsequent term of their otherwise renewable one-year scholarships, from which they benefited the full promised year. Given the stark contrast between the rights conferred and then withdrawn in *Stretten* and those alleged in the case at hand, I find that Plaintiffs have failed to plead a clearly established constitutional right for the purposes of a qualified immunity analysis.

Because there is no relevant precedent that clearly establishes the proposed constitutional rights at issue, per the standard articulated in *Al-Kidd*, 563 U.S. at 741, the Individual Defendants are entitled to qualified immunity from the due process claims asserted against them. Further, because those claims are asserted only against the Individual Defendants in this case and therefore do not survive against the University, the due process claims are DISMISSED with prejudice.[4]

---

[4] While I need not reach the merits of the due process claims, I note that significant information offered at this stage undercuts allegations that Plaintiffs were summarily deprived of process, including timely notice of the Student Conduct Code violations against them, the choice of resolution format provided to them, the fact that Plaintiffs were allowed to consult counsel in choosing their preferred format, and the number of rights conferred by each of those choices. Plaintiffs' conclusory allegations that the process to which they were entitled were flawed need not be taken as true. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## II. Title IX and Equal Protection Claims

### A. Title IX

Defendants move to dismiss Plaintiffs' Title IX sex discrimination claims brought against the University.[5] Defendants argue that Plaintiffs have failed to plead factual allegations supporting any plausible theory that Defendants selectively enforced Title IX by suspending Plaintiffs for sexual misconduct because of their gender or sex. Further, Defendants contend that Plaintiffs plead no facts supporting the theory that the University's investigation or hearing were flawed in a way that was motivated by Plaintiffs' gender or sex, or that the University was deliberately indifferent to Plaintiffs' rights under Title IX. Defendants apply this same line of argumentation to the Equal Protection Claims that only Plaintiffs Artis and Dotson set forth.

Plaintiffs, for their part, argue that this case can be characterized as each of the three types of Title IX sex discrimination cases: "selective enforcement," "erroneous outcome," and "deliberate indifference." Austin's Opp., 25–28, ECF No. 22. In opposition to the instant motion, Plaintiffs describe their theory at length: a nearly-immediate suspension, a hearing with alleged insufficient process,[6] a denial of appeal following the hearing, and the fact that the University's President called the accuser a "survivor" and pointed out during the press conference that, as a father, he was appalled at the alleged conduct described in the police report. *Id.* at 26–27. On its face, this theory is short on facts plausibly alleging sex discrimination.

This Court recognizes that lower federal courts are split as to whether a mere allegation of a pattern of discrimination against males accused of sexual assault is sufficient to survive a

---

[5] As Plaintiffs concede, this claim is not brought against the Individual Defendants. Austin's Opp., 22, ECF No. 22.

[6] Throughout oral argument, Plaintiffs suggested their entitlement to the full umbrella of rights that would accompany a quasi-judicial proceeding, including cross examination, presence of counsel, ability to subpoena witnesses, and discovery of investigative reports. A number of such processes were available to Plaintiffs had they chosen to proceed with a panel hearing. *See supra* page 5–6; *supra* note 4.

motion to dismiss. Some courts have dismissed similar Title IX claims because plaintiffs only made conclusory allegations of gender bias. *See Ludlow v. Northwestern Univ.*, 125 F. Supp. 3d 783 (N.D. Ill. 2015); *Salau v. Denton*, 139 F. Supp. 3d 989 (W.D. Mo. 2015); *Doe v. Univ. of Cincinnati*, 2016 WL 1161935 (S.D. Ohio Mar. 23, 2016); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774 (S.D. Ohio 2015). Other courts have found that similar allegations are sufficient to show that gender bias motivated an erroneous outcome, and that to require more is practically impossible and inconsistent with pleading standards governing other types of discrimination claims. *Doe v. Brown Univ.*, 2016 WL 715794, at \*8; *see also Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748 (D. Md. 2015); *Wells v. Xavier*, 7 F. Supp. 3d 746 (S.D. Ohio 2014). Others still strike a middle ground, maintaining that the potential facts necessary to plausibly support a claim—that is, whether women are ever accused of or penalized for sexual assault—are typically held closely by universities for obvious reasons and, at the very least, some discovery should be conducted on the matter. *See Doe v. Wash. & Lee Univ.*, 2015 WL 4647996, at \*10 (W.D. Va. Aug. 5, 2015).

The issue, then, is what constitutes sufficient factual pleadings to survive the motion to dismiss stage where a male alleges sex discrimination after a university suspends him for sexual misconduct.

### *1. Selective Enforcement*

Plaintiffs' first theory of discrimination is that the University's decision to initiate proceedings and subsequently suspend Plaintiffs for four to ten years was improperly influenced by the fact that the accused Plaintiffs are males and their accuser was a female. Pl. Artis' Compl, ¶ 51, ECF No. 1–1. Plaintiffs cite the DA's refusal to prosecute, *Id.* at ¶ 52–53, and University President Gottfredson's statement that the female was a "survivor" and that he was appalled at the accusations "as a father," *Id.* at ¶ 54, as evidence of gender bias. Plaintiffs allege "[o]n

information and belief" that, conversely, the University has never taken action against a female who made a false allegation of sexual assault. *Id.* at ¶ 56. Plaintiffs also allege that there is a presumption that accused males are guilty of sexual misconduct, as evidenced by the lack of opportunity the University gave Plaintiffs to defend themselves (despite providing them a hearing). *Id.* at ¶ 57.

Defendants correctly counter that Plaintiffs' complaint contains only conclusory statements bolstered by few factual allegations. Defs.' Mot. (Member Case), 27, ECF No. 12. First, Defendants argue that evidence of the DA's decision not to prosecute the matter as a criminal case has no bearing on the University's decision to investigate and prosecute a conduct code violation. *Id.* at 28. The University correctly points out that the elements of sexual misconduct, as defined by the Student Conduct Code, are quite different than the elements that a state prosecutor would have to prove beyond a reasonable doubt in a criminal case. The state's failure to indict Plaintiffs with a crime has no bearing on the Defendants' decision to investigate a Student Conduct Code violation based on that Code's definitions of "sexual misconduct" and "explicit consent."[7] There is no logical nexus that connects the failure to criminally prosecute with gender bias on the part of Defendants.

---

[7] Per the University's Student Conduct Code, "Sexual Misconduct" means:

    a) Unwanted Penetration is Penetration of another person, or causing the Penetration of another person, when one:
        A. Does not first obtain Explicit Consent from that person; or
        B. Knows or should have known the person was incapable of explicit consent by reason of Mental Disorder, Mental Incapacitation, or Physical Helplessness.

    b) Nonconsensual personal contact occurs when a student subjects another person to contact of a sexual nature when a reasonable person would know that such contact would cause emotional distress:
        A. Without having first obtained Explicit Consent; or
        B. When he or she knows or should have known the person was incapable of explicit consent by reason of Mental Disorder, Mental Incapacitation, or Physical Helplessness.

    Additionally, the Code defines "Explicit consent" as "voluntary, non-coerced and clear communication indicating a willingness to engage in a particular act." "Explicit consent" includes "an affirmative verbal response or

Second, Defendants argue that Gottfredson's statement was based on the police report's description of the events, and that the sentiments he expressed related only to the allegations of sexual misconduct and rape, regardless of Plaintiffs' gender or sex. *Id.* at 29. Defendants further argue that even if the University were biased in favor of accusers, it does not equate to bias against males because victims may be male or female. *Id.* Either way, Defendants claim, President Gottfredson was not involved in the hearing process or decision making and Plaintiffs have not established a connection between his statements and any subsequent harm. *Id.*

In response, Plaintiffs reassert that "regardless of guilt or innocence, the severity of the penalty, as well as the decision to initiate the proceeding in the first place, were affected by the fact that [Plaintiffs] are male, and the accuser is a female." Pl. Artis' Resp., 30, ECF No. 21. Defendants reiterate that Plaintiffs' selective enforcement theory is based on a misinterpretation of Gottfredson's statement as gender biased when, as they have already explained, a "survivor" can be male or female and any parent, regardless of bias, could be "appalled" at accusations of sexual misconduct regardless of the accused's gender. Defs.' Reply (Member Case), 24, ECF No. 23. Defendants also argue that the other three allegations made "[o]n information and belief" do not meet the pleading standards of *Iqbal*, *Twombly*, and *Brown University*. *Id.*

A Tennessee district court held that a selective enforcement claim such as the one Plaintiffs bring here requires evidence that a female in similar circumstances to the male student bringing the claim was treated more favorably by the University against which selective enforcement is alleged. *See, e.g., Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009). *Doe v. Brown Univ.* went forward on a similar theory of discrimination, but the theory was bolstered by pointed allegations in the complaint including, but not limited to, former

---

voluntary acts unmistakable in their meaning." *See* Student Conduct Code, OAR OAR 571-021-0105(30), 571-021-0120(3)(h) *available* at http://policies.uoregon.edu/vol-3-administration-student-affairs/ch-1-conduct/student-conduct-code.

university employees attesting to a pattern of gender bias as well as statements by current professors supporting the gender bias allegations. No. 15-144, 2016 WL 715794, *8–9 (D.R.I. Feb. 22, 2016). No such allegations are present here. In fact, a California district court recently dismissed a similar Title IX complaint because the plaintiff failed to adequately allege that his suspension was motivated by gender or that a similarly situated female student had been treated more leniently. *Doe v. Regents of the Univ. of Cal.*, No. 2:15-cv-02478-SVW-JEM, 9 (C.D. Cal. July 25, 2016).

Even taking all inferences in Plaintiffs' favor, their allegations of selective enforcement fall short of satisfying the pleading standards mandated by *Twombly* and *Iqbal*. First, the University's decision to investigate the female's claims and suspend Plaintiffs does not give rise to an inference of gender discrimination simply because the District Attorney did not criminally prosecute Plaintiffs. Second, even assuming that President Gottfredson's statements were biased toward the accuser, Plaintiffs have not established that they were grounded in sexism or gender bias or that they had any substantive bearing on the review process. As such, Plaintiffs fall short of plausibly alleging that Defendants selectively enforced the code of student conduct against Plaintiffs due to their sex.

Plaintiffs additionally allege a pattern of selective enforcement because the University has not, "[o]n information and belief," taken action against a female student for similar sexual misconduct or for making false allegations against a male. Pl. Artis' Compl., ¶¶ 56–57, ECF No. 1–1. What Plaintiffs argue, then, is that the University must show that it has treated women with equal severity. Simply because enforcement is asymmetrical does not mean that it is selectively so. It is a simple fact that the majority of accusers of sexual assault are female and the majority of the accused are male, therefore enforcement is likely to have a disparate impact on the sexes.

Furthermore, contrary to Plaintiffs' assertions, whether the University has ever taken action against a female student for making a false allegation has no bearing on Plaintiffs' case. The punishment for making a false accusation should necessarily be less severe than the punishment for engaging in sexual misconduct itself, and the University is unlikely to pursue sanctions against false accusers as vehemently as it does against alleged perpetrators for fear of chilling reports of sexual assault.

In light of these truths and the shortcomings of Plaintiffs' allegations, Plaintiffs have not shown any facts giving rise to a plausible inference that the University treated Plaintiffs unequally based on their sex. If anything, Plaintiffs have alleged that the University is biased against alleged perpetrators of sexual misconduct, but that does not implicate gender discrimination simply because those alleged perpetrators are typically male. As Defendants point out, survivors and perpetrators alike may be male or female. Because I find that conclusory allegations of a pattern of enforcement against males alone does not give rise to an inference of sex discrimination, Plaintiffs' Title IX claim brought under a selective enforcement claim is DISMISSED without prejudice.

### 2. *Erroneous Outcome*

Plaintiffs' second Title IX theory is that Defendants' allegedly flawed proceeding led to an erroneous outcome. Pl. Artis' Compl, ¶ 58, ECF No. 1–1. Plaintiffs assert that Defendants failed to comply with Title IX or even with the University's own protocols and instead aimed to reach a result that was predetermined based on Plaintiffs' sex. *Id.* at ¶ 59. Plaintiffs argue that the presumption of guilt led to a biased investigation and hearing that deprived Plaintiffs of educational opportunities based on their gender. *Id.* at ¶ 60–62.

Defendants argue that Plaintiffs must establish a causal connection between the erroneous

outcome and gender bias as evidenced by discriminatory statements or patterns of decision-

making. Defs.' Mot. (Member Case), 30–31, ECF No. 12. Defendants argue that Plaintiffs have

failed to establish such a connection between the University's process and Plaintiffs' gender or

sex. *Id.* at 30. In response, Plaintiffs maintain that President Gottfredson's statement that the

basketball players would not be playing for Oregon again and the subsequent immediate

suspension prejudged their fate. Pl. Artis' Resp., 25, ECF No. 21. Plaintiffs reassert that they

were deemed guilty because of their sex. *Id.* Defendants reply that Plaintiffs' theory of

erroneous outcome fails because Plaintiffs have failed to state all elements of a Title IX claim,

including a plausible inference that the University acted with discriminatory intent. Defs.' Reply

(Member Case), 24, ECF No. 23.

The Second Circuit recently extended the application of the *McDonnell-Douglass*

burden-shifting framework from Title VII cases to Title IX cases, requiring only a minimal

plausible inference of discrimination to survive a motion to dismiss. *Doe v. Columbia University*,

Civ. No. 15-cv-1536, 2016 WL 4056034, \*7 (2d. Cir. July 29, 2016). In that case, the Court

overturned the district court's opinion and found that an atmosphere of internal and public

scrutiny of the University's treatment of sexual misconduct allegations created a plausible

inference in favor of plaintiff's sex discrimination claim. *Id.*

I decline to extend the Second Circuit's reasoning because Plaintiffs make no similar

allegations of an atmosphere of scrutiny and, even had they done so, there remains no plausible

inference that a university's aggressive response to allegations of sexual misconduct is evidence

of gender discrimination. As explained in *Regents*, "the Court cannot plausibly infer, as Plaintiff

does, that a higher rate of sexual assaults committed by men against women, or filed by women

against men, indicates discriminatory treatment of males accused of sexual assault in the

consequent proceedings." *Regents*, No. 2:15-cv-02478-SVW-JEM at 7. Furthermore, to accept

the Second Circuit's pleading standard would put universities in a double bind. Either they come

under public fire for not responding to allegations of sexual assault aggressively enough or they

open themselves to Title IX claims simply by enforcing rules against alleged perpetrators. Given

these circumstances, Plaintiffs have failed to show how the University's enforcement of its

student conduct code, even if it had been overzealous, equates to sex discrimination.

Therefore, Plaintiffs' Title IX claims brought under an erroneous outcome theory are

DISMISSED without prejudice.

### *3. Deliberate Indifference*

Plaintiffs' third and final claim under Title IX is that the University exhibited deliberate

indifference to Plaintiffs' rights based upon their gender. Pl. Artis' Compl., ¶ 67, ECF No. 1–1.

Plaintiffs again allege that the University acted unreasonably in light of the DA's stance on the

case, *Id.* at ¶ 68, and maintain that the outcome of the proceeding would have been different if

not for the University's supposed gender bias. *Id.* at ¶ 69. Defendants counter that Plaintiffs have

not adequately alleged University misconduct and repeat that the DA's decision not to prosecute

Plaintiffs is irrelevant and inadmissible. Defs.' Mot. (Member Case), 32, ECF No. 12.

For the same reasons that Plaintiffs' selective enforcement claim fell short, I find that

Plaintiffs fail to plausibly allege that the University was deliberately indifferent to their rights.

First, the standard of proof required for a University investigation and suspension based on its

code of conduct is entirely different from the DA's standard to prosecute a criminal case. Second,

Plaintiffs continue to allege that the University is gender-biased but fail to allege specific facts

supporting that theory. Instead, Plaintiffs merely posit, without reason or alleged facts, that the

University would not have investigated or penalized them if they were not male. Because

Plaintiffs have failed to show how the University exhibited deliberate indifference to Plaintiffs'

rights based upon their gender or sex, Plaintiffs' Title IX claims brought under a deliberate

indifference theory are DISMISSED without prejudice.

### B. Equal Protection Claim

With regard to Plaintiffs' equal protection claim, both parties largely repeat the same

arguments from the Title IX sections of their respective briefs. Plaintiffs Artis and Dotson allege,

independently from Austin, that the Individual Defendants violated Plaintiffs' rights under color

of state law. Pl. Artis' Compl., ¶ 86–89, ECF No. 1–1.

In order to succeed on an equal protection claim brought under § 1983, plaintiffs must

prove that the defendants acted in a discriminatory manner and that the discrimination was

intentional." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) (citing *Fed.

Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991)). Intentional discrimination

means that a defendant's actions were motivated, at least in part, by a plaintiff's protected status.

*Serrano v. Francis*, 345 F3d 1071, 1082 (9th Cir. 2003).

For the same reasons explained under my Title IX analysis, I find that Plaintiffs'

allegations that the Individual Defendants violated their equal protection rights fall short of

satisfying the relevant pleading standards set forth by *Twombly* and *Iqbal*. Artis and Dotson fail

to plausibly allege facts that support the notion that the Individual Defendants' actions were

discriminatory or that they had the requisite intent to discriminate on the basis of sex. Even if

Plaintiffs adequately pled that the Individual Defendants denied them their substantive and due

process rights, Plaintiffs have *not* adequately pled facts to suggest that it was due to Defendants'

gender bias. Therefore, Artis' and Dotson's claims for violation of equal protection are DISMISSED without prejudice.

## III.  State Tort Claims

### A.  Tort Claim Exhaustion and Immunity Arguments

Turning to Plaintiffs' tort claims asserted under Oregon law, I first analyze two general challenges to those claims lodged by Defendants on the basis of preclusion and discretionary immunity.

#### *1.  Preclusion*

Defendants first argue that Plaintiffs failed to challenge their suspension from the University in accordance with Oregon administrative law, thereby mandating dismissal on the basis of claim preclusion. Oregon law attaches preclusive effect to some final administrative decisions, preventing re-litigation in other venues of the facts at issue in the administrative hearing except on appeal. ORS 183.310(6)(b) ("Final order means final agency action expressed in writing.").While Defendants acknowledge that Plaintiffs are not solely attempting to re-litigate the ultimate fact issue finding of the administrative hearing, they argue that Plaintiffs erroneous outcome theory under Title IX draws the instant case too close to a do-over of the administrative hearing. This position is patently flawed.

As Plaintiffs correctly contend, the § 1983 due process, equal protection claim, and Title IX claims do not center on the ultimate facts found at the hearing. Those claims allege insufficiency of process and a pattern or practice of discrimination. Plaintiffs are not here attempting to re-litigate their hearing. The preclusion argument therefore fails.

### *2. Discretionary Immunity*

Defendants invoke ORS 30.265(6)(c) and (f) to argue that claims against them should be dismissed because they are shielded from liability for "[a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

Discretionary immunity is a complex concept, and it is one with which the Oregon Supreme Court has "struggled with . . . over the years." *Westfall v. State*, 355 Or. 144 (2014) (*en banc*). ORS 30.265(6)(c) deals with decisions involving public policy and made under the apparent authority of law. Without more, the facts as presented at this stage do not reflect that Defendants decisions were made under the apparent authority of law as much as they were made under the auspices of administrative fiat as guided by the University's Student Conduct Code.

Further, ORS 30.265(6)(f) governs immunity from claims against official conduct guided by unconstitutional or invalid laws, rules, or regulations. Again, without more, it does not appear that the conduct at issue in this cases was so guided by a law or principle governed under 30.265(6)(f).

At this stage of litigation, I find that discretionary immunity does not shield Defendants from the claims levied against them.

### B. Negligence Claims

Regarding negligence, Defendants contend that Plaintiffs have failed to plead cognizable damages and that Defendants' conduct did not create a foreseeable risk of harm to an interest protected by Oregon law.

Plaintiffs' negligence claims seek economic damages purely in the form of lost future income. Such a claim is not cognizable under Oregon law unless a "special relationship" exists

between the parties. *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP,* 336 Or. 329, 341, 83 P. 3d 322 (2004). Whether Plaintiffs' negligence claim should be dismissed at this stage of litigation hinges on whether such a relationship existed between Plaintiffs and the University.

A special relationship exists when: (1) one party relinquishes over matters, usually financial, and entrusts them to the other party; (2) the party with special control is authorized to exercise independent judgment; (3) in order to further the other party's interest; and (4) the relationship either is, or resembles, other relationships "in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship. *Bell v. Public Employees Retirement Bd.*, 239 Or. App. 239, 326 (2010) (citing *Conway v. Pacific Univ.*, 324 Or. 231 (1996); *Onita Pac. Corp. v. Trustees of Bronson*, 315 Or. 149 (1992)).

There exists no precedent in Oregon or the Ninth Circuit recognizing a special relationship between college students or student athletes and the universities they attend. One case, *Freeman v. Busch*, 349 F.3d 582 (8th Cir. 2003), declared that "since the late 1970s, the general rule is that no special relationship exists between a college and its own students . . . ." *Id.* at 587. Since then, courts have reached differing conclusions as to whether such a special relationship exists. *Compare Davidson v. Univ. of N.C.,* 543 S.E.2d 920, 922 (N.C. Ct. App. 2001); *Kleinknecht v. Gettysburg Coll.,* 989 F.2d 1360 (3d Cir. 1993) (both finding special relationships between student athletes and universities in the contexts of sports related injuries), *with Orr v. Brigham Young Univ.,* 960 F. Supp. 1522, 1526–28 (D. Utah 1994); *Swanson v. Wabash Coll.,* 504 N.E.2d 327, 330-31 (Ind. Ct. App. 1987); *Fisher v. Northwestern State Univ.,* 624 So. 2d 1308, 1309 (La. Ct. App. 1993) (finding no special relationship). Notably, courts finding special relationships have done so when the incident giving rise to the negligence

claim occurred during a supervised school practice or other event and arose out of an injury related thereto. *See, e.g., Davidson,* 543 S.E.2d at 928; *Kleinknecht,* 989 F.2d at 1367. Those courts tend to limit their holdings accordingly.

When faced with this question, courts typically refer to the relevant factors of special relationships contemplated by state law. In Oregon, those factors focus on one party's ability to exercise independent judgment on another party's behalf in order to advance that party's interests. *Bell v. PERB,* 239 Or. App. at 249. In Oregon, this typically manifests in the form of an employer-employee relationship or an insurer-insured relationship. *See, e.g., McManus v. Auchincloss,* 271 Or. App. 765, 781 (2015).

Plaintiffs do not allege that the University of Oregon or the Individual Defendants exercised independent judgment on behalf of the student athletes to advance their individual interests. Even viewing the facts here in the light most favorable to Plaintiffs, the relationship between student athletes accused of sexual assault and a University rendering academic code of conduct decisions can be characterized as little more than an arm's-length relationship intent on securing divergent rather than joint interests. *See Conway,* 324 Or. 231, 245 n.8 (citing *Hall v. the May Dept. Stores,* 292 Or. 131, 141 (1981)).

Because no special relationship exists between the parties and because Plaintiffs plead only economic damages, Plaintiffs' negligence claims are DISMISSED without prejudice.

## C. Intentional Infliction of Emotional Distress ("IIED") Claims

Defendants move to dismiss Plaintiffs' IIED claims on the basis that Plaintiffs cannot plausibly allege that Defendants intended to inflict severe emotional distress or that Defendants alleged actions transgressed the bounds of socially tolerable conduct. These arguments coincide

with the first and third factors required for a cognizable IIED claim: (1) that the defendant intended to inflict severe emotional distress on the plaintiff; (2) the defendant's acts were the cause of the plaintiff's severe emotional distress; and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. *McGanty v. Staudenraus*, 321 Or. 532, 543 (1995).

Trial courts play a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine the third factor articulated in *McGanty*; whether the conduct is an extraordinary transgression of the bounds of socially tolerable conduct. *House v. Hicks*, 218 Or. App. 348, 358 (2008). In considering whether a defendant's acts were an "extraordinary transgression," a court must examine the purpose of the conduct and the means used to achieve the result. *Shay v. Paulson*, 131 Or. App. 270, 273 (1994).

The conduct at issue must be deliberate and the means of inflicting the harm must be extraordinary in order to "distinguish actionable conduct from the insults . . . that persons are expected to endure under contemporary standards of behavior," and to assess "objective reality for a claim of harm that otherwise rests only on evidence of the plaintiff's subjective reaction divorced from physiological or other tangible injury." *Brewer v. Erwin,* 287 Or. 435, 457, 600 P.2d 398 (1979). The conduct at issue must be "so offensive as to be outrageous." *Hall v. May Dept. Stores Co.,* 292 Or. 131, 637 P.2d 126 (1981). Oregon Courts have even required the alleged conduct to rise to the level of "outrageous in the extreme." *Shay*, 131 Or. App. at 273 (citing *Patton v. J.C. Penney Co.,* 301 Or. 117, 124 (1986)). Illustrative of this very high bar, Oregon Courts have found that even patently felonious conduct does not necessarily rise to the level of an IIED claim. *Id.* Oregon Courts also require a special relationship between the parties,

*House*, 218 Or. App. at 360, which, as articulated above, I do not find here. Finally, Oregon Courts look to whether a defendant had ulterior motives or intended to take advantage of unusually vulnerable individuals. *Checkley v. Boyd*, 170 Or. App. 721, 727 (2000).

The conduct that Plaintiffs argue transgresses the bounds of socially tolerable conduct is: (1) the University's choice to hold a press conference on the sexual assault allegations and the ongoing investigation; (2) the University President's choice to characterize the accuser as a victim and state that he was appalled by the accusations; (3) the University's alleged failure to provide sufficient process; (4) the alleged inadequacy of the hearings provided to the Plaintiffs and lack of appeal process; (5) and the "badge of infamy" stamped upon the Plaintiffs. Pl. Austin's Resp., 39, ECF No. 22. None of this rises to the level "outrageous in the extreme." *See Shay*, 131 Or. App. at 273. Further, given the nature of the accusations at the time they were made, the public interest in the situation, and the high standards to which Oregon Courts hold IIED claims I find that the conduct at issue does not constitute an extraordinary transgression of socially tolerable conduct. Plaintiffs' IIED claims are therefore DISMISSED with prejudice.

### D. Tortious Interference Claims

Defendants next move against Plaintiffs' tortious interference claims on the basis that (1) Plaintiffs do not plausibly allege that they had an actual or contemplated business relationship with an identifiable National Basketball Association ("NBA") team; (2) the pleadings do not sufficiently allege intentional interference with such a relationship, even if one did exist; and (3) Plaintiffs did not provide Defendants with any notice of this claim, as required under the Oregon Tort Claims Act ("OTCA").

Setting aside the issue of whether Plaintiffs provided adequate notice, tortious interference claims must allege six elements: (1) the existence of a professional or business relationship (which could include, *e.g.,* a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995) (citing *Straube v. Larson,* 287 Or. 357, 360-61, 600 P.2d 371 (1979)). Whether Plaintiffs' tortious interference claim should be dismissed at this stage of litigation hinges on the first, second, and fourth factors articulated above.

Under the first factor, the professional relationships at issue are the Plaintiffs' prospects as potential NBA draft picks. That factor requires a "voluntary relationship with another party that would have very likely resulted in a pecuniary benefit for the plaintiff but for the defendant's interference." *Cron v. Zimmer*, 255 Or. App. 114, 127 (2013). Plaintiffs allege that they were "widely projected by experts in basketball and the NBA Draft to be selected in the first round of the NBA Draft," Artis Resp. 36–37, ECF No. 21, and very likely would have benefited from the accompanying multi-million dollar contracts that would have arisen from draft selection. At this stage of litigation, this is sufficient to establish the first factor.

Plaintiffs' claims, however, fail under the second and fourth pleading requirements for tortious interference. *McGanty*, 321 Or. at 535. Plaintiffs do not allege that Defendants were aware of their projected NBA prospects, which in itself hobbles the second pleading requirement for intentional interference. That notwithstanding, under the forth requirement, improper means "must violate some objective, identifiable standard, such as a statute or other regulation, or a

recognized rule of common law, or, perhaps, an established standard of a trade or profession."
*Nw. Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498 (1999). The alleged means of
interference here was the summary suspension of Plaintiffs following the investigations and
hearings into the accusations of misconduct levied against them. The alleged impropriety of
these means is the constitutionally insufficient process and discrimination Plaintiffs allege of the
University's actions. Considering multiple intentional interference pleading requirements in
tandem—both the intentionality of interference and the improper means—Plaintiffs do not
plausibly allege that Defendants intended to interfere with their potential NBA prospects by
investigating rape allegations against them and suspending Plaintiffs based on Student Conduct
Code violations. The fact that the University's enforcement of its Student Conduct Code had the
indirect adverse effect of damaging Plaintiffs' NBA prospects, hypothetical or otherwise, is
unfortunate. Nonetheless, there is no place in the law of intentional interference for such indirect,
unintentional consequences. Plaintiffs' intentional interference claims are DISMISSED with
prejudice.

### E.  Breach of Contract Claims

Finally, Plaintiffs allege that Defendants materially breached their athletic scholarship
contracts by refusing to renew them following the completion of the two-quarter fixed term
anticipated therein. There is no dispute that the University fulfilled its obligations of scholarship
payment, nor is there any dispute that Plaintiffs received the full durational benefits of their
scholarship. Plaintiffs instead posit that the University breached by not renewing the contract at
the end of its term.

"A breach is material if it goes to the very substance of the contract and defeats the
object of the parties entering into the contract." *Biso v. Madenwald,* 33 Or. App. 325, 331, 576

P.2d 801, *rev. den.,* 283 Or. 1, 580 P.2d 1030 (1978). Plaintiffs allege that they held the "reasonable expectation, based upon the express terms of the contractual relationship governing the athletic scholarship, that the University of Oregon would renew [their] scholarship . . . ." Second Amended Complaint, ¶ 132 ECF No. 12. Defendants retort with the fact that the parties fulfilled the contract and it ended on its own terms in June 2014, after both quarters covered by the contract were completed. The renewal terms in the contract described that it would be *considered* for renewal as long as eligibility requirements were met and, if the University opted not to renew for any reason, that Plaintiffs would be promptly notified of that choice.

Plaintiffs appear to concede that they do not plead a breach of any material term of their athletic scholarship contracts. Instead, Plaintiffs argue that the University induced at least one of them into transferring using the scholarship offer, thus creating an expectation that it would be subsequently renewed. These skeletal pleadings fall well short of stating a claim for which relief can be granted. Specifically, Plaintiffs have failed to identify an actual breach, they have pointed to no promise regarding renewal, and they have asserted no contractual basis for their alleged expectation of renewal, save for the mere inclusion of a renewability provision in the terms of the contract. I do not find that a renewability provision inherently creates an expectation of renewal unless that provision expressly promises as much.

For these reasons, Plaintiffs' breach of contract claims are DISMISSED without prejudice.

/ / /

/ / /

/ / /

Page 28 – OPINION AND ORDER

## CONCLUSION

This Court is not tasked with determining whether the University made the correct decision in suspending the three Plaintiffs in this case. Certainly, if the accusations levied at them were a fabrication, then the injustice they feel is understandable. That said, nothing in the complaint or incorporated documents suggests that the actions of the University were motivated by gender bias or that the University deprived Plaintiffs of a due process right. For these reasons and the reasons above, the Motions to Dismiss in the Lead Case (ECF No. 19) and the Member Case (ECF No. 12) are GRANTED.

Plaintiffs may file an amended complaint curing the deficiencies of those claims dismissed without prejudice, as described above, within thirty (30) days of this order.

IT IS SO ORDERED.

Dated this _8_ September, 2016.

Michael J. McShane
United States District Judge