**ALAN C. MILSTEIN** (*Pro Hac Vice*)
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
(856) 662-0700
(856) 488-4744 Fax
amilstein@shermansilverstein.com

**MARIANNE DUGAN** (OSB No. 932563)
259 E. 5th Avenue, Suite 200D
Eugene, OR 97401
(541) 338-7072
(866) 650-5213 Fax
mdugan@mdugan.com

**ALEX SPIRO** (*Pro Hac Vice*)
Brafman & Associates, P.C.
767 Third Avenue, 26th Fl
New York, NY 10017
(212) 750-7800
(212) 750-3906 Fax

**BRIAN MICHAELS, P.C.** (OSB No. 925607)
259 E. 5th Avenue, Suite 300D
Eugene, OR  97401
(541) 687-0578
(541) 686-2137 Fax
brian@brianmichaelslaw.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| BRANDON AUSTIN,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF OREGON; SANDY WEINTRAUB; CHICORA MARTIN; ROBIN HOLMES; and MICHAEL R. GOTTFREDSON, all in their individual capacities only,<br><br>Defendants. | Case No. 6:15-cv-02257-MC (Lead Case)<br>Case No. 6:16-cv-00647-MC (Member Case)<br><br>PLAINTIFFS' THIRD<br><br>AMENDED COMPLAINT<br><br>**<u>JURY TRIAL DEMANDED</u>** |

DOMINIC ARTIS and
DAMYEAN DOTSON,

                       Plaintiffs,

       v.

UNIVERSITY OF OREGON; SANDY
WEINTRAUB; CHICORA MARTIN;
ROBIN HOLMES; and MICHAEL R.
GOTTFREDSON, all in their individual
capacities only,

                    Defendants.

Plaintiffs, by and through their counsel, by way of Complaint against Defendants University of

Oregon; Sandy Weintraub; Chicora Martin; Robin Holmes; and Michael R. Gottfredson, hereby

alleges as follows:

## SUBJECT MATTER JURISDICTION, AND VENUE

1.      This Court has subject matter jurisdiction over this removed action pursuant to 28

U.S.C. § 1331, as it arises out of the laws of the United States, including Title IX of the Education

Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX").

2.      This Court has subject matter jurisdiction over the Plaintiffs' state-law claims

pursuant to 28 U.S.C. § 1367(a), which provides in pertinent part as follows: "in any civil action

of which the district Courts have original jurisdiction, the district Courts shall have supplemental

jurisdiction over all other claims that are so related to claims in the action within such original

jurisdiction that they form part of the same case or controversy under Article III of the United

States Constitution."

3.      Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C. §

1391(b), as the Defendants reside within this judicial district, and a substantial part of the events

or omissions giving rise to the claim occurred within this judicial district.

## THE PARTIES

4.      Plaintiffs are individuals who were formerly matriculated students at the University of Oregon (when abbreviated, "University"), each of whom were receiving scholarships as starting basketball players.

5.      Defendant University is, and was at all relevant times, an institution of higher education chartered and existing pursuant to the laws of the State of Oregon, located in Eugene, Oregon.

6.      Defendant Sandy Weintraub is, and was at all relevant times, the Director of Student Conduct & Community Standards at the University. Mr. Weintraub can be served with process at the Office of the Dean of Students, 164 Oregon Hall, Eugene, OR 97403. Mr. Weintraub is being sued in his individual capacity only.

7.      Defendant Chicora Martin was, at all relevant times, the Assistant Dean of Students at the Universit. Ms. Martin can be served with process at Mills College, Cowell Building, 5000 MacArthur Blvd, Oakland, CA 94613. Ms. Martin is being sued in her individual capacity only.

8.      Defendant Robin Holmes is, and was at all relevant times, Vice President for Student Life at the Universit. Dr. Holmes can be served with process at Division of Student Life, 5216 University of Oregon, 164 Oregon Hall, Eugene, OR 97403. Dr. Holmes is being sued in her individual capacity only.

9.      Defendant Michael R. Gottfredson was the President of the University from August 1, 2012, through approximately August 6, 2014. Dr. Gottfredson can be served with process at UC Irvine School of Social Ecology, 5300 Social and Behavioral Sciences Gateway, Irvine, CA 92697. Dr. Gottfredson is being sued in his individual capacity only.

## FACTS

### I.

10.    Dominic Artis went to Salesian High School in Richmond CA until 11th grade. They won a state championship his freshman year (2009) and went to the state championship his junior year. His junior year (2011) he also won Division IV Player of the Year in California. He went to Findlay Prep High School in Henderson, NV for his senior year. They won the national championship that year (2012). For the Nationally Televised Hoop Hall Classic he received 'player of the game.' And for the nationally televised game against Bishop Gorman he received 'most inspirational.' He was also ranked 62nd on the ESPN 100 (#5 in state) coming out of high school and he was ranked the #8 point guard in the country and #1 in California as well. Mr. Artis was #32 in some mock drafts as a freshman in college. He was also invited to, and attended, the Darron Williams Nike Skills camp his senior year of high-school, and the Kyrie Irving Skills camp his freshman year of college which was composed of the top 20 point guards in college at the time.

11.    Damyean Dotson went to Jack Yates High School, a top basketball school in Texas. As a junior, he was recognized as the District 21 Newcomer of the Year and an All-District performer. In his senior season, he was captain of the team averaging 21 points and 5 rebounds per game which led to him being one of the top ranked players in Houston and leading his team to two state finals. The Houston Chronicle named him 2012 Greater Houston Player of the Year and he was selected All-District 21, All-Region 3 and 4A All-State after his impressive senior year. Mr. Dotson was slated for a Shooting Guard position, having been recruited at Oregon, Colorado, George Town, Texas Tech, Dayton, Arkansas, Texas Southern, Texas A&M. In his freshmen season at Oregon he was named to the 2013 Kyle Macy Freshman All-American Team, All-Tournament team and Pac-12 Freshman team and was invited to the Kevin Durant and Lebron James basketball camp and well as a finalist on the Team USA U19 Squad. Had the actions on the

part of the Defendants not occurred, he would currently be an NBA player making millions of dollars per year.

12.     During his high school basketball career at Imhotep Institute Charter High School in Philadelphia ("Imhotep"), Plaintiff Brandon Austin helped Imhotep win three straight Pennsylvania Interscholastic Athletic Association titles. As one of the top fifty or so prospects in the nation, Mr. Austin was recruited by multiple universities, and received offers to play basketball at multiple universities, and ultimately chose to attend Providence College ("Providence") and play basketball for the Providence Friars. During the Fall 2013 semester, Mr. Austin was suspended from the basketball team for thirty days. Providence pleaded with Mr. Austin to stay, but Mr. Austin was recruited by the University, and chose to transfer from Providence to Oregon. Prior to the Spring 2014 Semester, Mr. Austin matriculated at Oregon and became a member of the Oregon Ducks men's college basketball team ("Ducks"), which competes at the NCAA Division I level and is a member of the Pacific-12 Conference.[1] In order to intice Mr. Austin to attend Oregon and play for the Ducks, Oregon provided Mr. Austin with an athletic scholarship.

13.     As one of the top hundred or so high school basketball prospects in the nation, each Plaintiff received offers to play basketball at multiple universities, and ultimately chose to attend Oregon.

14.     In order to intice Plaintiffs to attend Oregon, Oregon provided Plaintiffs with athletic scholarships.

15.     The athletic scholarships contained both express terms and an implied covenant of good faith and fair dealing.

16.     Plaintiffs had the objectively reasonable expectation, based upon the express and implied terms of the contractual relationship governing the athletic scholarship, that the University

---

[1] Due to NCAA transfer rules, Mr. Austin was required to sit out of competition for one year.

would renew their scholarships, and not act so as to deprive them of the fruits of the scholarship, and otherwise act in good faith vis-à-vis their scholarships. Each scholarship contained this language of agreement:

> "This assistance will be considered for renewal during subsequent periods of attendance as long as you are a student in good standing, maintain normal progress toward graduation and are in compliance with all eligibility requirements of this institution, the Pac- 12 Conference and the NCAA. This assistance may be changed or terminated *only* in accordance with the legislation of the NCAA, principal details of which appear on the back of this statement." (Emphasis added)

17.    Plaintiffs attended an off-campus party on or around March 8, 2014.

18.    After about an hour and a half, a female student approached Plaintiffs and began "twerking" for them.

19.    Subsequently, the female student went into a bathroom with Mr. Artis and Mr. Dotson and Mr. Austin and initiated consensual sexual activity. The individuals then left the bathroom together.

20.    Numerous individuals at the party witnessed the female student interacting with the basketball players both before and after the sexual activity in the bathroom, and would have testified under oath that the female student gave absolutely no indication that she was sexually assaulted, or even upset, and insisted on remaining with the basketball players even after they left the bathroom.

21.    Later in the evening, the female student chose to return to the apartment of one of the basketball players, along with all three basketball players. The female student was laughing and joking, even as she left the party with Plaintiffs, and entered the taxi-cab with them. At least one female witness would have testified under oath she offered the female student a ride, which

she declined. At no time did this witness observe any reluctance on the part of the female student, nor any aggression on the part of Plaintiffs.

22.     Upon arrival, she stated that she needed to get into something comfortable.

23.     Subsequently, the student voluntarily took her clothes off, whereupon she voluntarily engaged in "group" sexual activity with the other players.

24.     At one point, the female student became teary-eyed, at which point the players chose to immediately cease any sexual activity. Soon after, she was again laughing and joking.

25.     The female student chose to stay overnight at the apartment, and had sexual intercourse with one of the other players after waking up in the morning.

26.     Thereafter, the player sent the female student home in a cab, and she sent a text message stating "thanks for getting me home."

27.     At no point did the female student appear to be intoxicated.

28.     At no point did the female student say "no" about any sexual activity, even when she became teary-eyed (after which, in any event, the sexual activity immediately ceased).

29.     The female student expressed verbal consent and/or gave unmistakable physical indications of her desire to participate in sexual contact with the young men at the times they were engaged in sexual conduct.

## II.

30.     Within a day or two, however, the female student began making false, scandalous, and malicious accusations about all three basketball players, including the utterly false accusation that the players dragged her into the bathroom and assaulted her; the utterly false accusation that the players wrestled her into a car, forced her to get drunk, and drove her to the apartment; and the utterly false accusation that she was raped at the apartment.

31.     Thereafter, the accuser made numerous inconsistent statements to the Eugene Police Department regarding her sobriety, the events and conversations leading up to the sexual conduct, and the actual actions, words, and behavior of those involved during sexual contact.

32.     When the University learned that Mr. Austin had been accused of rape, Defendant Chicora Martin suspended Plaintiffs on an "emergency" basis, and scheduled an "emergency" hearing to expel them.

33.     That emergency suspension was then modified to allow them to attend classes, and practice.

34.     On April 14, 2014, the Lane County District Attorney ("District Attorney") determined that she would not be pressing charges against Mr. Austin or any of the basketball players "because the conflicting statements and actions by the victim make this case unprovable as a criminal case."  (Emphasis added.)

35.     In or around late April, the Oregonian published the police report that the female student had made.

36.     The next evening, presumably in response to the publication of the police report, the District Attorney's office issued a lengthy document outlining numerous weaknesses in the prosecution's case, as well as numerous inconsistencies in the accuser's statements, and concluding that those weaknesses presented "an insurmountable barrier to prosecution."

37.     The District Attorney's office concluded, in pertinent part, as follows:

> A) Although the alleged victim reports being impaired by alcohol prior to any sexual contact, there is no evidence, from her or from others, that suggests she had enough to drink to become substantially impaired prior to the first two sexual encounters in the bathroom.  There is also no independent behavioral evidence that the victim appeared significantly impaired: nobody reports her having slurred speech, difficulty walking or any other symptom of impairment from intoxication at any point in the evening.
>
> B) Friends and associates of the alleged victim describe her as friendly and flirtatious, both before and after the first and second alleged assaults in the party-house bathroom.  Moreover, all

witnesses agree the alleged victim had the opportunity to leave the party, or at least ask for help, after the first series of sexual assaults. Friends and others report her "walking and talking fine" both before and after both sex-in-the-bathroom events.

C) The alleged victim recalls extensive detail about all aspects of the evening, including the timing, order of events - even the exact amount of the cab fare and her decision to have another drink of alcohol during the ride to the alleged assailants' residents, and most of the detail is consistent with the events reported by others (so she does not appear to have been affected to the point of perception or memory impairment. Similarly, there's no evidence she was ever unconscious during the sex acts, nor is there any evidence she was ever impaired to the point where it adversely effected her balance or stability.)

D) The alleged assailants stopped the sex acts several times - first when the alleged victim asked for a drink of water, next when the alleged victim said she "had to go" and, finally, at the second residence, when the alleged victim started crying (the first point at which suspects claim they realized she wasn't "in to it").

E) Victim returned to isolated locations with her alleged assailants repeatedly, although she had friends nearby and she was in a crowded party.

F) Telephone calls between the alleged victim and alleged assailants were recorded surreptitiously.  The contents of those conversations are consistent with suspect's version of consensual sex, or at least their belief it was consensual sex.)

G) Friends of the alleged victim say she did not appear to be impaired by alcohol at any time during the evening.

H) Alleged victim had consensual sex with one of the suspects the morning after the alleged assaults and, later the same day, she had sex with another friend.

I) The crimes are reported by victim's father days after the alleged assaults took place and alleged victim is angered by the reporting (because of timing).

J) Alleged victim indicated a desire to only have her assailants' "wrists slapped", not ruin their lives.

K) Assailant interviews with police are consistent with recording made without their knowledge and the statements of other witnesses

None of the above would be individually inexplicable, but collectively, and in the absence of additional evidence, they provide an insurmountable barrier to prosecution.

38.    This information was known to the Defendants well prior to May 9, 2014.

39.    The "logical nexus" connecting the District Attorney's failure to prosecute the basketball players with the Defendants' sex/gender bias includes, but is not limited to, the following.

40.    Following the publication of the police reports by the <u>Oregonian</u> and the District Attorney's statement explaining why the basketball players were not prosecuted, widespread protests occurred on the University's campus, both generally and outside Dr. Gottfredson's office in Johnson Hall (the main administration building at the Univeristy), attempting to pressure the University into taking action against the male basketball players on the basis of their sex/gender.

41.    On one occasion, protesters held signs with such slogans as "It's Not OK to Slut Shame," "I Live in a Rape Culture," "UO: Expel Rapists," "Dana Altman $25K Bonus for Ignoring Rape," "Trust Survivors," and "Passes on a Court Free Pass from the Courts." An Associated Press photo documented the scene:



Page 10 – PLAINTIFFS' THIRD AMENDED COMPLAINT

42.    The protests received extensive press coverage in the local and national media, and cast the University and its employees, including Dr. Gottfredson, in a negative light for failing to punish the basketball players, and the University and its employees, including Dr. Gottfredson, were aware of the foregoing.

43.    These signs, using extremely loaded phrases such as "slut shame" (a colloquial phrase widely understood to mean criticizing or punishing a woman for engaging in sexual activity) and "rape culture" (another widely understood term "that was coined by feminists in the United States in the 1970's … designed to show the ways in which society blamed victims of sexual assault and normalized male sexual violence")[2] plainly and unambiguously suggested that the University had declined to punish the male students accused of rape, solely on the basis of their sex/gender.

44.    These signs and protests had the actual effect of pressuring the University to take punitive action against the male basketball players solely on the basis of their sex/gender (notwithstanding the fact that the accuser was plainly not telling the truth, and the male basketball players had plainly not engaged in any culpable conduct) in an effort to combat widespread public perception, both locally and nationally, that the University was not tough enough on male individuals or male athletes accused of sexual assault.

45.    Additionally, a psychology professor at the University, Jennifer J. Freyd, Ph.D., had "published a study in 2013 based on a survey of UO [University of Oregon] students examining whether an institution's failure to prevent sexual assault or respond supportively could exacerbate a survivor's trauma. The study found that when women experienced a phenomenon Freyd calls institutional betrayal, they reported increased levels of anxiety, suggesting that 'institutions have the power to cause additional harm to survivors.'"[3]

---

[2] See http://www.wavaw.ca/what-is-rape-culture/ (last visited September 13, 2016).
[3] See http://www.cnn.com/2015/11/19/us/whistleblowers-campus-rape-ou/ (last visited September 13, 2016) (emphasis added).

46.     Prior to May 9, 2014, Dr. Freyd repeatedly spoke out against the University's handling of the situation involving the basketball players, and a protest led by and/or publicly endorsed by Dr. Freyd occurred at noon on May 8, 2014.

47.     At 11:00 a.m. on May 9, 2014, Defendant Michael R. Gottfredson in effect imposed discipline upon Plaintiffs without due process, solely on the basis of their sex/gender, by holding a press conference and making a public statement condemning the other basketball players, even though the District Attorney had declined to prosecute them and the University had not started much less concluded the hearing process.

48.     Without limiting the generality of the foregoing, despite the fact that the District Attorney had cast significant doubt on whether the accuser was telling the truth, Dr. Gottfredson stated, "The type of behavior in the police report released this week is utterly unacceptable and will not be tolerated," and further stated, "I know it's frustrating, and we would like to say more, but we are not going to violate the laws that are in place to protect students' privacy or the rights of our students – *especially* the survivor."  (Italics in original University transcript.)

49.     Evidencing that the University had prejudged Plaintiffs' guilt, and done so on the basis of their sex/gender, Dr. Gottfredson's statement included the conclusion that the female accuser was a "survivor" ("survivor" being a loaded word invoking sex/gender, in the context now pled and described above), the statement that "as a father, I was appalled at what I read" ("as a father" being loaded code invoking sex/gender, in the context now pled and described above), and the statement that Plaintiffs would "not be playing basketball at Oregon again."

50.     Dr. Gottfredson's statements were grounded in sexism and/or gender bias, and constituted a clear statement on behalf of the University that represented its position in the matter, and directly controlled and/or influenced the actions of all other individuals who acted on behalf of the University and/or as its actual or apparent agents in taking action against Mr. Austin.

51.     In addition, and/or in the alternative, the prior and subsequent actions of the University and the individual Defendants with regard to Plaintiffs were all taken in response to internal and external compliants and protests that the University was not taking strong enough actions against males in cases involving alleged sexual misconduct by female students against male students at the University.

52.     As the Second Circuit observed in <u>Doe v. Columbia University</u>, Docket No. 15-1536, 2016 U.S. App. LEXIS 13773 (2d Cir. July 29, 2016), in ruling that the plaintiff therein had stated a plausible claim under Title IX:

> The Complaint alleges that, having been severely criticized in the student body and in the public press for toleration of sexual assault of female students, Columbia was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students—especially varsity athletes. There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults. … It is worth noting furthermore that the possible motivations mentioned by the district Court as more plausible than sex discrimination, including a fear of negative publicity or of Title IX liability, are not necessarily, as the district Court characterized them, lawful motivations distinct from sex bias. A Defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action. A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.

53.     Here, as in the <u>Doe v. Columbia</u> case, the University "was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students—especially varsity athletes."

54.    At a proximate point in time, Ms. Martin again suspended Plaintiffs.

55.    Ms. Martin subsequently modified the suspensions of Mr. Artis and Mr. Dotson, but refused to modify Mr. Austin's suspension. (Mr. Austin later learned that Ms. Martin refused to modify Mr. Austin's suspension because he exercised his Miranda rights during the police investigation.)

56.    Almost concurrently, a University student came forward and told a University investigator that she personally interacted with the female student throughout the evening in question, the female student was not at all intoxicated, and the female student insisted on going home with the basketball players, to the point of refusing to leave with her friends.

57.    Meanwhile, on or around June 5, 2014, the accuser published an opinion piece in a newspaper criticizing the University for its handling of the situation, putting further internal pressure on the University to punish Plaintiffs on the basis of their sex/gender, and regardless of actual culpability.

### III.

58.    At all relevant times, Plaintiffs had a recognized property interest in (among other things) their status as an admitted, matriculated University student in good standing; their interest in pursuing public higher education and intercollegiate athletic participation; and the economic benefit in the form of his existing scholarship, a future scholarship at another Division I school, or a future contract with an NBA team.[4]

59.    Additionally, at all relevant times, Plaintiffs also had a recognized liberty interest in (among other things) being in good standing at the University, and being free from the stigma associated with being suspended for disciplinary reasons. Due process protection "is particularly necessary when, as here, the governmental action may damage the individual's standing in the

---

[4] We recognize that this Court's prior ruling [Document No. 36] held that the allegations in this section did not give rise to a claim under 42 U.S.C. § 1983. We respectfully reserve the right to challenge this Court's conclusions on appeal.

community, academic or general, or may impose 'a stigma or other disability that foreclose[s] his freedom to take advantage' of other educational or future employment opportunities." See, e.g., Marin v. University of Puerto Rico, 377 F. Supp. 613, 622-23 (D.P.R. 1974) (quoting Board of Regents v. Roth, 408 U.S. 564, 573 (1972)); accord Albert v. Carovano, 824 F.2d 1333, 1339 n.6 (2d Cir. 1987) (noting that "at a minimum, the students' protected liberty interest is at stake because of the 'stigma' attached to suspension from college for disciplinary reasons"); cf. Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971).

60.     At all relevant times, it was clearly established that, given the seriousness of the alleged infraction, the possible consequences to Plaintiffs, and the degree of sanction or penalty sought to be imposed, the Fourteenth Amendment to the US Constitution's guarantee of procedural and substantive due process, and the Oregon Revised Statutes, required the Defendants to provide Plaintiffs with the right to representation by counsel, testimony of witnesses under oath, depositions, issuance of subpoenas, cross-examination of witnesses, a fundamentally fair proceeding, and other due process protections.

61.     Plaintiffs' Counsel, however, were presented with two choices: (1) a "panel hearing" at which the University would not provide most or all of the foregoing due process protections, except for representation by counsel; or (2) an "administrative conference" at which the University would not provide most or all of the foregoing due process protections, except for representation by counsel.

62.     After the "panel hearing" was scheduled, counsel for the basketball players requested a "contested case hearing" which complies with the due process requirements set forth in ORS 351.088, and ORS 183.413-.497 and 183.502, including representation by counsel (ORS 183.417(1)), testimony of witnesses under oath (ORS 183.417(7)), depositions (ORS 183.425), issuance of subpoenas by a party (ORS 183.440), and cross-examination of witnesses (ORS 183.450(3)).

Page 15 – PLAINTIFFS' THIRD AMENDED COMPLAINT

63.     Among other things, Counsel further made clear that, in order to present a defense, they would need to subpoena the numerous witnesses who would testify that the female student gave absolutely no indication that she was sexually assaulted, or even upset, and insisted on remaining with the basketball players even after they left the bathroom, and two individuals with whom the female student had chosen to have sex after just meeting them, evidencing her willingness to engage in sexual activity with individuals who she just met.

64.     The University and its representatives, however, failed to even directly respond to the request of Mr. Austin's counsel for a contested case hearing.

65.     Based upon the foregoing, it was clear to Plaintiffs' counsel that the University and its representatives were not going to grant her request for a contested case hearing.

66.     Ultimately, as the University was only providing two options, neither of which provided the requisite due process, and the University was requiring Plaintiffs to choose between one of the two options—the "administrative conference" option. Counsel was not asked to sign, and did not sign, a waiver of due process rights, and would never have signed such a waiver. Moreover, Plaintiffs' counsels never waived their due process rights by choosing the "administrative conference" option over the "panel hearing" option, neither of which provided the due process protections that Plaintiffs' counsels had expressly requested.

67.     The "administrative conference" turned out to be nothing less than an unconstitutional "kangaroo court" scenario of the very worst order, in which Plaintiffs were deprived of the foregoing rights, and not even provided with a basic opportunity to properly respond to all information provided, and to contact and call all relevant and necessary witnesses.

68.     The conference was ultimately scheduled for May 30, 2014.

69.     Defendant Sandy Weintraub ruled against Plaintiffs, suspending them from the University from four to ten years, long enough for the removal to be the functional equivalent of

an expulsion from the University, and refused to provide due process to Plaintiffs generally and in the manner described in detail above.

70.     Defendant Robin Holmes was charged with the responsibility of hearing an appeal.

71.     Dr. Holmes, however, refused to respond to Plaintiffs' requests for an appeal and did not return multiple phone calls from counsel, in violation of their right to procedural and substantive due process.

72.     Plaintiffs were not required to take an administrative appeal in order to bring this Court action.

73.     Without limiting the generality of the foregoing, neither Title IX nor the state-law causes of action alleged herein require the exhaustion of administrative remedies, if any, before bringing a Court action.

74.     In addition, Dr. Holmes' refusal to respond to Plaintiffs' request for an appeal relieve Plaintiffs of any possible obligation to bring an administrative appeal, an administrative appeal would have been futile, and the Defendants are estopped from asserting that Plaintiffs were required to bring an administrative appeal.

75.     Additionally, the Defendants' actions before the hearing process, during the hearing process, and after the hearing process were motivated in whole or large part by the fact that Plaintiffs are male and the accuser is a female.

76.     Attached to this complaint are attorney affidavits from the two attorneys who represented the Plaintiffs, Greg Veralrud (Exhibit #1), and Laura Fine Moro (Exhibit #2). The affidavits of Lissa Casey, (Exhibit #3) who has represented numerous clients in front of the University, is attached, as well as Brian Michaels (Exhibit #4).

77.     Greg Veralrud represented Dominic Artis throughout his administrative hearing with the University. His affidavit (Exhibit #1) states that he made a request for the report of the investigation and recalls that the report contained references to interviews with other students who

were with the complainant the night she alleges she was assaulted. He recalls that the the witnesses provided statements indicating that the complainant was sober and willing to leave with the three Plaintiffs. After viewing the investigative report, Mr. Veralrud was concerned that there would be significant pressure on the University to make its own findings and he advised Mr. Artis not to waive a panel hearing.   Mr. Veralrud's affidavit states:

> Subsequent to that, we received information from the university that if Mr. Artis were to waive the panel hearing and proceed based upon an administrative review by Mr. Weintraub that did not require the presence of the complaining witness, they would agree that there would be no expulsion and that the sanction would be limited to a suspension of some years.
>
> This wouldn't necessarily be a disqualifying factor. I was also concerned about the university's counsel's lack of willingness to exercise its subpoena power in conjunction with the panel hearing to bring forth witnesses who contradicted the complainant and corroborated Mr. Artis with respect to the consensual nature of the encounter. Without subpoena, we would not be able to get the presence of the Eugene police officer who investigated the case and took statements from the complainant, the three basketball players accused, various acquaintances and companions of the complainant, and the cab driver who picked up the three basketball players and the complaining witness and took them from the party to Mr. Artis' and Mr. Dotson's apartment (the statement of the cab driver to our investigator was that the complainant was in a talkative mood, did not seem at all afraid or apprehensive and he described her as seeming very pleased to be in the company of three University of Oregon basketball players).

See Exhibit #1.

78.     Laura Fine Moro represented Mr. Brandon Austin in connection with the sexual allegation charges. She has represented hundreds of University students in various matters, including allegations of University Student Conduct Code Violations. In her affidavit (Exhibit #2), she recalls representing one female student at the University who was alleged to have commited sexual misconduct. Ms. Fine Moro states:

> Her alleged conduct at issue consisted of the following:
>
> She had a loud verbal fight with her boyfriend in her apartment;

She refused to let him leave her apartment by exerting physical force against him which resulting in scratches and abrasions on his skin; and

When he finally left the apartment, she grabbed a large kitchen knife and ran after him. She held the knife above her head in an aggressive manner.

Her boyfriend reported that he feared for his life when he called 911 for help. Police arrived and she was arrested and lodged in the Lane County Jail on the Charge of *Meancing as Domestive Violence*(Class A Misdemeanor). She ultimately pleaded guilty to *Reckless Endangerment* (Class A Misdemeanor) and *Harassment*(Class B misdemeanor). She was placed on probation, given a jail sentence, and she was ordered to complete a mental health evaluation and any required treatment.

**I assisted her through the Title IX investigation interview and disclosed the outcome of her criminal case to the investigator.**

**Following that, no further action was taken by the UO that I am aware of.**

See Exhibit #2 (emphasis added).

79.    She also swears in her affidavit:

I have never had a case personally or heard through professional peers of a case where an allegation of sexual misconduct made by a female against a male has been unfounded by Title IX and by the UO. In other words, in my experience and in the experience of my peers as reported to me, the female accuser is always believed and the male accused is never believed.

I have personally represented male students where the evidence was overhwleming the conduct was consensual, yet the Title IX investigator and the UO have found otherwise. When sexual misconduct is ruled founded against my male clients, they are universally suspended for some period of time as punishment.

Id.

80.    Based on the numerous cases Ms. Fine has participated in with the University over Student Conduct Code allegations, she declared that the University "acts with a presumption against men in their investigations, ignores evidence which contradicts female accusers, and treats females found in violation with leniency which is denied to similarly situated men." Id.

Page 19 – PLAINTIFFS' THIRD AMENDED COMPLAINT

81.    Lissa Casey has represented students charged with sexual misconduct offenses at the University of Oregon and investigated accusations similar to the ones alleged by the University in this matter.  In her affidavit (Exhibit #3), she states:

> I have previously suggested that the University provide unbiased officers to preside over Administrative Conferences, which the University has responded to with denials.  The investigators at the University are also the decision-makers about their own investigations.
>
> When I have attempted to investigate accusations by attempting to interview witnesses, I have been threatened with additional student conduct allegations of "retaliation" against my client.
>
> In my professional opinion, bias exists at the University of Oregon to find female students' accusations of sexual misconduct credible and to find male students in violation of sexual misconduct pursuant to the University's student conduct code, and they have failed to remedy the blatant bias that exists within that system.

See Exhibit #3.

82.    Brian Michaels is local counsel for Plaintiffs Artis and Dotson.  In his affidavit (Exhibit #4), he recalls his representation of a client in a Sexual Assault Restraining Order case, stemming from a University sexual misconduct proceeding. In connection with that case, he took three depositions of University employees. These depositions were taken under a protective order. Mr. Michaels swears "Two of these depositions are extremely relevant and helpful to establishing Plaintiffs' claims under both Due Process and Title IX."   See Exhibit #4. However, due to the protective order, he is prohibited from revealing the details at this time. He states, "It is my understanding from speaking with several attorneys who do this work, that these may be the only depositions of their kind, providing a unique insight into exactly how the university conducts its procedures in these contexts. Because the University maintains all relevant material behind protective orders, this declaration and the ones by the other local attorneys provide the only 'knowledge' of facts available at this stage of proceedings." Id.

83.     Based upon Plaintiffs' sex/gender, the University deprived them of basic due process rights, equal protection rights, and other rights guaranteed by Title IX, and its implementing regulations, and by the University's own stated policies and procedures.

84.     In or around January 2015, the female student filed a lawsuit against University, alleging that her own Title IX rights had been violated due to University's alleged "deliberate indifference" to the safety of its students.

85.     Astonishingly, Oregon's counsel contacted Mr. Austin's counsel, stated that had she been consulted as counsel things might have been handled differently, and asked for Mr. Austin's help in defending the suit.

86.     Prior to the Defendants' actions, Plaintiffs were regarded as three of the top amateur basketball players in the US; on the men's basketball team at the Oregon, a Division I school within the Pac-12 Conference; and widely projected by experts in basketball and the NBA Draft to be selected in the first round of the NBA Draft, which would more likely than not be accompanied by a multi-million dollar guaranteed contract and tens of millions of dollars in prospective economic advantage.

87.     Prior to taking the actions alleged herein, the Defendants were aware of the foregoing facts.

88.     As a direct and proximate result of the Defendants' conduct, Plaintiffs no longer play at a Division I school, have diminished chances of playing in the NBA, have been made to suffer the opprobrium associated with an suspension from a university, and the opprobrium associated with committing a sexual assault (when in fact he committed no sexual assault), and have as a result suffered personal and professional harm, including emotional distress, in the past, and will as a result suffer personal and professional harm in the future, including loss of income.

89.     Plaintiffs, through counsel, served timely (within 180 days of the events), proper notice of their claims in the manner required by ORS 30.275.

90.     Recently, another male University student filed a lawsuit alleging that he was falsely accused of an off-campus sexual assault, and subsequently was given given an unfair disciplinary hearing, demonstrating a pattern and practice on the part of the University. The transcript of this hearing demonstrates patent bias on the part of Ms. Martin and the University in favor of the female accuser, and against the male who was accused, in both the conduct and outcome of the proceeding. Ultimately, the female's testimony was believed by Ms. Martin and the University in the face of overwhelming testimony to the contrary.

## COUNT 1

### VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681, ET SEQ. (AGAINST DEFENDANT UNIVERSITY OF OREGON)

91.     Plaintiffs repeat the foregoing allegations as if fully set forth herein.

92.     Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681, et seq.) provides, in relevant part, as follows: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

93.     The University receives federal funding through various means including, without limitation, student loans provided to University students directly by the federal government and through other funds furnished by the federal government, and as such is subject to the strictures of Title IX and its implementing regulations.

94.     To assist schools with implementing Title IX and its regulations, the Office of Civil Rights of the US Department of Education has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirements of the regulations. The procedures adopted by a school must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved ... ."

95.    The University (by and through its agents and employees acting within the scope of their agency and employment, including the Defendants) deprived Plaintiffs, on the basis of their sex/gender, of their Title IX rights to among other things due process and equal protection through the improper administration, and/or the existence, in its current state, of the University's policies and procedures.

96.    First, the University engaged in selective enforcement in violation of Title IX, and discriminated against them based on their sex and, as a result, they have been seriously and irreparably damaged.

97.    Regardless of their guilt or innocence (and, to be clear, Plaintiffs was and are innocent), the severity of the penalty (a suspension of between four and ten years), as well as the decision to initiate the proceeding in the first place, were affected by the fact that they are male, and the accuser is a female.

98.    On April 14, 2014, the Lane County District Attorney determined that she would not be pressing charges against the Plaintiffs "because the conflicting statements and actions by the victim make this case unprovable as a criminal case."  (Emphasis added.)

99.    In or around early May 2014, presumably in response to the publication of the police report, the District Attorney's office issued a lengthy document outlining numerous weaknesses in the prosecution's case, as well as numerous inconsistencies in the accuser's statements, and concluding that those weaknesses presented "an insurmountable barrier to prosecution."  (Emphasis added.)

100.    Following the publication of the police reports at the end of April 2014, widespread protests occurred on the University's campus, generally and outside Dr. Gottfredson's office in Johnson Hall, attempting to pressure the University into taking action against the male basketball players on the basis of their sex/gender.

101.    On one occasion, protesters wielded bullhorns, and held signs with such slogans as "It's Not OK to Slut Shame," "I Live in a Rape Culture," "UO: Expel Rapists," "Dana Altman $25K Bonus for Ignoring Rape," "Trust Survivors," and "Passes on a Court Free Pass from the Courts."

102.    The protests received extensive press coverage in the local and national media, and the University and its employees, including Dr. Gottfredson, were aware of same.

103.    These signs, using extremely loaded phrases such as "slut shame" (a colloquial phrase widely understood to mean criticizing or punishing a woman for engaging in sexual activity) and "rape culture" (another widely understood term "that was coined by feminists in the United States in the 1970's … designed to show the ways in which society blamed victims of sexual assault and normalized male sexual violence") plainly and unambiguously suggested that the University had declined to punish the male students accused of rape, solely on the basis of their sex/gender.

104.    These signs and protests had the actual effect of pressuring the University to take action against the innocent male basketball players solely on the basis of their sex/gender, in an effort to combat widespread public perception, both locally and nationally, that the University was not tough enough on male individuals who were accused of sexual assault.

105.    Additionally, a psychology professor at the University, Jennifer J. Freyd, Ph.D., had "published a study in 2013 based on a survey of UO [University of Oregon] students examining whether an institution's failure to prevent sexual assault or respond supportively could exacerbate a survivor's trauma. The study found that when women experienced a phenomenon Freyd calls institutional betrayal, they reported increased levels of anxiety, suggesting that 'institutions have the power to cause additional harm to survivors.'" (Emphasis added.)

106.     Prior to May 9, 2014, Dr. Freyd repeatedly spoke out against the University's handling of this situation, and a protest led by and/or publicly endorsed by Dr. Freyd occurred at noon on May 8, 2014.

107.     At 11:00 a.m. on May 9, 2014, Defendant Michael R. Gottfredson in effect imposed discipline upon Plaintiffs without due process, solely on the basis of their sex/gender.

108.     Without limiting the generality of the foregoing, despite the fact that the District Attorney had cast significant doubt on whether the accuser was telling the truth, Dr. Gottfredson stated, "The type of behavior in the police report released this week is utterly unacceptable and will not be tolerated," and further stated, "I know it's frustrating, and we would like to say more, but we are not going to violate the laws that are in place to protect students' privacy or the rights of our students – *especially* the survivor."  (Italics in original University transcript.)

109.     Evidencing that the University had prejudged Plaintiffs' guilt, and done so on the basis of their sex/gender, Dr. Gottfredson's statement included the conclusion that the female accuser was a "survivor" ("survivor" being a loaded word invoking sex/gender, in the context pled and described above), the statement that "as a father, I was appalled at what I read" ("as a father" being a loaded phrase invoking sex/gender, in the context pled and described above), and the statement that Plaintiffs would "not be playing basketball at Oregon again."

110.     Dr. Gottfredson's statements were grounded in sexism and/or gender bias, and constituted a clear statement on behalf of the University that directly influenced the actions of all other individuals who acted on behalf of the University in taking action against Plaintiffs. Indeed, Dr. Gottfredson had significant influence, and likely even determinative influence, over the University's decision and actions.

111.     In addition, and/or in the alternative, the actions of the University and the individual Defendants were all taken in response to internal and external compliants and protests that the

University was not taking strong enough actions against males in cases involving alleged sexual misconduct by female students against male students at the University.

112.    As the Second Circuit observed in Doe v. Columbia University, Docket No. 15-1536, 2016 U.S. App. LEXIS 13773 (2d Cir. July 29, 2016), in ruling that the plaintiff therein had stated a plausible claim under Title IX:

> The Complaint alleges that, having been severely criticized in the student body and in the public press for toleration of sexual assault of female students, Columbia was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students—especially varsity athletes. There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults. … It is worth noting furthermore that the possible motivations mentioned by the district Court as more plausible than sex discrimination, including a fear of negative publicity or of Title IX liability, are not necessarily, as the district Court characterized them, lawful motivations distinct from sex bias. A Defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action. A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.

113.    Here, as in the Doe v. Columbia case, the University "was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students—especially varsity athletes."

114.    In this very case, a female accuser was treated more favorably than the male accused on the basis of sex/gender. Her highly questionable and in fact discredited statements were taken at face value and served as a basis for punishment.

Page 26 – PLAINTIFFS' THIRD AMENDED COMPLAINT

115.     Additionally, all evidence presently available to the undersigned, in the absence of further discovery, demonstrates that the University has never taken action against a female student (including the accuser in this case) for engaging in the type of conduct that Plaintiffs allegedly engaged in according to the University, i.e., sex with only implicit consent.

116.     Furthermore, all evidence presently available to the undersigned, in the absence of further discovery, demonstrates that the University has never taken action against a female student for making a false allegation of the kind involved in this matter.

117.     Finally, all evidence presently available to the undersigned, in the absence of further discovery, demonstrates that males invariably lose when charged with sexual misconduct at the University, and the University invariably "believes" the female's version of events, no matter how implausible that version of events is, and "rejects" the male's version of events, no matter how credible that version of events is.

118.     Second, there was an erroneous outcome from a flawed proceeding, in violation of Title IX.

119.     The University discriminated against Plaintiffs by failing to comply with its own procedures and by failing to comply with the requirements of Title IX, in order to reach a pre-determined result, due to his sex, gender stereotypes, Dr. Freyd's work and/or the work of others at the University, and the accuser's newspaper article, creating an internal "atmosphere of scrutiny," and widespread campus protests that received local and national press coverage and created an external "atmosphere of scrutiny" demanding that the male basketball players be punished as alleged perpetrators of male-on-female sexual assault, on the basis of their sex/gender.

120.     The University created an environment in which Plaintiffs, accused male students, was so fundamentally denied due process as to be virtually assured a finding of guilt.

121.     Such a biased and one-sided process deprived Plaintiffs, male students, of educational opportunities on the basis of sex.

122.    The University conducted its "investigation" and subsequent hearing in a manner that was biased against the accused based on sex.

123.    From the outset, the investigation and hearing processes were slanted in favor of the female accuser, because of her sex. The University's representatives, including its president, accepted her statements at face value despite the prosecutor's statements, and granted the female accuser the presumption of truth because she is female, as demanded by the protesters and otherwise, in order to appease those who wished for males accused of sexual assault to be punished.

124.    Plaintiffs did not have an equal or fair opportunity to present relevant witnesses, to present evidence (as described above), and to present evidence about the accuser's motives to present false accusations, and even if they did, which they did not, their fate had been prejudged by the Defendants and such evidence would have been rejected as a matter of course due to the University's sex/gender bias, and the sex/gender bias of the individual Defendants.

125.    Those involved with the hearing process were improperly and/or insufficiently trained under Title IX.

126.    The University responded to the accuser's accusations with a series of arbitrary, capricious, discriminatory, and gender-based actions directed toward a predetermined outcome: Plaintiff's suspension from the University to satisfy and appease the University's internal and external critics.

127.    Third, the University, in violation of Title IX, demonstrated a deliberate and systematic indifference to the rights of Plaintiffs, due to their sex.

128.    The University's actions, and inactions, were unreasonable in light of the known circumstances, as described in detail above, including but in no way limited to the District Attorney's office declining to prosecute, and issuing a document outlining numerous weaknesses in the case, and concluding that those weaknesses presented "an insurmountable barrier to

prosecution" (emphasis added), after which time the University took contrary action solely on the basis of sex/gender bias.

129.    But for the obvious gender bias, the outcome of the University proceeding would have been different.

130.    As a direct and proximate consequence of the University's Title IX violation, Plaintiffs have sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly reflects that he was found to have committed sexual misconduct, harassment, and/or other related offenses.

131.    Additionally, as a direct and proximate consequence of the University's Title IX violation, Plaintiffs no longer play at a Division I school, have diminished chances of playing in the NBA, have been made to suffer the opprobrium associated with an suspension from a university, and the opprobrium associated with committing a sexual assault (when in fact he committed no sexual assault), and have as a result suffered personal and professional harm, including emotional distress, in the past, and will as a result suffer personal and professional harm in the future, including loss of income.

132.    Without limiting the generality of the foregoing, as a result of the actions of the Defendants, Plaintiffs are likely to sustain economic damages in the form of lost income, and seek at least $6 million for economic damages; and have sustained and will continue to sustain noneconomic damages, and seek $1.5 million in noneconomic damages.

133.    Plaintiffs were required to hire attorneys to represent him in this matter and are entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and otherwise, and such other legal and equitable relief as is appropriate in the circumstances presented.

**COUNT 2**

**LIABILITY UNDER 42 U.S.C. § 1983**
**(AND FOR ATTORNEY FEES UNDER § 1988)**

Page 29 – PLAINTIFFS' THIRD AMENDED COMPLAINT

**(VIOLATION OF THE 14TH AMENDMENT'S GUARANTY OF EQUAL PROTECTION)**
**(AGAINST ALL DEFENDANTS EXCEPT UNIVERSITY OF OREGON)**

134.    Plaintiffs Dominic Artis and Damyean Dotson repeat the foregoing allegations as if fully set forth herein.

135.    These Defendants by their treatment of these Plaintiffs during these accusatory proceedings in a disparate manner, discriminating against them due to their gender by depriving them of the slightest rights afforded an accused, by announcing their guilt to the press before even conducting the slightest investigation, or opportunity to defend themselves against such horrific allegations, despite the fact the Lane County District Attorney's Office, upon review of the evidence, declined to prosecute.

136.    The individually sued Defendants, in their individual capacities, are "persons" within the ambit of 42 U.S.C. § 1983.

137.    These Defendants, in their individual capacities, acted "under color of' state law" because they exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  See West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941).

138.    Furthermore, these Defendants and their representatives were acting in accordance with their employers' official policy and custom, including the refusal to provide students facing expulsion with substantive and procedural due process.

139.    There was a direct and proximate causal connection between these Defendants' wrongful conduct and the harm and damages that resulted.

140.    These Defendants' conduct deprived the Plaintiff of his rights under the Fifth and Fourteenth Amendments to the US Constitution, and other rights secured by the Bill of Rights and the US Constitution, as well as other federally secured rights and rights secured by other law, and failed to protect Plaintiffs from injury.

141.    These Defendants acted arbitrarily and capriciously, acted with deliberate indifference towards the Plaintiffs substantive and procedural due process rights, and acted with an improper motivation.

142.    As a result of these Defendants' conduct, Mr. Austin has suffered and will continue to suffer personal and professional harm, as alleged supra.

143.    As a result of these actions by Defendants, Plaintiffs are each likely to sustain economic damages in the form of lost income; and have sustained and will continue to sustain noneconomic damages; thereby each Plaintiff is seeking at least $9 million for economic damages; and has sustained and will continue to sustain noneconomic damages, and seeks $1.5 million in noneconomic damages.

144.    Plaintiffs were required to hire attorneys to represent him in this matter and is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT 3

## NEGLIGENCE
## (AGAINST ALL DEFENDANTS)

145.    Plaintiffs repeat the foregoing allegations as if fully set forth herein.

146.    The Defendants, individually and collectively, had a "special relationship" with Plaintiffs and a corresponding duty to Plaintiffs to conduct a campus investigation in a competent manner and in accordance with societal standards and norms governing such investigations, and to conduct a hearing in a competent manner and in accordance with societal standards and norms governing such hearings, and otherwise act in a reasonably prudent manner with regard to Plaintiffs, and it was foreseeable that a breach of this duty would lead to the harm suffered by Plaintiffs.

147.    Both the University and the individual Defendants had a "special relationship" with Plaintiffs because they exercised independent judgment on behalf of Plaintiffs and other varsity

athletes to advance the individual interests of those athletes, by recruiting those athletes and then managing virtually every aspect of their time at University, and by virtue of this special relationship owe a duty of care actionable in damages.

148.    Additionally, and/or in the alternative, as an athlete at the University, Plaintiffs were "particularly vulnerable and dependant upon the [Univerity and the individual Defendants] who, correspondingly, hold[] considerable power over the plaintiff's welfare." See, e.g., Davidson v. Univ. of N.C. at Chapel Hill, 543 S.E.2d 920, 926-27 (N.C. App. 2001).

149.    Here, the University depended upon its well-known basketball program for a variety of benefits, including national attention and recognition, the University actively recruited Plaintiffs, top basketball prospects in the US, for the purposes of benefiting the University's basketball program, and the University further exercised significant control over Plaintiffs and the other athletes on the basketball team as demonstrated by among other things the terms of Plaintiffs' scholarship, and the conditions imposed by the University on its athletes, including but not limited to the University's scheduling of and control over athletes' time and suspending athletes and removing them from participation in athletics for disciplinary reasons. See id. ("Second, when a school exerts significant control over students as a result of their participation in a school-sponsored athletic activity, the students may have higher expectations with regard to the protection they will receive from the school."); see also Kleinknecht v. Gettysburg College, 989 F.2d 1360 (3d Cir. 1993) (holding that a special relationship existed between Gettysburg College and a student participating lacrosse practice, where the college actively recruited the student to play lacrosse, as this fact demonstrated the extent to which the student's participation in the lacrosse program benefitted the school); Kavanagh v. Trs. of Boston University, 795 N.E.2d 1170 (Mass. 2003).

150.    The Defendants (including Defendant University of Oregon, by and through its agents and employees acting within the scope of their agency and employment) breached their

duty by (among other things) refusing to allow Plaintiffs to subpoena witnesses who would be supportive of their defense, refusing to provide unredacted reports, refusing to provide a contested case hearing, refusing to allow cross-examination, refusing to provide due process, and most significantly prejudging Plaintiffs' guilt, and engineering a "kangaroo court" hearing with the purpose of finding that Plaintiffs committed a sexual assault that did not in reality occur, solely to appease protesters and internal, local, and national critics of the University (rather than protecting Plaintiffs' rights as an athlete who had been recruited to play basketball for the University, and who were widely expected to be drafted in the first round of the NBA Draft).

151.    The Defendants' actions were in bad faith, and/or taken with malice.

152.    As a direct and proximate result of the Defendants' conduct, Plaintiffs have suffered and will continue to suffer personal and professional harm, including the property damage alleged supra.

153.    Without limiting the generality of the foregoing, as a result of the actions of the Defendants, Plaintiffs are likely to sustain economic damages in the form of lost income, and seek at least $6 million for economic damages; and have sustained and will continue to sustain noneconomic damages, and seek $1.5 million in noneconomic damages.

## COUNT 4

## BREACH OF CONTRACT
## (AGAINST DEFENDANT UNIVERSITY OF OREGON)

154.    Plaintiffs repeat the foregoing allegations as if fully set forth herein.

155.    At all relevant times, Plaintiffs were recipients of an athletic scholarship from the University of Oregon, which contained both express terms and an implied covenant of good faith and fair dealing.

156.    Among the express terms was the provision that "[t]his assistance will be considered for renewal during subsequent periods of attendance as long as you are a student in good standing, maintain normal progress toward graduation and are in compliance with all

Page 33 – PLAINTIFFS' THIRD AMENDED COMPLAINT

eligibility requirements of this institution, the Pac-12 Conference and the NCAA. This assistance may be changed or terminated only in accordance with the legislation of the NCAA, principal details of which appear on the back of this statement."

157.    Nothing in these "details … appear[ing] on the back of this statement" state much less suggest that the University could decline to renew Plaintiffs' scholarship in the circumstances presented.

158.    Further, industry custom and "usage of trade" makes it implicit in the contractual relationship between athletes and the universities recruiting them, including the University of Oregon, that the universities would renew the scholarships of athletes recruited to play at a university.

159.    Plaintiffs had the objectively reasonable expectation, based upon the express terms of the contractual relationship governing the athletic scholarship, that the University would renew their scholarship, and not act so as to deprive them of the fruits of the scholarship, and otherwise act in good faith vis-à-vis their scholarships.

160.    The University's actions, as described and set forth above, constituted a breach of the terms of the contract, including the implied covenant of good faith and fair dealing.

161.    As a direct and proximate result of the University's breach of contract, Plaintiffs have been made suffer significant direct and consequential damages, including loss of future income as described and set forth above.

162.    As a result of the actions of the Defendants, Plaintiffs expects to sustain further economic damages, and will move to amend the complaint when and if those economic damages are incurred.

**WHEREFORE**, Plaintiffs request a jury trial and pray for a judgment in their favor, damages in an appropriate amount to be determined by the trier of fact, their reasonable costs and attorneys' fees, and for any other relief deemed appropriate by the Court.

Dated: October 11, 2016

Respectfully submitted,

By:    s/ Brian Michaels
       Brian Michaels, Attorney at Law, OSB No. 925607
       259 East Fifth Ave.
       Eugene, OR  97401
       Phone: (541) 687-0578
       Fax: (541) 686-2137


       Alex Spiro, Esq. (*Pro Hac Vice*)
       Brafman & Associates, P.C.
       767 Third Avenue, 26th Fl
       New York, NY 10017
       Phone: (212) 750-7800
       Fax: (212) 750-3906
       s/ Alex Spiro

       Attorneys for Plaintiffs
       Dominic Artis and Damyean Dotson

## <u>CERTIFICATE OF SERVICE</u>

I, Brian Michaels, hereby certify that, on the date set forth below, I served a copy of the

within Third Amended Complaint upon the following counsel of record via this Court's mandatory

Electronic Case Filing system:

Michelle Barton Smigel, P.C. (OSB No. 045530)
Michael Porter, P.C. (OSB No. 003560)
MILLER NASH GRAHAM & DUNN LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204

Attorneys for the Defendants

Dated: October 11, 2016

Respectfully submitted,

By:     /s/ Brian Michaels
        Brian Michaels, Attorney at Law, OSB No. 925607
        259 East Fifth Ave.
        Eugene, OR  97401
        Phone: (541) 687-0578
        Fax: (541) 686-2137

DECLARATION OF GREG VERALRUD

I, Greg Veralrud, being first duly sworn, make this declaration regarding my recollections of my review of a report of the Title IX investigation conducted as a consequence of a claim of non-consensual sexual contact by my then client, Dominic Artis, and Damyean Dotson and Brandon Austin, all male students at the University of Oregon and members of its basketball team:

I represented Dominic Artis from approx. April, 2014, through his administrative hearing with the University of Oregon held June 17, 2014, then through receipt of the University's order suspending Mr. Artis and his two fellow student basketball players.

Prior to the hearing, I made a request for the report of the investigation conducted by what I understood to be and was advised was an investigator working under the auspices of and in accordance with the requirements of Title IX. I was allowed to review a copy of the Title IX investigative report, but I was not permitted to take a copy of it from the office of the Student Affairs Dean, Sandy Weintraub. My recollection of the report is that many witness names were redacted from the copy.

I do not contend that my current recollection of the contents of the report is complete or totally accurate. Because there was some overlap between the Title IX investigation, the investigation of the Eugene Police Dept., and the investigation conducted on behalf of the male students by their respective counsel, I acknowledge that attribution of a particular fact to the Title IX report could be in error. That said, I do recall the evidence supporting the claim of non-consensual contact was based solely upon the statement of the complaining female student involved in the encounter with the male students.

I recall that the report contained references to interviews with other students who were with the complainant the evening of the encounter, who saw her interact with one or more of the male students at a private party, and who talked with her and watched her leave in a taxi with the three male students after she had been involved in sexual contact and oral intercourse with the male students at the party. My recollection is that these witnesses provided statements indicating the complainant was not intoxicated (as she later claimed), that she evidenced a willingness to leave in the taxi with the three male students, and that she ignored advice from her acquaintances at the party that she should not leave with the male students.

My recollection is that the report contained references to text conversations occurring the day following the encounter between the complainant and the male students, including one exchange between the complainant and an acquaintance where the complainant was asked how the evening had gone and the

Exhibit #1 Page 1 of 3

complainant making a response that contained no complaint of any non-consensual sexual contact, even though the female student's interaction with the male students was clearly the subject matter.  I thought the complainant's text conversation was inconsistent with someone having been subjected to unwanted sexual contact with three male students.

I, along with counsel for students Dotson and Austin, provided additional evidence to the University corroborating the male students' position that the sexual activity with the complaining female student was consensual.  This information included a report of a conversation with the taxi driver who had taken the male and female students from the party to the premises of one of the male students.  The taxi driver advised that the female student was talkative, and he characterized her as seeming impressed with being in the company of three University of Oregon basketball players.  We also provided information from the Eugene Police Dept. investigation to the effect that the complaining female student had acknowledged consensual sexual activity with Mr. Artis the morning after spending the evening in his bed after sexual activity with the other two male students.  Other reports provided to the University included a statement from a fellow female student who had talked to the complaining female student at the party while she (the complainant) was in the bathroom with at least one of the three male students; the complainant made it clear to the reporting student that her presence was not welcome in the bathroom.  To this date, I do not know whether or not this additional information provided to the University ever made it into any report or addendum to the report conducted by the Title IX investigator.

Even without that information, in the report that I viewed, I recall the report was broad enough and contained so much evidence corroborating the male students' account that I was perplexed by the investigator's conclusion that non-consensual sexual contact had occurred without any explanation or effort to explain the contradictory evidence.

When I reviewed the conclusion in the investigative report, my immediate concern was that there would be significant pressure on the university administration to make its own student conduct findings in lock step with the Title IX investigative report, and my initial thought and advice to my client was that he should not waive his right to a "panel hearing," which would allow the factfinding to be made by a panel made up of faculty and students acting as a type of jury. Subsequent to that, we received information from the university that if Mr. Artis were to waive the panel hearing and proceed based upon an administrative review by Mr. Weintraub that did not require the presence of the complaining witness, they would agree that there would be no expulsion and that the sanction would be limited to a suspension of some years.

This wouldn't necessarily be a disqualifying factor.  I was also concerned about the university's counsel's lack of willingness to exercise its subpoena power in conjunction with the panel hearing to bring forth witnesses who contradicted

Exhibit #1 Page 2 of 3

the complainant and corroborated Mr. Artis with respect to the consensual nature of the encounter.  Without subpoena, we would not be able to get the presence of the Eugene police officer who investigated the case and took statements from the complainant, the three basketball players accused, various acquaintances and companions of the complainant, and the cab driver who picked up the three basketball players and the complaining witness and took them from the party to Mr. Artis' and Mr. Dotson's apartment (the statement of the cab driver to our investigator was that the complainant was in a talkative mood, did not seem at all afraid or apprehensive and he described her as seeming very pleased to be in the company of three University of Oregon basketball players).

I, the undersigned, hereby declare the above statement is true to the best of my knowledge and belief, and I understand it is made for use as evidence in court and subject to penalty for perjury.

Greg Veralrud

Exhibit #1 Page 3 of 3

1

2

3

4

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

5    DOMINIC ARTIS and        )
        DAMYEAN DOBSON,       )

6                         )    Case No 16CV00647
          Plaintiffs,       )

7                         )

8          v.              )    DECLARATION OF

9                         )    LAURA FINE MORO
        UNIVERSITY OF OREGON;   )

10   SANDY WEINTRAUB,       )
        CHICORA MARTIN;        )

11   and MICHAEL R. GOTTREDSON )
        all in their individual capacities only,)

12                         )
          Defendants.     )

13  --------------------------------------------

14        I, Laura Moro, being first duly sworn, declare that to the best of my recollection and

15  understanding, the following is true:

16  1.     In or about April of 2014, the University of Oregon (UO) accused UO students Brandon

Austin, Dominic Artis and Damyeon Dobson of sexual misconduct.  Each student

17       received two temporary suspensions and one final ten year suspension.

18

19  2.     I represented Mr. Austin at all times during the UO's action against him.

20  3.     I am a criminal defense attorney and I have practiced law continually in Oregon since

1988.  I have represented hundreds of UO students in their various matters, including in

21       allegations of  UO Student Conduct Code violations.

22

23  4.     I am familiar with the UO Student Conduct Code and with the hearings and adjudication

procedures.

24

25  5.     I have never had a case personally or heard through professional peers of a case where an

allegation of sexual misconduct made by a female against a male has been unfounded by

26

27       Title IX and by the UO.  In other words, in my experience and in the experience of my

28  DECLARATION OF LAURA FINE MORO              Page 1

Exhibit #2 Page 1 of 6

1   peers as reported to me, the female accuser is always believed and the male accused is

2   never believed.

3   6.   I have personally represented male students where the evidence was overwhelming that

4   the conduct was consensual, yet the Title IX investigator and the UO have found

5   otherwise.  When sexual misconduct is ruled founded against my male clients, they are

6   universally suspended for some period of time as a punishment.

7   7.   I have appealed prior findings based on numerous factors, but most alarmingly, the

8   following factor:

9   a.   In order for a sexual misconduct investigation to commence upon receipt of a

10   complaint, the UO must determine whether it is more likely than not that it may

11   have occurred.  At the conclusion of the investigation, the UO must determine

12   whether it is more likely than not that the allegation is true.

13   b.   By applying the same standard to the initiation of the investigation as to the final

14   outcome, the UO reveals that their "investigations" are really just an attempt to

15   collect the information needed to justify their final finding.  They do not search

16   for the truth, they do not consider information which runs contrary to the

17   complaint, and due process is denied to the accused.

18   8.   To the best of my recollection, every client that I have represented on a UO sexual

19   misconduct allegation has been male, with one exception, described as follows:.

20   a.   In 2015, I represented one female UO student who was alleged to have committed

21   sexual misconduct.  Her alleged conduct at issue consisted of the following:

22   i.   She had a loud verbal fight with her boyfriend in her apartment;

23   ii.   She refused to let him leave her apartment by exerting physical force

24   against him which resulted in scratches and abrasions on his skin; and

25   iii.   When he finally left the apartment, she grabbed a large kitchen knife and

26   ran after him. She held the knife above her head in an aggressive manner.

27

28   DECLARATION OF LAURA FINE MORO                                    Page 2

Exhibit #2 Page 2 of 6

     b.     Her boyfriend reported that he feared for his life when he called 911 for help. Police arrived and she was arrested and lodged in the Lane County Jail on the charge of *Menacing as Domestic Violence* (Class A Misdemeanor). She ultimately pleaded guilty to *Reckless Endangerment* (Class A Misdemeanor) and *Harassment* (Class B Misdemeanor). She was placed on probation, given a jail sentence, and she was ordered to complete a mental health evaluation and any required treatment.

     c.     I assisted her through the Title IX investigation interview and disclosed the outcome of her criminal case to the investigator. Following that, no further action was taken by the UO that I am aware of.

9.     The plaintiffs herein, along with my client Brandon Austin, were charged with sexual misconduct by the UO.

     a.     The Eugene Police and the Lane County District Attorney's office completed an investigation conducted by a seasoned sex crimes detective.

     b.     As a result of their investigation, there were no criminal charges filed against any of the three men.

     c.     The district attorney made a public proclamation that there was insufficient evidence to support the filing of any charges.

10.     I worked in concert with the attorneys representing the Plaintiffs in this instant case. We shared information, joined in each other's motions and requests, and viewed the Title IX report together in the office of Sandy Weintraub.

11.     The Title IX report inexplicably concluded that the allegation against the three men was founded. Regarding the Title IX report:

     a.     We were allowed to view but not have a copy of the Title IX report;

     b.     Large portions of the Title IX report were redacted, including all of the witness names;

DECLARATION OF LAURA FINE MORO               Page 3

Exhibit #2 Page 3 of 6

c.    The Title IX investigator failed to interview the taxi driver who witnessed conduct outside of his cab and inside of his cab.

d.    The Title IX investigator failed to interview the female eyewitness to conduct within the bathroom where a sexual assault is claimed to have occurred.

e.    The portions of the report which we could read seemed to comport with our understanding of the facts which included the following:

   i.    The complaining witness was not very intoxicated, if intoxicated at all, on the evening in question (as opposed to her claim that she was intoxicated);

   ii.    She refused to leave with her friends who told her that she would regret her decisions in the morning because the men only wanted her for sex;

   iii.    She willingly entered the cab with the young men (as opposed to her claim of them forcing her into the cab); and

   iv.    She had text communication with a friend the next day who inquired about the events of the night after the complaining witness had been seen driving off with the three men.  Those text messages made no reference, however vague or shielded, of being the victim of a sexual assault.

12.    Once the Title IX investigator deemed the claims founded, it was readily apparent that the UO would fall in lockstep with her conclusion and find against our clients.  Despite that presumption, I, along with the attorneys for the other two students supplemented the incomplete Title IX investigation by providing the following information to the UO:

a.    Statements from the taxi driver witness whose observations directly contradicted the complaining witness claim of being physically dragged and forced into his cab and her claim that she was forced to drink alcohol while in the cab.  To the contrary, he recalled that she was quite enthralled with the young men, she sat on the lap of one of them, and she laughed and spoke about herself.  He reported seeing no alcohol offered, forced or consumed in his cab.

DECLARATION OF LAURA FINE MORO                                    Page 4

Exhibit #2 Page 4 of 6

b.   Statements made by the female UO student who joined the complaining witness in the bathroom with the three men at issue. Her observations directly contradicted the complaining witness claim of being forced into the bathroom by the men and having an inability to escape, because she was seen to leave the bathroom when the woman entered, and then return to the bathroom after that woman left.

13.  I, along with the attorneys for the other two students, requested subpoenas by way of providing a letter detailing the nature and substance of the testimony sought. All of the testimony which we sought directly contradicted claims by the complaining witness. Our request for subpoenas, which is authorized by the Student Conduct Code Hearings Procedures, was not responded to and not granted, although Doug Park did state that his office never issues subpoenas in any case.

14.  At the onset of this matter, Mr. Austin received a temporary suspension which was modified to allow him to continue classes under certain restrictive circumstances. Following the release of the police report to the UO, Mr. Austin was again temporarily suspended.  The second suspension was due to his refusal to speak with the police, (as allowed by law), during their initial contact with him. His rights per *Miranda* were asserted by me personally in a phone call with the involved detective. This second suspension was implemented by **Chicora Martin** and verified to me by **Sandy Weintraub** who told me that "he was suspended because he wouldn't answer questions."

a.   The police report clearly reflected that I personally spoke with the detective and that I gave him a statement of facts from my client which the detective observed comported with the statements of the other two involved men.

b.   Nothing my client did in this regard violated the law or hindered the prosecution.

c.   In further evidence of the denial of due process to male students charged with sexual misconduct by the UO, I filed a written appeal of this second temporary suspension with the designated recipient of appeals: **Robin Holmes**. She refused

DECLARATION OF LAURA FINE MORO                                   Page 5

Exhibit #2 Page 5 of 6

1    to respond to my appeal in writing or verbally. I left her several messages

2    requesting a response to my appeal but none was given.

3    15.    Facing an insurmountable and unarmed battle with the UO, all three students opted to

4    accept an administrative hearing as their final adjudication with the understanding that, by

5    doing so, expulsion was no longer a possible consequence.

6    16.    Based on my experience in the instant case and numerous other cases which I have

7    participated in with the UO over Student Conduct Code allegations, I declare that the UO

8    acts with a presumption against men in their investigations, ignores evidence which

9    contradicts female accusers, and treats females found in violation with lienancy which is

10   denied to similarly situated men.

11   Dated this 6th day of October, 2016,

12

13

14   Laura Fine Moro                OSB 882057

15

16

17

18

19

20

21

22

23

24

25

26

27

28   DECLARATION OF LAURA FINE MORO                                Page 6

Exhibit #2 Page 6 of 6

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| DOMINIC ARTIS and DAMYEAN DOTSON,<br><br>                              Plaintiffs,<br><br>        v.<br><br>UNIVERSITY OF OREGON; SANDY WEINTRAUB; CHICORA MARTIN; ROBIN HOLMES; and MICHAEL R. GOTTFREDSON, all in their individual capacities only,<br><br>                              Defendants. | Case No.  16-CV-00647<br><br>DECLARATION OF<br><br>LISSA CASEY |

I, Lissa Casey, do hereby depose and swear, under penalty of perjury, based upon knowledge and belief:

1.  I am an attorney at Arnold Law in Eugene, Oregon.

2.  I have represented students that are charged with Sexual Misconduct offenses by the University of Oregon through the disciplinary process at that University.

3.  I have reviewed reports of accusations that have both been filed by the Lane County District Attorney's Office and those that have, to my knowledge, have had no law enforcement involvement whatsoever.

4.  I have investigated these accusations by interviewing witnesses and presenting evidence to the University throughout the Student Conduct disciplinary process.

5.  I have never had a female student make an inquiry of our firm for representation due to an allegation of Sexual Misconduct under the Student Conduct Code.  All of my clients have been male.

6.  Through my investigations in each case I have had against the University, when the

1    DECLARATION OF LISSA CASEY

Exhibit #3 Page 1 of 2

totality of the evidence is viewed, there can only be one logical conclusion, even based on the preponderance of the evidence standard: that the accuser's accusations are not credible.

7. I have presented the University with credible evidence of consensual sexual activity in each case, in addition to motives for false accusations on the accuser's part. The University has consistently found that evidence not credible or not relevant to the determination, and has always found the accuser's statements credible instead.

8. I have previously suggested that the University provide unbiased officers to preside over Administrative Conferences, which the University has responded to with denials. The investigators at the University are also the decision-makers about their own investigations.

9. When I have attempted to investigate accusations by attempting to interview witnesses, I have been threatened with additional student conduct allegations of "retaliation" against my client.

10. In my professional opinion, bias exists at the University of Oregon to find female students' accusations of sexual misconduct credible and to find male students in violation of sexual misconduct pursuant to the University's student conduct code, and they have failed to remedy the blatant bias that exists within that system.

Undersigned hereby declares the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and subject to penalty for perjury.

**RESPECTFULLY SUBMITTED** this 4th day of October 2016,
BY:

_____s/ Lissa Casey_____
Lissa Casey, OSB #086541
Attorney For Plaintiff

2   DECLARATION OF LISSA CASEY

Exhibit #3 Page 2 of 2

ALEX SPIRO, ESQ.
Brafman & Associates, P.C.
767 Third Avenue, 26th Fl
New York, NY 10017
Phone: (212)-750-7800
Fax: (212)-750-3906

**BRIAN MICHAELS**, OSB # 925607
259 East Fifth Avenue, Suite 300-D
Eugene, Oregon   97401
Telephone: 541.687.0578
Fax:       541.686.2137
  brian@brianmichaelslaw.com

Attorney for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| DOMINIC ARTIS and DAMYEAN DOTSON, | Case No.  16-CV-00647 |
| Plaintiffs, | DECLARATION OF |
| v. | |
| UNIVERSITY OF OREGON; SANDY WEINTRAUB; CHICORA MARTIN; ROBIN HOLMES; and MICHAEL R. GOTTFREDSON, all in their individual capacities only, | BRIAN MICHAELS |
| Defendants. | |

Undersigned BRIAN MICHAELS does hereby depose and swear, under penalty of perjury:

1. Undersigned Counsel is local counsel for plaintiffs. These statements are based upon my personal knowledge.

2. Previously, I represented a Respondent, Jacob Cohen, in a Sexual Assault Restraining Order case filed by Lea Lawrence, Petitioner, through the University of Oregon.

3. In that case, Depositions were taken of three University of Oregon Employees. These

1   DECLARATION OF COUNSEL

EXHIBIT 4 Page 1 of 3

Depositions were taken under a Protective Order. Two of these depositions are extremely relevant and helpful to establishing Plaintiffs' claims under both Due Process and Title IX. Having taken the depositions and read them, I have personal knowledge. Because of the Protective Order, I am prohibited from expressing any further information.

4. It is my understanding from speaking with several attorneys who do this work, that these may be the only depositions of their kind, providing a unique insight into exactly how the university conducts its procedures in these contexts. Because the University maintains all relevant material behind protective orders, this declaration and the ones by the other local attorneys provide the only 'knowledge' of facts available at this stage of proceedings.

5. These depositions will become available through discovery once this case enters that stage.

6. In hopes of being able to use these depositions in this case, under a protective order issued by this Court, a motion was filed in Lane County Circuit Court to modify the protective order. The motion along with the attached protective order are attached here as Exhibit 1.

7. The university, Defendants in this case, objected, and submitted a letter to the court. That letter is also attached, Exhibit 2.

8. Because I no longer represent Respondent, and Respondent objected through new

///

///

///

///

///

2    DECLARATION OF COUNSEL

EXHIBIT 4 Page 2 of 3

counsel, the court determined the motion lacked standing, and struck the pleadings.  See

attached order, Exhibit 3.


Undersigned hereby declares the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and subject to penalty for perjury.


        **RESPECTFULLY SUBMITTED** this 8th day of August 2016,
BY:

_____s/ BRIAN MICHAELS_____
BRIAN MICHAELS OSB 925607
Attorney For Plaintiff
