Alan C. Milstein (*Pro Hac Vice*)
SHERMAN, SILVERSTEIN, KOHL, ROSE &
PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
E-Mail: amilstein@shermansilverstein.com

Marianne Dugan (OSB #932563)
259 E. 5th Avenue, Suite 200-D
Eugene, OR 97401
Telephone: 541-338-7072
E-Mail: mdugan@mdugan.com

*Attorneys for Plaintiff Brandon Austin*

Alex Spiro (*Pro Hac Vice*)
BRAFMAN & ASSOCIATES
767 Third Avenue
New York, NY 10017
Telephone: 212-750-7800
E-Mail: aspiro@braflaw.com

Brian Michaels (OSB #925607)
259 East Fifth Avenue, Suite 300-D
Eugene, OR 97401
Telephone: 541-687-0578
E-Mail: brian@brianmichaelslaw.com

*Attorneys for Plaintiffs Dominic Artis and
Damyean Dotson*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| BRANDON AUSTIN,<br><br>    Plaintiff,<br><br>    v.<br><br>UNIVERSITY OF OREGON; SANDY WEINTRAUB; CHICORA MARTIN; ROBIN HOLMES; and MICHAEL R. GOTTFREDSON, all in their individual capacities only,<br><br>    Defendants.<br><br>DOMINIC ARTIS and DAMYEAN DOTSON,<br><br>    Plaintiffs,<br><br>    v. | Case Nos.:<br>6:15-cv-02257-MC (Lead Case)<br>6:16-cv-00647-MC (Member Case)<br><br>**JURY TRIAL DEMANDED**<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS**<br><br>ORAL ARGUMENT REQUESTED |

UNIVERSITY OF OREGON; SANDY
WEINTRAUB; CHICORA MARTIN;
ROBIN HOLMES; and MICHAEL R.
GOTTFREDSON,

    Defendants.

# **TABLE OF CONTENTS**

Table of Contents ..................................................................................... i

Table of Authorities ................................................................................ ii

Introduction ............................................................................................ 1

Statement of the Facts ............................................................................ 8

Legal Argument ..................................................................................... 26

    1.    The Plaintiffs' TAC States a Plausible, and Compelling, Claim for
        Violations of Title IX of the Education Amendments of 1972,
        20 U.S.C. § 1681, et seq. ............................................................ 26

        a.    Introduction ................................................................. 26

        b.    The Pleading Standard for Title IX Claims ............... 27

        c.    The Plaintiffs Have Stated a Plausible, and Compelling, Claim for
            Violations of Title IX ................................................. 33

    2.    The Plaintiffs' TAC States a Plausible, and Compelling, Equal Protection
        Claim ........................................................................................ 38

    3.    The Plaintiffs' TAC States a Plausible, and Compelling, Claim for
        Negligence ................................................................................ 39

    4.    The Plaintiffs' TAC States a Plausible, and Compelling, Claim for
        Breach of Contract .................................................................... 42

Conclusion ............................................................................................. 44

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ................................................................ *passim*

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ......................................... *passim*

Doe v. Alger, et al., Docket No. 5:15-cv-00035, 2016 WL 7429458 (W.D. Va. December 23, 2016) .......................................................................................... 7, 8

Doe v. Brown University, Docket No. 15-144 S, 2016 U.S. Dist. LEXIS 21027 (D.R.I. February 22, 2016) ........................................................................................ 28, 29

Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016) .................................... *passim*

Doe v. Salisbury University, Docket No. JKB-15-517, 2015 U.S. Dist. LEXIS 110772 (D. Md. Aug. 21, 2015) .................................................................................... 34

Yusuf v. Vassar Coll., 35 F.3d 709 (2d Cir. 1994) ....................................... 28, 29, 37

Emeldi v. University of Oregon, 673 F.3d 1218 (9th Cir. 2012) ........................ *passim*

Emeldi v. University of Oregon, 698 F.3d 715 (9th Cir. 2012) (en banc) .......... *passim*

Littlejohn v. City of New York, 795 F.3d 297 (2d Cir. 2015) ................................ 31

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ................................ 1, 31

Orneglas-Morales v. United States, Docket No. 3:15-cv-02304-SI, 2015 U.S. Dist. LEXIS 168575 (D. Or. 2015) ........................................................................... 8

Perry v. Sindermann, 408 U.S. 593 (1972) ...................................................... 7, 8

Stanley v. Trustees of California State University, 433 F.3d 1129 (9th Cir 2006) .............. 26, 27

Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) ........................................... 1

Wells v. Xavier University, 7 F. Supp. 3d 746 (S.D. Ohio 2014) ...................... 29, 34

Wilson v. Hewlett-Packard Co., 668 F.3d 1136 (9th Cir. 2012) ......................... 8

### **STATE CASES**

Davidson v. Univ. of North Carolina at Chapel Hill, 543 S.E.2d 920 (N.C. App. 2001) ...... 39, 40

Doe v. Brandeis University, 177 F. Supp. 3d 561 (D. Mass. 2016) ........................... 44

Kavanagh v. Trs. of Boston University, 795 N.E.2d 1170 (Mass. 2003) ................................... 41

Kleinknecht v. Gettysburg College, 989 F.2d 1360 (3d Cir. 1993) ........................................... 41

## **UNITED STATES CODE**

20 U.S.C. § 1681, et seq. ........................................................................................................ 26

20 U.S.C. § 1681(a) ........................................................................................................... 26, 27

20 U.S.C. § 1687 ..................................................................................................................... 27

42 U.S.C. § 2000e, et seq. ....................................................................................................... 27

## INTRODUCTION

Plaintiffs Brandon Austin, Dominic Artis, and Damyean Dotson (collectively, "Plaintiffs"), by and through the undersigned counsel, respectfully submit this memorandum in opposition to the motion to dismiss ("Motion") filed on behalf of Defendants University of Oregon, Sandy Weintraub, Chicora Martin, Robin Holmes, and Michael R. Gottfredson (collectively, "Defendants").

This Court's September 8, 2016, Order allowing the Plaintiffs to re-plead ("September 8 Order") stated, in pertinent part, at page 15:

> Even taking all inferences in Plaintiffs' favor, their allegations of selective enforcement fall short of satisfying the pleading standards mandated by Twombly[1] and Iqbal[2]. First, the University's decision to investigate the female's claims and suspend Plaintiffs does not give rise to an inference of gender discrimination simply because the District Attorney did not criminally prosecute Plaintiffs. Second, even assuming that President Gottfredson's statements were biased toward the accuser, Plaintiffs have not established that they were grounded in sexism or gender bias or that they had any substantive bearing on the review process. As such, Plaintiffs fall short of plausibly alleging that Defendants selectively enforced the code of student conduct against Plaintiffs due to their sex.

In Bell Atlantic Corp. v. Twombly, the United States Supreme Court, following citations to Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002), and its interpretation of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), provided this conclusion when analyzing a motion to dismiss:

> Here, in contrast, we do not require heightened fact pleading of specifics, but **only enough facts to state a claim to relief that is plausible on its face**. Because the plaintiffs here have not nudged their claims **across the line from conceivable to plausible**, their complaint must be dismissed.[3]

---

[1] See Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).
[2] See Ashcroft v. Iqbal, 556 U.S. 662 (2009).
[3] See Twombly, 550 U.S. at 570 (emphasis added).

In Iqbal, the Supreme Court explained:

> Two working principles underlie our decision in Twombly.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. … Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not **unlock the doors of discovery for a plaintiff** armed with nothing more than conclusions. … Second, **only a complaint that states a plausible claim for relief survives a motion to dismiss**. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. … But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).[4]

The key principles for this Court to consider in this case are eloquently distilled in this emphasized quotation from Iqbal: the pleadings must be sufficient to "unlock the doors of discovery for a plaintiff."[5]  Amongst many other elements of the Plaintiffs' Third Amended Complaint ("TAC") which qualify the pleadings to move "across the line from conceivable to plausible"[6] are the declarations of numerous prominent local attorneys involved in University of Oregon proceedings, which declarations make clear that there is much relevant information to be learned in unlocking the doors of discovery.  This evidence, to be taken as true, is more than sufficient to move the pleadings from conceivable to plausible.

The Defendants seek to undermine the value, content, and context of these attorneys' declarations by presenting more of a summary judgment posture than a motion to dismiss, as though there had already been discovery (which there has not), and that plaintiffs have only these

---

[4] See Iqbal, 556 U.S. at 678-79 (bracketing in original) (emphasis added).
[5] See id.
[6] See Twombly, 550 U.S. at 570.

declarations after discovery.  An example of this type of presentation by the Defendants can be found at page 17 of their brief, in analyzing the declaration of Laura Fine Moro (emphasis added):

> In her declaration, Fine Moro states that "in [her] experience and in the experience of [her] peers as reported to [her], the female accuser is always believed and the male accused is never believed." (Compl. ¶ 79.) Fine Moro's statement, however, **merely** reflects (1) the opinion of one attorney who has represented students—including one of the plaintiffs—in University hearings and (2) a statement of hearsay concerning the purported experiences of other attorneys.  It does not constitute factual allegations of bias.

As an attorney, Ms. Fine Moro is an officer of the court.  At this phase, when the allegations of the Complaint (and its incorporated exhibits) must be taken as true, her statements regarding her own experience constitute sufficient factual allegation of University bias.  The Defendants' use of the word "merely" is simply editorializing, and adds nothing to the analysis at this stage. Ms. Fine Moro did in fact specifically address actual instances which she witnessed as an attorney.[7] Further, the Defendants glossed over several important, highly specific points made by attorney Fine Moro and the other officers of the court who submitted declarations to accompany the TAC. As set forth in ¶¶ 78-80 of the TAC, Ms. Fine Moro avers that she represented a female student at the University who was alleged to have committed sexual misconduct.  The female student was arrested and pled guilty to a variety of criminal acts against a male student, including menacing as domestic violence and reckless endangerment.  As alleged in the TAC, supported by Ms. Fine Moro's sworn declaration:

> I assisted her through the Title IX investigation interview and disclosed the outcome of her criminal case to the investigator.
>
> Following that, no further action was taken by the UO that I am aware of.[8]

---

[7] See Plaintiffs' Third Amended Complaint, a true and correct copy of which is attached as **Exhibit "A,"** ¶ 78-80; see also Exhibit A, Exhibit 2 thereto.

[8] See Exhibit A, ¶ 78; see also Exhibit A, Exhibit 2 thereto.

Page 3 – Plaintiffs' Memorandum in Opposition to the Defendants' Motion to Dismiss

This averment alone – an actual instance of gender bias in the extreme when compared to the fate suffered by the Plaintiffs, and the other examples set forth in the attorneys' declarations which are incorporated by reference into the TAC – remedies many of the deficiencies the Court felt were present in the Second Amended Complaint.

The sworn declarations of the officers of the court which are incorporated into the TAC are sufficient to allow this court to unlock the doors of discovery.  These pieces of <u>evidence</u>, even though evidence is not required at this phase, make clear that it is likely that behind those doors there will be found evidence to support the Plaintiffs' claims under Title IX, including selective enforcement and erroneous outcome; equal protection; and due process.[9]

The same attempts to diminish the credibility afforded an officer of the court were directed at attorney Lissa Casey.  At page 17 of their brief, the Defendants attempt to minimize Ms. Casey's sworn statement, based upon her firsthand experience, by characterizing it as solely being a "professional opinion."  To the contrary, as set forth in ¶ 81 of the TAC, she averred:

> I have previously suggested that the University provide unbiased officers to preside over Administrative Conferences, which the University has responded to with denials.   The investigators at the University are also the decision-makers about their own investigations.
>
> When I have attempted to investigate accusations by attempting to interview witnesses, I have been threatened with additional student conduct allegations of "retaliation" against my client.[10]

The same is true of the Defendants' handling of Mr. Veralrud's declaration, at page 14 of their Motion.  Said declaration describes quite pointedly:

---

[9] The Plaintiffs hereby incorporate their pending motion to reconsider this Court's dismissal of their 42 U.S.C. § 1983 due process claim.

[10] <u>See</u> Exhibit A, ¶ 81; <u>see also</u> Exhibit A, Exhibit 3 thereto.

> Even without that information, in the report that I viewed, I recall the report was broad enough and contained so much evidence corroborating the male students' account that I was surprised at the investigator's conclusion that nonconsensual sexual contact had occurred without any explanation or effort to explain the contradictory evidence.[11]

Defendants' dismissive attitude toward Brian Michaels' declaration about the actual existence of discoverable information contained in depositions in a prior case, specifically including named Defendants, which depositions are under protective order, underscores the "Catch-22" aspect of the Defendants' Motion.  On the one hand, the Defendants refuse to allow the depositions from the prior case to be received by this Court under protective order, and then on the other state that Mr. Michaels' declaration should be ignored because "[t]his is not a factual allegation and does not meet the pleading standard."

The Plaintiffs have exceeded the Twombly/Iqbal standard for alleging facts plausible enough to open the doors of discovery.

On pages 14-15 of its September 8 Order, this Court observed (emphasis added):

> A Tennessee district court held that a selective enforcement claim such as the one Plaintiffs bring here requires evidence that a female in similar circumstances to the male student bringing the claim was treated more favorably by the University against which selective enforcement is alleged. See, e.g., Doe v. Univ. of the South, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009). *Doe v. Brown Univ.* went forward on a similar theory of discrimination, but the theory was bolstered by pointed allegations in the complaint including, but not limited to, former university employees attesting to a pattern of gender bias as well as statements by current professors supporting the gender bias allegations. No. 15-144, 2016 WL 715794, *8-9 (D.R.I. Feb. 22, 2016).  **No such allegations are present here.**

Similarly, on pages 18-19, under the section titled "Erroneous Result," the Order analyzed the relevance of the District Attorney's Office declining to prosecute (emphasis added):

---

[11] See Exhibit A, ¶ 77; see also Exhibit A, Exhibit 1 thereto.

Page 5 – Plaintiffs' Memorandum in Opposition to the Defendants' Motion to Dismiss

>      For the same reasons that Plaintiffs' selective enforcement
> claim fell short, I find that Plaintiffs fail to plausibly allege that the
> University was deliberately indifferent to their rights.   First, **the
> standard of proof required for a University investigation and
> suspension based on its code of conduct is entirely different from
> the DA's standard to prosecute a criminal case**.   Second,
> Plaintiffs continue to allege that the University is gender-biased but
> fail to allege specific facts supporting that theory.  Instead, **Plaintiffs
> merely posit, without reason or alleged facts**, that the University
> would not have investigated or penalized them if they were not male.

At pages 19-20, the Order expresses the same sentiment with regard to equal protection, citing

Twombly and Iqbal.

By way of response, the Plaintiffs substantially amplified their pleading to include

numerous additional allegations demonstrating the presence of the University's gender bias against

the male basketball players in this specific instance, including the fact that internal and external

scrutiny by students and the media caused the University of Oregon to take punitive action against

the male athletes solely on the basis of their sex/gender (notwithstanding the fact that the accuser

was plainly not telling the truth, and the male basketball players had plainly not engaged in any

culpable conduct) in an effort to combat widespread public perception, both locally and nationally,

that the University was not tough enough on male individuals or male athletes accused of sexual

assault.  Additionally, the Plaintiffs submitted the declarations of the four officers of the court

attached to and incorporated within the TAC.  These declarations not only must be taken as true at

this phase, they must be given the deference that is due to the status of the declarants, based on

their many years of experience dealing with University of Oregon student conduct matters.  In

particular, the facts set forth by Ms. Fine Moro make clear there is sufficient evidence to make

plausible the allegation that male students are always treated differently from female students when

it comes to the University of Oregon student conduct system.  Ms. Fine Moro's female client was

not only prosecuted, but actually pled guilty to crimes of violence and harm, yet the University

declined to prosecute her under the same student conduct code that the Plaintiffs were prosecuted under.  At this pleading stage, Plaintiffs have presented more than sufficient allegations that gender bias exists in the University student conduct system, and have pled sufficient facts to move their allegations from speculation to plausible.

Tellingly, the University fails to cite or even acknowledge Emeldi v. University of Oregon, wherein the Ninth Circuit held or at least strongly suggested that the pleading standard for Title IX claims is akin to the minimal pleading standard applicable to Title VII claims.[12]  Regardless of the standard, the amplified factual allegations within the TAC, and the numerous attorney declarations discussed therein and attached thereto, provide ample evidence of the University's extreme sex/gender bias.  Indeed, the TAC plausibly pleads that the University's disciplinary actions in this instance, as in others, were motivated by bias against males on the basis of sex/gender, giving rise to a Title IX and equal protection claim.

As further discussed below, this Court should reject the Defendants' assertion that the Plaintiffs' negligence claim, as now pled, fails due the lack of a "special relationship" between the athletes and the University, and this Court should further reject the Defendants' baseless attack on the Plaintiffs' breach of contract claim.   On December 23, 2016, the Honorable Elizabeth K. Dillon, U.S.D.J. of the Western District Of Virginia-Harrisonburg Division, held that continuing education is a protected property interest worthy of due process.  In Doe v. Alger, et al., Docket No. 5:15-cv-00035, 2016 WL 7429458 (W.D. Va. December 23, 2016), Judge Dillon noted: "In

---

[12] See Emeldi v. University of Oregon, 673 F.3d 1218, 1223 (9th Cir. 2012); see also Emeldi v. University of Oregon, 698 F.3d 715 (9th Cir. 2012) (en banc) (Kozinski, J., dissenting) (emphasis added) ("Under the established Title VII pleading framework, which the majority applies to this Title IX case … ."); accord Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016) (holding that a Title IX complaint, like a Title VII complaint, must simply "meet[] the low standard … of alleging facts giving rise to a plausible minimal inference of bias sufficient to survive a motion to dismiss").

Perry v. Sindermann, 408 U.S. 593 (1972), the Court recognized that, even where there was no statute and no contract provision conferring a property interest, one might exist."[13] While the court also noted Perry involved an employment contract, the court found an implied-in-fact contact existed between the student and James Madison University. [14]  The court further held:

> Here, as already shown, the admissions of defendants show a clear and mutual assent to an entitlement based on a mutual understanding.  Both defendants (as well as Doe) have stated their understanding that, as long as Doe maintained sufficient academic progress, paid tuition and applicable fees, and did not commit a conduct violation, he had an "entitlement" to continued enrollment at JMU, and thus a protectable property interest.  The court's conclusion is also supported by JMU's long-standing practice of not suspending or expelling students except for cause, as both defendants acknowledged in their depositions.[15]

The Motion should be denied in its entirety.

## STATEMENT OF THE FACTS

"In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party."[16]  Notwithstanding this bedrock principle, the Defendants transparently attempt to downplay the compelling facts of this matter as pled in the TAC, and substitute a narrative that clearly does not represent the facts of this matter viewed in the light most favorable to the Plaintiffs.  The actual facts are as follows.

---

[13] See Doe v. Alger, et al., Docket No. 5:15-cv-00035, 2016 WL 7429458, at *10 (W.D. Va. December 23, 2016), a true and correct copy of which is attached as **Exhibit "B."**

[14] See id. at *12-13.  Alger was decided at the summary judgment stage, where the plaintiffs of course face a much more stringent standard than at the motion to dismiss stage.

[15] See id.  This analysis would likewise apply to the Plaintiffs' motion to reconsider the dismissal with prejudice of their due process claim, as it applies to the scholarship language.

[16] See, e.g., Orneglas-Morales v. United States, Docket No. 3:15-cv-02304-SI, 2015 U.S. Dist. LEXIS 168575, at *2 (D. Or. 2015) (citing Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1140 (9th Cir. 2012)) (additional citation omitted).

## I.

The Plaintiffs were formerly matriculated students at the University of Oregon ("University" or "Oregon").[17]  The Defendant University is, and was at all relevant times, an institution of higher education chartered and existing pursuant to the laws of the State of Oregon, located in Eugene, Oregon.[18]

During his high school basketball career in Philadelphia, Mr. Austin helped his school win three straight titles.[19]  As one of the top fifty or so prospects in the nation, Mr. Austin was recruited by multiple universities, and received offers to play basketball at multiple universities; Mr. Austin ultimately chose to attend Providence College ("Providence") and play basketball for the Providence Friars.[20]  During the Fall 2013 semester, Mr. Austin was suspended from the basketball team for thirty days.[21]  Providence pleaded with Mr. Austin to stay, but Mr. Austin was recruited by the University of Oregon, and chose to transfer from Providence to Oregon.[22]  Prior to the Spring 2014 Semester, Mr. Austin matriculated at Oregon and became a member of the Oregon Ducks men's college basketball team ("Ducks"), which competes at the NCAA Division I level and is a member of the Pacific-12 Conference.[23]  The TAC sets forth separate allegations regarding the recruitment and playing abilities of the other Plaintiffs.[24]

---

[17] <u>See</u> Exhibit A, ¶ 4.
[18] <u>See</u> Exhibit A, ¶ 5.
[19] <u>See</u> Exhibit A, ¶ 12.
[20] <u>See</u> Exhibit A, ¶ 12.
[21] <u>See</u> Exhibit A, ¶ 12.
[22] <u>See</u> Exhibit A, ¶ 12.
[23] <u>See</u> Exhibit A, ¶ 12.
[24] <u>See</u> Exhibit A, ¶¶ 10, 11.

In order to induce and entice the Plaintiffs to attend Oregon and play for the Ducks, Oregon provided them with an athletic scholarship.[25]    The basketball players had the objectively reasonable expectation, based upon the express and implied terms of the contractual relationship governing the athletic scholarship, that the University would renew the scholarship, and not act so as to deprive the basketball players of the fruits of the scholarship, and otherwise act in good faith vis-à-vis  scholarship.[26]

Mr. Austin, Mr. Artis, and Mr. Dotson attended an off-campus party on or around March 8, 2014.[27]  After about an hour and a half, a female student approached the basketball players and began "twerking" for them.[28]  Subsequently, the female student went into a bathroom with the basketball players and initiated consensual sexual activity.[29]  The three individuals then left the bathroom together.[30]  Numerous individuals at the party witnessed the female student interacting with the basketball players both before and after the sexual activity in the bathroom.[31]  These individuals would have testified under oath that the female student gave absolutely no indication that she was sexually assaulted, or even upset, and insisted on remaining with the basketball players even after they left the bathroom.[32] Later in the evening, the female student chose to go to the apartment of one of the basketball players, along with all three basketball players.[33]  She was laughing and joking as she left the party with the basketball players and entered a taxicab with

---

[25] See Exhibit A, ¶¶ 12, 14.
[26] See Exhibit A, ¶¶ 15-16.
[27] See Exhibit A, ¶ 17.
[28] See Exhibit A, ¶ 18.
[29] See Exhibit A, ¶ 19.
[30] See Exhibit A, ¶ 19.
[31] See Exhibit A, ¶ 20.
[32] See Exhibit A, ¶ 20.
[33] See Exhibit A, ¶ 21.

them.[34]  At least one female witness would have testified under oath that she offered the female student a ride, which the female student declined.[35]  At no time did this witness observe any reluctance on the part of the female student, or any aggression on the part of the players.[36]

Upon arrival at the apartment, the female student stated that she needed to get into something comfortable.[37]  Subsequently, the student voluntarily took her clothes off, whereupon she voluntarily engaged in "group" sexual activity with the other players.[38]  At one point, the female student became teary-eyed, at which point the basketball players chose to immediately cease any sexual activity.[39]  Soon after, she was again laughing and joking.[40]  The female student chose to stay overnight at the apartment, and had sexual intercourse with one of the other players after waking up in the morning.[41]  Thereafter, the player sent the female student home in a cab, and she sent a text message stating "thanks for getting me home."[42]

At no point did the female student appear to be intoxicated.[43]  At no point did the female student say "no" about any sexual activity, even when she became teary-eyed (after which, in any event, the sexual activity immediately ceased).[44]  The female student expressed verbal consent and/or gave unmistakable physical indications of her desire to participate in sexual contact with the young men at the times they were engaged in sexual conduct.[45]

---

[34] See Exhibit A, ¶ 21.
[35] See Exhibit A, ¶ 21.
[36] See Exhibit A, ¶ 21.
[37] See Exhibit A, ¶ 22.
[38] See Exhibit A, ¶ 23.
[39] See Exhibit A, ¶ 24.
[40] See Exhibit A, ¶ 24.
[41] See Exhibit A, ¶ 25.
[42] See Exhibit A, ¶ 26.
[43] See Exhibit A, ¶ 27.
[44] See Exhibit A, ¶ 28.
[45] See Exhibit A, ¶ 29.

## II.

Within a day or two, however, the female student began making false, scandalous, and malicious accusations about all three basketball players, including the utterly false accusation that the players dragged her into the bathroom and assaulted her; the utterly false accusation that the players wrestled her into a car, forced her to get drunk, and drove her to the apartment; and the utterly false accusation that she was raped at the apartment.[46]  Thereafter, the accuser made numerous inconsistent statements to the Eugene Police Department regarding her sobriety, the events and conversations leading up to the sexual conduct, and the actual actions, words, and behavior of those involved during sexual contact.[47]

When the University learned that the basketball players had been accused of rape, Defendant Chicora Martin, the Assistant Dean of Students at the University, suspended those individuals on an "emergency" basis, and scheduled an "emergency" hearing to expel the players.[48] That emergency suspension was then modified to allow the players to attend classes and basketball practice.[49]

On April 14, 2014, the Lane County District Attorney ("District Attorney") determined that she would not be pressing charges against Mr. Austin or any of the basketball players "because the conflicting statements and actions by the victim make this case unprovable as a criminal case."[50]  In or around late April, the Oregonian published the police report that the female student had made.[51]  The next evening, the District Attorney's office issued a lengthy document outlining

---

[46] See Exhibit A, ¶ 30.
[47] See Exhibit A, ¶ 31.
[48] See Exhibit A, ¶¶ 7, 32.
[49] See Exhibit A, ¶ 33.
[50] See Exhibit A, ¶ 34 (emphasis added).
[51] See Exhibit A, ¶ 35.

numerous weaknesses in the prosecution's case, as well as numerous inconsistencies in the accuser's statements, and concluding that those weaknesses presented "an insurmountable barrier to prosecution."[52]  In their TAC, unlike their prior pleading, the Plaintiffs specifically allege that the District Attorney's office concluded, in pertinent part, as follows:

> A) Although the alleged victim reports being impaired by alcohol prior to any sexual contact, there is no evidence, from her or from others, that suggests she had enough to drink to become substantially impaired prior to the first two sexual encounters in the bathroom.  There is also no independent behavioral evidence that the victim appeared significantly impaired: nobody reports her having slurred speech, difficulty walking or any other symptom of impairment from intoxication at any point in the evening.

> B) Friends and associates of the alleged victim describe her as friendly and flirtations, both before and after the first and second alleged assaults in the party-house bathroom.  Moreover, all witnesses agree the alleged victim had the opportunity to leave the party, or at least ask for help, after the first series of sexual assaults. Friends and others report her "walking and talking fine" both before and after both sex-in-the-bathroom events.

> C) The alleged victim recalls extensive detail about all aspects of the evening, including the timing, order of events - even the exact amount of the cab fare and her decision to have another drink of alcohol during the ride to the alleged assailants' residents, and most of the detail is consistent with the events reported by others (so she does not appear to have been affected to the point of perception or memory impairment. Similarly, there's no evidence she was ever unconscious during the sex acts, nor is there any evidence she was ever impaired to the point where it adversely effected her balance or stability.)

> D) The alleged assailants stopped the sex acts several times - first when the alleged victim asked for a drink of water, next when the alleged victim said she "had to go" and, finally, at the second residence, when the alleged victim started crying (the first point at which suspects claim they realized she wasn't "in to it").

---

[52] See Exhibit A, ¶ 36.

E) Victim returned to isolated locations with her alleged assailants repeatedly, although she had friends nearby and she was in a crowded party.

F) Telephone calls between the alleged victim and alleged assailants were recorded surreptitiously.  The contents of those conversations are consistent with suspect's version of consensual sex, or at least their belief it was consensual sex.)

G) Friends of the alleged victim say she did not appear to be impaired by alcohol at any time during the evening.

H) Alleged victim had consensual sex with one of the suspects the morning after the alleged assaults and, later the same day, she had sex with another friend.

I) The crimes are reported by victim's father days after the alleged assaults took place and alleged victim is angered by the reporting (because of timing).

J) Alleged victim indicated a desire to only have her assailants' "wrists slapped", not ruin their lives.

K) Assailant interviews with police are consistent with recording made without their knowledge and the statements of other witnesses

None of the above would be individually inexplicable, but collectively, and in the absence of additional evidence, they provide an insurmountable barrier to prosecution.[53]

This information was known to the Defendants well prior to May 9, 2014.[54]

In this Court's September 8 Order, it held that the Second Amended Complaint lacked a "logical nexus that connects the failure to criminally prosecute with gender bias on the part of Defendants."  The TAC contains the following "logical nexus."

Following the publication of the police reports by the <u>Oregonian</u> and the District Attorney's statement explaining why the basketball players were not prosecuted, widespread protests occurred

---

[53] <u>See</u> Exhibit A, ¶ 37.
[54] <u>See</u> Exhibit A, ¶ 40.

on the University's campus attempting to pressure the University into taking action against the male basketball players on the basis of their sex/gender.[55]  These protests occurred both generally and outside the office of Defendant Michael R. Gottfredson (the President of the University) in Johnson Hall (the main administration building at the University).[56]  On one occasion, protesters held signs with such slogans as "It's Not OK to Slut Shame," "I Live in a Rape Culture," "UO: Expel Rapists," "Dana Altman $25K Bonus for Ignoring Rape," "Trust Survivors," and "Passes on a Court Free Pass from the Courts."[57]  An Associated Press photo, included within the TAC at ¶ 41, documented the scene:



The protests received extensive press coverage in the local and national media, and cast the University and its employees, including Dr. Gottfredson, in a negative light for failing to punish the basketball players, and the University and its employees, including Dr. Gottfredson, were

---

[55] See Exhibit A, ¶ 38.
[56] See Exhibit A, ¶ 40.
[57] See Exhibit A, ¶ 41.

aware of the foregoing.[58]  These signs, using extremely loaded phrases such as "slut shame" (a phrase widely understood to mean criticizing or punishing a woman for engaging in sexual activity) and "rape culture" (another widely understood term "that was coined by feminists in the United States in the 1970's … designed to show the ways in which society blamed victims of sexual assault and normalized male sexual violence") unambiguously suggested that the University had declined to punish the male students accused of rape, solely on the basis of their sex/gender.[59]

These signs and protests had the actual effect of pressuring the University to take ***punitive action*** against the male basketball players solely on the basis of their sex/gender (notwithstanding the fact that the accuser was plainly not telling the truth, and the male basketball players had plainly not engaged in any culpable conduct) in an effort to combat widespread public perception, both locally and nationally, that the University of Oregon was not tough enough on male individuals or male athletes accused of sexual assault.[60]  Additionally, a psychology professor at the University, Jennifer J. Freyd, Ph.D., had "published a study in 2013 based on a survey of UO [University of Oregon] students examining whether an institution's failure to prevent sexual assault or respond supportively could exacerbate a survivor's trauma.  The study found that when women experienced a phenomenon Freyd calls institutional betrayal, they reported increased levels of anxiety, suggesting that 'institutions have the power to cause additional harm to survivors.'"[61]  Prior to May 9, 2014, Dr. Freyd repeatedly spoke out against the University's handling of the situation involving Mr. Austin and the basketball players, and a protest led by and/or publicly endorsed by Dr. Freyd occurred at noon on May 8, 2014.[62]

---

[58] See Exhibit A, ¶ 42.
[59] See Exhibit A, ¶ 43.
[60] See Exhibit A, ¶ 44.
[61] See Exhibit A, ¶ 45.
[62] See Exhibit A, ¶ 46.

Against this backdrop, at 11:00 a.m. the very next day, Defendant Michael R. Gottfredson in effect imposed discipline upon Mr. Austin and the other basketball players without due process, solely on the basis of their sex/gender, by holding a press conference and making a public statement condemning Mr. Austin and the other basketball players, even though the District Attorney had declined to prosecute Mr. Austin and the other basketball players, and the University had not started much less concluded the hearing process.[63]   Despite the fact that the District Attorney had cast significant doubt on whether the accuser was telling the truth, Dr. Gottfredson stated, "The type of behavior in the police report released this week is utterly unacceptable and will not be tolerated," and further stated, "I know it's frustrating, and we would like to say more, but we are not going to violate the laws that are in place to protect students' privacy or the rights of our students – *especially* the survivor."[64]   Evidencing that the University had prejudged the players' guilt, and done so on the basis of their sex/gender, Dr. Gottfredson's statement included the conclusion that the female accuser was a "survivor" ("survivor" being a loaded word invoking sex/gender, in the context now pled and described above), the statement that "as a father, I was appalled at what I read" ("as a father" being a loaded code word invoking sex/gender, in the context now pled and described above), and the statement that the male individuals would "not be playing basketball at Oregon again."[65]   These statements were grounded in sexism and/or gender bias, and constituted a clear statement on behalf of the University that represented its position in the matter, and directly controlled and/or influenced the actions of all other individuals who acted on behalf of the University and/or as its actual or apparent agents in taking action against the players.[66]

---

[63] <u>See</u> Exhibit A, ¶ 47.
[64] <u>See</u> Exhibit A, ¶ 48 (italics in original University transcript).
[65] <u>See</u> Exhibit A, ¶ 49.
[66] <u>See</u> Exhibit A, ¶¶ 49-50.

The prior and subsequent actions of the Defendants with regard to Mr. Austin and the other basketball players were all taken in response to internal and external compliants and protests that the University was not taking strong enough actions against males in cases involving alleged sexual misconduct by female students against male students at the University of Oregon.[67]

The Plaintiffs plausibly allege that the University, as in <u>Doe v. Columbia</u>, "was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students—especially varsity athletes."[68]

Ms. Martin again suspended Mr. Austin and the other two basketball players; she subsequently modified the suspensions of the other two basketball players, but refused to modify Mr. Austin's suspension because he had exercised <u>Miranda</u> rights during the police investigation.[69] Almost concurrently, a University student came forward and told a University investigator that she personally interacted with the female student throughout the evening in question, the female student was not at all intoxicated, and the female student insisted on going home with the basketball players, to the point of refusing to leave with her friends.[70]

### III.

At all relevant times, the basketball players had a recognized property interest in (among other things) their status as an admitted, matriculated University student in good standing; their interest in pursuing public higher education and intercollegiate athletic participation; and the economic benefit to them in the form of their existing scholarship, a future scholarship at another

---

[67] <u>See</u> Exhibit A, ¶ 51.
[68] <u>See</u> Exhibit A, ¶¶ 52-53.
[69] <u>See</u> Exhibit A, ¶¶ 54-55.
[70] <u>See</u> Exhibit A, ¶ 56.

Division I school, or a future contract with an NBA team.[71]  Additionally, at all relevant times, the

players also had a recognized liberty interest in (among other things) being in good standing at the

University, and being free from the stigma associated with being suspended for disciplinary

reasons.  Due process protection "is particularly necessary when, as here, the governmental action

may damage the individual's standing in the community, academic or general, or may impose 'a

stigma or other disability that foreclose[s] his freedom to take advantage' of other educational or

future employment opportunities."[72]  At all relevant times, it was clearly established that, given

the seriousness of the alleged infraction, the possible consequences to the players, and the degree

of sanction or penalty sought to be imposed, the Fourteenth Amendment to the United States

Constitution's guarantee of procedural and substantive due process, and the Oregon Revised

Statutes, required the Defendants to provide the players with the right to representation by counsel,

testimony of witnesses under oath, depositions, issuance of subpoenas, cross-examination of

witnesses, a fundamentally fair proceeding, and other due process protections.[73]

Counsel for the basketball players, however, were presented with two choices: (1) a "panel

hearing" at which the University would not provide most or all of the foregoing due process

protections, except for representation by counsel; or (2) an "administrative conference" at which

the University would not provide most or all of the foregoing due process protections, except for

representation by counsel.[74]    After the "panel hearing" was scheduled, counsel requested a

"contested case hearing" which complies with the due process requirements set forth in ORS

---

[71] See Exhibit A, ¶ 58.  We recognize that this Court's prior ruling [Document No. 36] held
that the allegations in this section did not give rise to a claim under 42 U.S.C. § 1983.  See Exhibit
A, ¶ 58 n.1.  This is the subject of a pending reconsideration motion.
[72] See Exhibit A, ¶ 59.
[73] See Exhibit A, ¶ 60.
[74] See Exhibit A, ¶ 61.

351.088, and ORS 183.413-.497 and 183.502.[75]   Among other things, counsel for the basketball players further made clear that, in order to present a defense, the players would need to subpoena the numerous witnesses who would testify that the female student gave absolutely no indication that she was sexually assaulted, or even upset, and insisted on remaining with the basketball players even after they left the bathroom, and two individuals with whom the female student had chosen to have sex after just meeting them, evidencing her willingness to engage in sexual activity with individuals who she just met.[76]

The University and its representatives, however, failed to even directly respond to the request of counsel for a contested case hearing.[77]   Based upon the foregoing, it was clear to the basketball players' counsel that the University and its representatives were not going to grant their request for a contested case hearing.[78]   Ultimately, as the University was only providing two options, neither of which provided the requisite due process, and the University was requiring the basketball players to choose between one of the two options, the players' counsel accepted the "administrative conference" option.[79]   Counsel was not asked to sign, and did not sign, a waiver of the players' due process rights, and would never have signed such a waiver.[80]

The "administrative conference" was ultimately scheduled for May 30, 2014.[81]   The conference turned out to be nothing less than an unconstitutional "kangaroo court" scenario of the very worst order, in which the basketball players were deprived of the foregoing rights, and not

---

[75] See Exhibit A, ¶ 62.
[76] See Exhibit A, ¶ 63.
[77] See Exhibit A, ¶ 64.
[78] See Exhibit A, ¶ 65.
[79] See Exhibit A, ¶ 66.
[80] See Exhibit A, ¶ 66.
[81] See Exhibit A, ¶ 68.

even provided with a basic opportunity to properly respond to all information provided, and to contact and call all relevant and necessary witnesses.[82]

Defendant Sandy Weintraub, the Director of Student Conduct & Community Standards at the University, ruled against Mr. Austin and the other basketball players, suspending them from the University from four to ten years, the functional equivalent of an expulsion from the University, and refused to provide due process generally and in the manner described in detail above.[83] Defendant Robin Holmes, Vice President for Student Life at the University, was charged with the responsibility of hearing an appeal.[84]  Dr. Holmes refused to respond to the request for an appeal by the players' counsel, and did not even return phone calls from counsel.[85]

Ultimately, all of the Defendants' actions, including the foregoing actions, were motivated in whole or large part by the fact that Mr. Austin and the other basketball players are males, and the accuser is a female.[86]  Based upon Mr. Austin's sex/gender, the University deprived Mr. Austin of basic due process rights, equal protection rights, and other rights guaranteed by Title IX, and its implementing regulations, and by the University's own stated policies and procedures.[87]

In or around January 2015, the female student filed a lawsuit against Oregon, alleging that her own Title IX rights had been violated due to Oregon's alleged "deliberate indifference" to the safety of its students.[88]  Astonishingly, Oregon's counsel contacted Mr. Austin's counsel, stated

---

[82] <u>See</u> Exhibit A, ¶ 67.
[83] <u>See</u> Exhibit A, ¶¶ 6, 69.
[84] <u>See</u> Exhibit A, ¶¶ 8, 70.
[85] <u>See</u> Exhibit A, ¶ 71.
[86] <u>See</u> Exhibit A, ¶ 75.
[87] <u>See</u> Exhibit A, ¶ 83.
[88] <u>See</u> Exhibit A, ¶ 84.

that had she been consulted as counsel things might have been handled differently, and asked for Mr. Austin's help in defending the suit.[89]

**IV.**

While the foregoing aspects of the Plaintiffs' TAC move the Plaintiffs' allegations "across the line from conceivable to plausible"[90] and "unlock the doors of discovery,"[91] the Plaintiffs have also attached to and discussed within their TAC attorney declarations demonstrating that Mr. Austin and the basketball players are not the only males to have fallen victim to the University's patent discrimination on the basis of sex and gender.[92]  The declarations of prominent attorneys in the field of University proceedings, standing alone, also unlock the doors of discovery.

Laura Fine Moro, who represented Mr. Austin and has also represented "hundreds of University students in various matters," avers that, in her experience and in the experience of her peers as reported to her, the female accuser is always believed and the male accused is never believed" by the University.[93]  She further avers that she has "personally represented male students where the evidence was [overwhelming] the conduct was consensual, yet the Title IX investigator and the UO have found otherwise," and her male clients are "universally suspended for some period of time as punishment."[94]  Based upon her extensive experience, she further avers that the University "acts with a presumption against men in their investigations, ignores evidence which contradicts female accusers, and treats males found in violation with leniency which is denied to similarly situated men."[95]  She details an instance of a female UO student who was alleged to have

---

[89] See Exhibit A, ¶ 85.
[90] See Twombly, 550 U.S. at 570.
[91] See Iqbal, 556 U.S. at 678-79.
[92] See Exhibit A, ¶¶ 76-82.
[93] See Exhibit A, ¶ 78.
[94] See Exhibit A, ¶ 79.
[95] See Exhibit A, ¶ 80.

committed sexual misconduct.  The student pleaded guilty to reckless endangerment and harassment, and was subsequently placed on probation.[96]  Ms. Fine Moro "disclosed the outcome of [the] criminal case to the [UO] investigator," but "[f]ollowing that, no further action was taken…"[97]  Lissa Casey, who has also represented students charged with sexual misconduct offenses by the University, avers that the University is biased in its decision-making, her attempts to investigate accusations have been met with threats of retaliation by the University, and in her professional opinion "bias exists at the University … to find female students' accusations of sexual misconduct credible and to find male students in violation of sexual misconduct pursuant to the University's student conduct code … ."[98]  Brian Michaels, local counsel for the two other Plaintiffs, avers that, in connection with another case, he took three depositions of University employees, which are presently subject to a protective order.[99]  He avers that "[t]wo of these depositions are extremely relevant and helpful to establishing Plaintiffs' claims under both Due Process and Title IX," though they cannot be discussed further at this time.[100]

The Defendants seek to undermine the content and value of these attorneys' declarations by making summary judgment arguments, as though there was discovery and this is all that came from that discovery.  In analyzing the declaration of Ms. Fine Moro, for example, the University alleges that "Fine Moro's statement … merely reflects (1) the opinion of one attorney who has represented students—including one of the plaintiffs—in University hearings and (2) a statement of hearsay concerning the purported experiences of other attorneys.  It does not constitute factual allegations of bias."  (Emphasis added.)  Given that Ms. Fine Moro is an officer of the court, and

---

[96] See Exhibit A, ¶ 8.
[97] See Exhibit A, ¶ 8.
[98] See Exhibit A, ¶ 81.
[99] See Exhibit A, ¶ 82.
[100] See Exhibit A, ¶ 82.

hearsay is not excluded at this stage, her statements based upon her experience, and the experience

of others, constitute factual allegations of bias.   The Defendants' use of the word "merely" to both

editorialize about and attempt to diminish the impact of Ms. Fine Moro's statements is hardly the

appropriate analysis directed toward an officer of the court.   This is especially so when considering

Ms. Fine Moro did in fact specifically address actual instances she witnessed as an attorney.

Among other things, she avers that she represented one female student at the University who was

alleged to have committed sexual misconduct; this female student was arrested and actually pled

guilty to a variety of criminal acts against a male student.   Ms. Fine Moro avers, "I assisted her

through the Title IX investigation interview and disclosed the outcome of her criminal case to the

investigator.  Following that, no further action was taken by the UO that I am aware of."[101]  This

averment alone, presenting an actual instance of the University's gender bias in the extreme,

addresses and remedies many of the issues raised by the Court's prior order.

　　　　In their Motion, the Defendants attempt to reduce Ms. Casey's declaration to a

"professional opinion."  In actuality, she avers:

> I have previously suggested that the University provide unbiased
> officers to preside over Administrative Conferences, which the
> University has responded to with denials.  The investigators at the
> University are also the decision-makers about their own
> investigations.
>
> When I have attempted to investigate accusations by attempting to
> interview witnesses, I have been threatened with additional student
> conduct allegations of "retaliation" against my client.[102]

　　　　The same is true of Defendants' attempts to dismiss Mr. Veralrud's declaration, when his

declaration describes quite pointedly: "Even without that information, in the report that I viewed,

---

[101] See Exhibit A, ¶ 78.
[102] See Exhibit A, ¶ 81.

I recall the report was broad enough and contained so much evidence corroborating the male students' account that I was surprised at the investigator's conclusion that nonconsensual sexual contact had occurred without any explanation or effort to explain the contradictory evidence."[103]

Finally, the Defendants' dismissive attitude toward Mr. Michaels' declaration about the actual existence of discoverable information contained in depositions under protective order – specifically including named Defendants – underscores the absurd aspect of the Defendants' endeavor.  On the one hand, they refused to allow the depositions under protective order to be received by the Court, and then on the other state that Mr. Michaels' declaration need be ignored because, "This is not a factual allegation and does not meet the pleading standard."

Similarly, the Plaintiffs allege that another male University student recently filed a lawsuit alleging that he was falsely accused of an off-campus sexual assault, and subsequently was given given an unfair disciplinary hearing, further demonstrating a pattern and practice on the part of the University.[104]  They allege that the transcript of this hearing demonstrates patent bias on the part of Ms. Martin and the University in favor of the female accuser, and against the male who was accused, in both the conduct and outcome of the proceeding.[105]  Ultimately, the female's testimony was believed in the face of overwhelming testimony to the contrary.[106]

**V.**

Prior to the Defendants' actions, the Plaintiffs were regarded as three of the top amateur basketball players in the United States; on the men's basketball team at the Oregon, a Division I school within the Pac-12 Conference; and widely projected by experts in basketball and the NBA

---

[103] <u>See</u> Exhibit A, Exhibit A thereto (Declaration of Greg Veralrud).
[104] <u>See</u> Exhibit A, ¶ 90.
[105] <u>See</u> Exhibit A, ¶ 90.
[106] <u>See</u> Exhibit A, ¶ 90.

Draft to be selected in the first round of the NBA Draft, which would more likely than not be accompanied by a multi-million dollar guaranteed contract and tens of millions of dollars in prospective economic advantage.[107]  Prior to taking the actions alleged herein, the Defendants were aware of the foregoing facts.[108]  As a result of the Defendants' conduct, the Plaintiffs no longer play at a Division I school, have diminished chances of playing in the NBA, have been made to suffer the opprobrium associated with an suspension from a university, and the opprobrium associated with committing a sexual assault (when in fact they committed no sexual assault), and has as a result suffered personal and professional harm, including emotional distress and loss of income.[109]

## LEGAL ARGUMENT

1.      **The Plaintiffs' TAC States a Plausible, and Compelling, Claim for Violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, <u>et</u> seq.**

        a.      **Introduction**

In ¶¶ 91-133 of their TAC, the Plaintiffs advance in detail three theories of Title IX liability: (1) selective enforcement; (2) an erroneous outcome from a flawed proceeding; and (3) deliberate indifference.  The Defendants concede that federal courts recognize these theories of liability, but argue that all "three theories of Title IX liability … fail as a matter of law" because the TAC lacks "any factual allegations that plausibly suggest the University discriminated against plaintiffs based on their sex or gender."[110]  In its argument, the University relies upon selective quotations from

---

[107] <u>See</u> Exhibit A, ¶ 86.
[108] <u>See</u> Exhibit A, ¶ 87.
[109] <u>See</u> Exhibit A, ¶ 88.  The Defendants argue that few college athletes actually play in the NBA, but concede that it is not "necessary to resolve" this issue now.  [Doc. No. 41, page 36.]
[110] The only other "legal" challenge raised by the Defendants is the contention, set forth in foonote 3 of their Motion, that the Plaintiffs' Title IX claim is barred by the statute of limitations. The Defendants attempt to raise this challenge by way of a footnote "renewing" their previous argument that <u>Stanley v. Trustees of California State University</u>, 433 F.3d 1129 (9th Cir 2006),

out-of-circuit cases, and simply ignores the Ninth Circuit's decision in <u>Emeldi v. University of</u>

<u>Oregon</u>.  In <u>Emeldi</u>, the Ninth Circuit held or at least strongly suggested that the pleading standard

for Title IX claims is akin to the minimal pleading standard applicable to claims under Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et</u> <u>seq.</u>  Under any standard, the Plaintiffs have

set forth a compelling claim for violations of Title IX, and plausibly plead that the University's

disciplinary actions were motivated by bias and discrimination on the basis of sex or gender.

### b.    The Pleading Standard for Title IX Claims

20 U.S.C. § 1681(a) provides in pertinent part as follows: "No person in the United States

shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal financial

assistance."[111]  20 U.S.C.A. § 1687 expressly extends this provision "to all of the operation[s] of

... a college, university, or other postsecondary institution, or a public system of higher education

... any part of which is extended Federal financial assistance."  The University of Oregon receives

federal funding through various means including, without limitation, student loans provided to

University students directly by the federal government and through other funds furnished by the

federal government, and as such is subject to the strictures of Title IX and its implementing

regulations.[112]

---

which held that a state's personal injury statute of limitations applies to Title IX claims, was
incorrectly decided, and this Court should apply a different, "shorter" Oregon statute.  We know
of no rule of court allowing the Defendants to raise an argument in such a perfunctory manner.  In
any event, not only is <u>Stanley</u> binding upon this Court, it is consistent with all authority before it.
Indeed, as the Ninth Circuit pointed out in <u>Stanley</u>, "every circuit to consider the issue has held
that Title IX … borrows the relevant state's statute of limitations for personal injury," and "[t]he
close similarity between Title VI and Title IX also supports applying the statute of limitations for
personal injury."  <u>See</u> <u>Stanley</u>, 433 F.3d at 1134-36.

[111] <u>See</u> 20 U.S.C. § 1681(a).
[112] <u>See</u> Exhibit A, ¶ 93.

To assist schools with implementing Title IX and its regulations, the Office for Civil Rights of the United States Department of Education has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirements of the regulations: the procedures adopted by a school must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved ... ."[113]

Beyond this, "it is ... well established that Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."[114] "[C]ases attacking university disciplinary proceedings on the ground of gender bias ... fall generally within two categories ... 'erroneous outcome' and 'selective enforcement.'"[115] "In the first category, 'erroneous outcome' cases, 'the claim is that the plaintiff was innocent and wrongly found to have committed an offense.' ... In the second category, 'selective enforcement' cases, the 'claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.'"[116]

Under the pleading standard articulated in Twombly and clarified in Iqbal, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."[117] In Doe v. Brown University, the United States District Court for the District of Rhode Island held that, with regard to "erroneous outcome" cases, the plaintiff must first "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and must next "allege particular circumstances suggesting that gender bias was a motivating factor behind the

---

[113] See Exhibit A, ¶ 93.
[114] See Doe v. Brown University, Docket No. 15-144 S, 2016 U.S. Dist. LEXIS 21027, at *15 (D.R.I. February 22, 2016) (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994))
[115] See id. (quoting Yusuf, 35 F.3d at 715).
[116] See id. at *15-16 (quoting Yusuf, 35 F.3d at 715).
[117] See Twombly, 550 U.S. at 570; see also Iqbal, 556 U.S. at 662.

erroneous finding."[118]  "Such allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."[119]  The District Court made clear that, given that Title IX claims are generally treated like Title VII claims at the motion-to-dismiss stage, even allegations such as "male students accused of sexual assault are invariably found guilty, regardless of the evidence, or lack thereof" pass muster under Iqbal and Twombly with regard to pleading gender as a motivating factor.[120]

The most recent circuit court decision to address the pleading standard in Title IX claims was Doe v. Columbia University, which is consistent with the Ninth Circuit's decision in Emeldi.

In Doe v. Columbia, the plaintiff's complaint alleged that Columbia University violated Title IX "by acting with sex bias in investigating him and suspending him for an alleged sexual assault."  The Second Circuit held that the Complaint "meets the low standard … of alleging facts giving rise to a plausible minimal inference of bias sufficient to survive a motion to dismiss, which we hold applies in Title IX cases."[121]

The plaintiff, a male athlete at Columbia, alleged that a female classmate initiated a discussion of "hooking up," retrieved a condom, undressed herself, and proceeded to have a consensual sexual encounter with the plaintiff.  Months later, however, the female classmate alleged that the encounter constituted a sexual assault, and the plaintiff was "charged with 'Non-

---

[118] See Doe v. Brown University, 2016 U.S. Dist. LEXIS 21027, at *15-16 (quoting Yusuf, 35 F.3d at 715).

[119] See id.

[120] See id. at *25-26.  Thus, one District Court recently denied a motion to dismiss his complaint where it "recounts Defendants having rushed to judgment, having failed to train UCB members, having ignored the Prosecutor, having denied Plaintiff counsel, and having denied Plaintiff witnesses.  These actions came against Plaintiff, he contends, because he was a male accused of sexual assault."  See Wells v. Xavier Univ., 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014).

[121] See Doe, 831 F.3d at 48.

Consensual Sexual Intercourse' in violation of the school's Gender-Based Misconduct Policies for Students." When the plaintiff met with the Title IX investigator, he told her that the encounter had been consensual, and witnesses at the residence hall would be helpful to the investigation; the Title IX investigator's response was hostile, and she neither asked about the witnesses nor interviewed them. Moreover, the Title IX investigator took the accuser at her word, despite serious questions about the veracity of her account. Perhaps most significantly, "[i]n the period preceding Plaintiff's disciplinary hearing, Columbia students had expressed concern that the University did not take seriously the complaints of female students about sexual assaults by male students." The Second Circuit's opinion describes in detail criticism throughout the campus community, and in the local media as well as media associated with the school, regarding this perceived issue. Moreover, the hearing suffered from significant procedural flaws.

The Second Circuit summed up the allegations within Mr. Doe's complaint as follows:

> It alleges that Sessions-Stackhouse, in the role of the University's supposedly neutral Title IX investigator, was motivated by pro-female sex bias, attributable in part to a desire to refute criticisms of herself and of the University for their past handling of similar complaints, to perform her duties in a manner that discriminated against the accused male. The Complaint alleges that she conducted a sex-biased and deficient investigation that was hostile to his claim, failed to carry out her duty to interview his witnesses and explore channels that could be helpful to him, failed to advise him of his rights, and drew unfair and incorrect conclusions against him in her report to the adjudicatory panel. The Complaint alleges also that the University's decision-makers (the panel and the Dean), seeking to protect the University from criticism both among students and the public to the effect that it was not taking women's sexual assault complaints seriously, took a pro-female, sex-biased stance on Jane Doe's allegations, leading them to decide against him, incorrectly and contrary to the weight of the evidence. [122]

---

[122] See id. at 49-53.

The Second Circuit began its legal analysis by discussing the line of Title VII cases starting with <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Therein, the Supreme Court held that, in suits alleging discrimination in violation of Title VII, "the plaintiff needs to present only minimal evidence supporting an inference of discrimination," which raises a temporary presumption of discriminatory motivation and shifts the burden to the defense.  "Because the discrimination complaint, by definition, occurs in the first stage of the litigation ... the complaint also benefits from the temporary presumption and must be viewed in light of the plaintiff's minimal burden to show discriminatory intent."  This is true even following <u>Twombly</u> and <u>Iqbal</u>.[123]

The court then held <u>McDonnell Douglas</u> applies to Title IX cases at the pleading stage, given the commonality between the two types of cases.  "Thus, a complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination."[124]  The court proceeded to rule that Mr. Doe had stated a claim:

> When the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias.  Here, the facts pleaded in the Complaint (which we must accept in the light most favorable to Plaintiff) support John Doe's version (not surprisingly as they represent his contentions).  The Complaint's narrative depicts Jane Doe as an altogether willing participant.  It denies that Plaintiff coerced Jane and asserts that "no evidence was presented" in support of the claim of coercion.  The alleged fact that Sessions-Stackhouse, and the panel and the Dean, chose to accept an unsupported accusatory version over Plaintiff's, and declined even to explore the testimony of Plaintiff's witnesses, if true, gives plausible support to

---

[123] <u>See id.</u> at 54-55 (internal alteration omitted) (quoting <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 311 (2d Cir. 2015)).
[124] <u>See id.</u> at 55-56.

the proposition that they were motivated by bias in discharging their responsibilities to fairly investigate and adjudicate the dispute.

While those allegations support the inference of bias, they do not necessarily relate to bias on account of sex. Additional allegations of the Complaint, however, give ample plausible support to a bias with respect to sex. As outlined above, the Complaint alleges that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students. It alleges further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue. Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault.

The Complaint alleges that, having been severely criticized in the student body and in the public press for toleration of sexual assault of female students, Columbia was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students—especially varsity athletes. There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults. … It is worth noting furthermore that the possible motivations mentioned by the district court as more plausible than sex discrimination, including a fear of negative publicity or of Title IX liability, are not necessarily, as the district court characterized them, lawful motivations distinct from sex bias. A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action. A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the

motive for the discrimination did not come from ingrained or permanent bias against that particular sex.[125]

The Second Circuit's decision in <u>Doe v. Columbia</u> is on all fours with <u>Emeldi v. University of Oregon</u>, the post-<u>Iqbal</u>/<u>Twombly</u> decision wherein the Ninth Circuit "join[ed its] sister circuits" in holding that, in order to "prevail on a retaliation claim under Title IX," a plaintiff can use "the familiar framework used to decide retaliation claims under Title VII."[126]  In so holding, the Ninth Circuit noted that "the legislative history of Title IX strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII," and further noted that "we have found the Title VII framework useful in assessing claims of discrimination and retaliation outside the Title VII context, even where its application is not mandatory."[127]  Chief Judge Kozinski subsequently observed that the panel's opinion held or at a mimimum strongly suggested "that <u>the Title VII pleading standard applies to Title IX cases</u>."[128]

Thus, to the extent that this Court's prior decision in this case could be read to decline to follow <u>Doe v. Columbia</u> in general, as opposed to simply with regard to the Second Amended Complaint, we respectfully suggest that said holding would be inconsistent with <u>Emeldi</u>.

### c.    The Plaintiffs Have Stated a Plausible, and Compelling, Claim for Violations of Title IX

First, in ¶¶ 96-117, the Plaintiffs allege a selective enforcement theory of Title IX liability asserting that, regardless of their guilt or innocence, the severity of the penalty and/or the decision

---

[125]  <u>See id.</u> at 55-56.
[126]  <u>See</u> <u>Emeldi v. University of Oregon</u>, 673 F.3d 1218, 1223 (9th Cir. 2012).
[127]  <u>See id.</u> at 1224 (internal quotation marks omitted).
[128]  <u>See</u> <u>Emeldi v. University of Oregon</u>, 698 F.3d 715 (9th Cir. 2012) (en banc) (Kozinski, J., dissenting) (emphasis added) ("<u>Under the established Title VII pleading framework, which the majority applies to this Title IX case</u>, Emeldi must show a causal connection between her complaint and her advisor's resignation. … <u>Even accepting that the Title VII pleading standard applies to Title IX cases</u>, no one claims the pleading standard should be lower for students suing professors in the Ivory Tower than for employees suing supervisors on the factory floor.").

to initiate the proceeding[129] was motivated by their gender. Stated differently, the Plaintiffs allege that the "the University engaged in selective enforcement in violation of Title IX, and discriminated against them based on their sex and, as a result, they have been seriously and irreparably damaged" and allege that "[r]egardless of their guilt or innocence (and, to be clear, Plaintiffs [were] and are innocent), the severity of the penalty (a suspension of between four and ten years), as well as the decision to initiate the proceeding in the first place, were affected by the fact that they are male, and the accuser is a female."

Next, in ¶¶ 118-126, the Plaintiffs set forth an "erroneous outcome from a flawed proceeding"-type Title IX claim. Specifically, they contend that the University failed to comply with both its own procedures and the requirements of Title IX, which requirements include "accord[ing] due process to both parties involved," "in order to reach a pre-determined result," and provide ample factual matter plausibly demonstrating that the outcome of the hearing was erroneous and woefully at odds with what actually occurred.

Finally, in ¶¶ 127-133, the Plaintiffs allege that the University demonstrated a deliberate and systematic indifference to the rights of the Plaintiffs, due to their sex, as the University's

---

[129] In footnote 4, the University cites the so-called "Dear Colleague" letter issued in 2011 by the Department of Education's Office for Civil Rights, and argues that the "Dear Colleague" letter required it to investigate. Recent court decisions, including Wells, have made clear that a University's overzealousness in charging men and adjudicating that they have committed Title IX violations, in order to avoid the specter of a loss of federal funding suggested by the "Dear Colleague" letter, is actionable. See, e.g., Doe v. Salisbury Univ., Docket No. JKB-15-517, 2015 U.S. Dist. LEXIS 110772, at *41 (D. Md. Aug. 21, 2015); accord Wells, 7 F. Supp. 3d at 751 (holding that the plaintiff had stated a claim where he alleged, among other things, that "Defendants were reacting against him, as a male, to demonstrate to the OCR that Defendants would take action, as they had failed to in the past, against males accused of sexual assault"). Moreover, whether or not the "Dear Colleague" letter is binding is a matter disputed on a national basis, and the University has hardly proven its applicability in a footnote. Even if it is somehow applicable as a matter of law, and even if the University was required to investigate, nothing therein required the University to actually begin a disciplinary procedure against the athletes, much less "railroad" them in the manner set forth in the TAC.

actions and inactions were unreasonable in the light of the known circumstances, and but for the obvious gender bias, the outcome of the proceeding would have been different.

Contrary to the University's argument, the Plaintiffs' Complaint is replete with facts that provide at least a minimal inference – and in actuality far more than just a minimal inference – that the University's selective enforcement, erroneous outcome, and deliberate indifference were motivated by the sex/gender of the accused individuals.  These facts are set forth in great detail and discussed in the statement of facts above, and very briefly include without limitation (1) the internal and external pressure brought upon the University by the negative media coverage suggesting the University was too lenient with males accused of sexual assault, one of the University's psychology professors speaking out against the University's handling of the situation and leading or endorsing a student protest that occurred just one day before Dr. Gottfredson's speech, and widespread protests on campus plainly and unambiguously suggesting that the University had been too lenient with male students accused of rape, which the Plaintiffs quite plausibly allege had the actual effect of pressuring the University to take action against the innocent male players solely on the basis of their sex/gender in order to demonstrate that it is harsh on males and male athletes accused of sexual assault; (2) the District Attorney's decision not to prosecute the basketball players and issuance of a document undercutting the accuser's statements, which is now included in the Plaintiffs' pleading; and (3) Dr. Gottfredson's use of loaded statements and code words grounded in sexism and gender bias, all of which had the effect of influencing others at the University associated with the proceeding.

Further, the Plaintiffs plead detailed facts supporting their contention that in this very case, the female accuser was treated more favorably than the accused males, on the basis of sex and gender; all evidence presently available demonstrates that the University has never taken action

against a female student (including the accuser here) for engaging in the exact type of conduct the Plaintiffs allegedly engaged in, i.e., sex with only implicit consent; all evidence presently available demonstrates that the University has never taken action against a female student for making a false allegation of the kind involved in this matter; and all evidence presently available demonstrates that males invariably lose when charged with sexual misconduct at the University, and it invariably "believes" the female's version of events, no matter how implausible, and "rejects" the male's version of events, no matter how credible.

The Plaintiffs further allege that the University created an environment in which the accused male students were so fundamentally denied due process, and subjected to a biased and one-sided process, so as to be virtually assured of a finding of guilt. The Plaintiffs allege that the University's representatives accepting the female student's statements at face value despite serious questions regarding their verity, the lack of training of University personnel under Title IX, and the deprivation of an equal or fair opportunity to present relevant witnesses and other evidence, demonstrate that the University's "investigation" and subsequent hearing were conducted in a manner biased against the accused based on sex. Ultimately, the Plaintiffs allege, based upon the facts set forth in their pleading, that "[t]he University responded to the accuser's accusations with a series of arbitrary, capricious, discriminatory, and gender-based actions directed toward a predetermined outcome: [Plaintiffs'] suspension from the University to satisfy and appease the University's internal and external critics."

Last, but hardly least, the Plaintiffs repeat and incorporate the above argument that the evidence provided by the four attorney declarants, experienced officers of the court, is to be given great deference at the motion-to-dismiss stage. Even if this Court finds the evidence to be too speculative, which it should not, the declaration by Ms. Fine Moro standing alone provides an

actual basis to allow the Plaintiffs to proceed.  In *this* instance, the District Attorney felt that the case was unprovable as a criminal case, and the basketball players were not charged much less prosecuted, yet they were sanctioned by the University under its conduct code.  In the instance set forth in Ms. Fine Moro's declaration, the female was not only prosecuted, she pled *guilty* to crimes of violence and harm, yet the University declined to even pursue her under the very same student conduct code.  Gender is the only answer to the question, "Why so?"  Similarly, the Plaintiffs allege that another male University student recently filed a lawsuit alleging that he was falsely accused of an off-campus sexual assault, and subsequently was given given an unfair disciplinary hearing, further demonstrating a pattern and practice on the part of the University.  They allege that the transcript of this hearing demonstrates patent bias on the part of Ms. Martin and the University in favor of the female accuser, and against the male who was accused, in both the conduct and outcome of the proceeding.  Ultimately, the female's testimony was believed in the face of overwhelming testimony to the contrary.[130]

The University faults the Plaintiffs for not pleading information that no plaintiff could reasonably expected to have at the pleadings stage in a Title IX case, such as a "smoking gun" or a direct admission from Dr. Gottfredson that the protesters, Dr. Freyd, or the media coverage influenced him or the others, or that he influenced the others.  No Title IX plaintiff alleging sex/gender discrimination in discipline could reasonably be expected to have such material at the pleadings stage, and such allegations need not be advanced at the pleadings stage.[131]

---

[130] See Exhibit A, ¶ 90.

[131] See Doe v. Brown, 2016 U.S. Dist. LEXIS 21027, at *24 ("In sum, the Court is not convinced as Brown would have it that the type of allegation found to be sufficient in Yusuf … that male students accused of sexual assault are invariably found guilty, regardless of the evidence, or lack thereof … is now insufficient under Iqbal and Twombly absent some smoking gun evidence set forth in the complaint."); accord Emeldi, 698 F.3d at 715 (en banc) (Kozinski, J., dissenting)

The Plaintiffs' allegations, individually and taken as a whole, more than plausibly allege that the Defendants' actions were motivated by the Plaintiffs' sex/gender.  Indeed, ultimately, the University's arguments are summary judgment arguments if not trial arguments that attempt to twist and indeed "argue" with the facts set forth in the TAC.  The Plaintiffs, having pled a plausible and in fact compelling Title IX claim, are entitled to discovery to fully meet those arguments.  Here, as in <u>Doe v. Columbia</u>, and consistent with <u>Elemdi</u>, <u>Twombly</u>, and <u>Iqbal</u>, the operative pleading plausibly demonstrates that the University "was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students—especially varsity athletes."  The Plaintiffs, through the aforementioned attorney declarations, go even further.  They have adequately pled their Title IX claim, and this Court should allow that compelling claim to proceed to the discovery stage.

### 2.     The Plaintiffs' TAC States a Plausible, and Compelling, Equal Protection Claim

At pages 20-24, the Defendants move to dismiss the equal protection claim brought by Plaintiffs Dotson and Artis.   Insomuch as the pleading standards and underlying factual basis for this claim is aligned with that of the Title IX claim, those Plaintiffs submit the text and context of each of the four attorney declarations, including the woman criminally convicted yet not subjected to student conduct prosecution, previously briefed herein constitute sufficient basis to unlock the doors of discovery on this claim as well.   As mentioned in the introduction, rather than repeat the sections highlighted therein and the reasoning underlying their individual relevance and force at this stage of proceedings, the Plaintiffs will simply herein incorporate them in their entirety.

---

(observing that the majority "applies" "the established Title VII pleading framework … to this Title IX case," and "accepting that the Title VII pleading standard applies to Title IX cases").

The history and patterns as described by both Ms. Casey and Ms. Fine Moro, as well as the depositions described in the declaration of Mr. Michaels with as much certainty as allowable by law, apply equally to the bases against qualified immunity.   Defendants cannot say the state of the law was not clear at the time that they must treat all students equally, unbiased, regardless of gender.   These declarations point specifically, and at the least plausibly, to the conclusion they behaved not in conformity with the Fourteenth Amendment guarantees for gender equality.

Given the development of how these proceedings were conducted, as per Attorney Veralrud and Fine Moro, the Defendants' comments at footnote 9 on issue preclusion are not well-founded.   Including the description by Ms. Casey of her being threatened with greater sanctions against her clients when seeking procedures to insure a fair hearing, such coercion cannot constitute issue preclusion.

**3.      The Plaintiffs' TAC States a Plausible, and Compelling, Claim for Negligence**

This Court's prior ruling held that, because the Plaintiffs were attempting to pursue a negligence claim in the absence of physical injury, they were required to plead the existence of a "special relationship" between the Defendants and the Plaintiffs.  This Court granted the Plaintiffs leave to amend to properly allege such a relationship.  Contrary to the Defendants' argument, the Plaintiffs have now done so.

In <u>Davidson v. University of North Carolina at Chapel Hill</u>, the Court of Appeals of North Carolina readily concluded that a special relationship exists between a school and its athletes, due to the "mutual dependence" between the two.  The court began its analysis by citing Prosser and Keaton's observation regarding a special relationship" (emphasis in original): "Fairness … may require the defendant to use his power to help the plaintiff, based upon the plaintiff's expectation of protection, which itself may be based upon the defendant's expectation of financial gain... .

There is now respectable authority imposing the same duty upon a shopkeeper to his business visitor, upon a host to his social guest, upon a jailor to his prisoner, *and upon a school to its pupil.*"[132]    After making clear that "special relationships are most often premised upon the existence of mutual dependence," the court analyzed the mutual dependence between a school and its athletes as follows:

> Here, UNC depended upon the cheerleading program for a variety of benefits.  The JV squad was responsible for cheerleading at JV basketball games, women's basketball games, and wrestling events.  The JV squad represented UNC at a trade show, and often entertained the Rams Club before games.  Plaintiff testified, and Boulton [the Vice Chancellor and Dean for Student Affairs at UNC] acknowledged, that the cheerleaders acted as representatives of the school at official athletic events.    Likewise, the cheerleaders received significant benefits from UNC as a result of participating in the cheerleading program.  They were provided school uniforms purchased by the school.  They were provided transportation by UNC, and they used university facilities and equipment for practices. …

> We also find it significant that UNC exerted a considerable degree of control over its cheerleaders.  <u>Typically, schools exert a high degree of control over many aspects of a student athlete's life.  … Here, UNC cheerleaders had to abide by certain standards of conduct, such as maintaining a minimum GPA and refraining from drinking alcohol in public.  Such control affects our analysis in at least two ways.  First, the argument that a duty of care should not be imposed upon a school because it may stifle student autonomy is considerably less compelling where the school already exerts significant control over the students in question.  Second, when a school exerts significant control over students as a result of their participation in a school-sponsored athletic activity, the students may have higher expectations with regard to the protection they will receive from the school.</u>[133]

---

[132] <u>See</u> <u>Davidson v. Univ. of North Carolina at Chapel Hill</u>, 543 S.E.2d 920, 926-27 (N.C. App. 2001) (italics in original) (citation omitted).
[133] <u>See</u> <u>id.</u>

Similarly, in the oft-cited case of <u>Kleinknecht v. Gettysburg College</u>, the Third Circuit held that a special relationship existed between Gettysburg College and a student participating lacrosse practice, where the college actively recruited the student to play lacrosse, as this fact demonstrated the extent to which the student's participation in the lacrosse program benefitted the school.[134]

In Count 3 of the Plaintiffs' TAC, for negligence, the Plaintiffs allege that the Defendants, individually and collectively, had a "special relationship" with the Plaintiffs and a corresponding duty to them to conduct a campus investigation in a competent manner and in accordance with societal standards and norms governing such investigations, and to conduct a hearing in a competent manner and in accordance with societal standards and norms governing such hearings, and otherwise act in a reasonably prudent manner with regard to the Plaintiffs, and it was foreseeable that a breach of this duty would lead to the harm suffered by Plaintiffs.

Specifically, the Plaintiffs allege in ¶¶ 145-153 that both the University and the individual defendants had a "special relationship" with the basketball players because they exercised independent judgment on their behalf to advance the individual interests of those athletes, by recruiting those athletes and then managing virtually every aspect of their time at Oregon. Additionally, and/or in the alternative, as athletes at the University, the Plaintiffs were particularly vulnerable and dependant upon the Univerity and the individual defendants who, correspondingly, hold considerable power over their welfare. Here, the University depended upon its well-known basketball program for a variety of benefits, including national attention and recognition, the University actively recruited the Plaintiffs, three of the top basketball prospects in the United States, for the purposes of benefiting the University's basketball program, and the University

---

[134] See <u>Kleinknecht v. Gettysburg College</u>, 989 F.2d 1360 (3d Cir. 1993); <u>accord</u> <u>Kavanagh</u> <u>v. Trs. of Boston University</u>, 795 N.E.2d 1170 (Mass. 2003) (summarizing authorities).

further exercised significant control over the athletes on the basketball team as demonstrated by among other things the terms of their scholarship, and the conditions imposed by the University on its athletes, including but not limited to the University's scheduling of and control over athletes' time and suspending athletes and removing them from participation in athletics for disciplinary reasons.  Ironically, the Defendants' argument that the University had the sole and unfettered right to terminate the Plaintiffs' scholarship, if correct, demonstrates as well as anything the existence of a special relationship.

Finally, the Defendants briefly argue that what occurred was not a foreseeable risk.  This argument ignores the allegations that, prior to the Defendants' actions, the Plaintiffs were regarded as among the top amateur basketball players in the country; on the team at Oregon; and widely projected to "be selected in the first round of the NBA Draft, which would more likely than not be accompanied by a multi-million dollar guaranteed contract and tens of millions of dollars in prospective economic advantage," and further allege that at all relevant times "the Defendants were aware of the foregoing facts."  It should have been foreseeable to the Defendants that their careless conduct would stigmatize them and cause the harm claimed.  Moreover, for the reasons previously asserted, the players did not "waive" their right to a fair hearing and procedures.[135]

### 4.    The Plaintiffs' TAC States a Plausible, and Compelling, Claim for Breach of Contract

---

[135] The Defendants also attempt, in footnotes 9 and 10, to "reassert" previously asserted and rejected defenses, and attempt to incorporate their prior briefing in doing so.  These defenses, raised only in a footnote presumably due to page limitations, are not properly before the Court.  To the extent they somehow are, the Plaintiffs are constrained to "reassert" their prior response.  Moreover, with regard to the "thrown-in" argument regarding the notice of claims, the notice [Doc. No. 43-6] plainly notifies the Defendants of the time, place, circumstances of their actions.  To the extent the Court requires a full response to a particular argument raised summarily in a footnote, we respectfully request the opportunity to do so in a supplementary opposition.

The Plaintiffs' TAC alleges that the athletic scholarship contained both express terms and an implied covenant of good faith and fair dealing.  The express terms included (emphasis added):

> This assistance will be considered for renewal during subsequent periods of attendance as long as you are a student in good standing, maintain normal progress toward graduation and are in compliance with all eligibility requirements of this institution, the Pac-12 Conference and the NCAA.  This assistance may be changed or terminated <u>only</u> in accordance with the legislation of the NCAA, principal details of which appear on the back of this statement.[136]

In Count 4, for breach of contract, the Plaintiffs allege that nothing in the "details … appear[ing] on the back of this statement" state much less suggest that the University could decline to renew Plaintiffs' scholarship in the circumstances presented."  They further allege that "industry custom and "usage of trade" makes it implicit in the contractual relationship between athletes and the universities recruiting them, including the University of Oregon, that the universities would renew the scholarships of athletes recruited to play at a university."  They further allege that they "had the objectively reasonable expectation, based upon the express terms of the contractual relationship governing the athletic scholarship, that the University would renew their scholarship, and not act so as to deprive them of the fruits of the scholarship, and otherwise act in good faith vis-à-vis their scholarships."

In a short argument, the University summarily contends that it did what it was required to do during the relevant academic year, and nothing within the scholarship agreement guarantees renewal.  Mr. Austin, however, plausibly alleges that the University induced him to transfer from Providence with the scholarship, all of the Plaintiffs were recruited by the University, and the Plaintiffs had the objectively reasonable expectation, based upon the express terms of the scholarship, that the University would renew their scholarship, and not act so as to deprive them

---

[136] <u>See</u> Exhibit A, ¶ 16 (emphasis added).

of the fruits of the scholarship, and otherwise act in good faith vis-à-vis their scholarship. The Plaintiffs have more than plausibly pled that the University breached the contract by failing to renew it, depriving them of the fruits of the scholarship, or at a bare minimum failing to act in good faith vis-à-vis the scholarship. Accepting the allegations in the TAC as true, in order to demonstrate to the protesters, the critical media, and a watching nation that the University was serious about punishing males accused of sexual assault, the other Plaintiffs were made the subject of a "kangaroo court" proceeding with a predetermined result, which included the non-renewal of a scholarship. Much like (for example) an at-will employment relationship cannot be terminated for discriminatory reasons, non-renewal cannot occur due to bad faith reasons.[137]

## CONCLUSION

For the foregoing reasons, and the reasons to be advanced at oral argument, the Motion should be denied in its entirety, and this matter should proceed to discovery.

Dated: <u>Thursday, February 9, 2017</u>          Respectfully submitted,

LAW OFFICES OF MARIANNE DUGAN

By:   /s/ Marianne Dugan
      Marianne Dugan
      259 East 5th Avenue, Suite 200-D
      Eugene, OR 97401
      Telephone: 541-338-7072
      Facsimile: 866-650-5213
      E-Mail: mdugan@mdugan.com

      – and –

---

[137] Cf. <u>Doe v. Brandeis University</u>, 177 F. Supp. 3d 561, 612 (D. Mass. 2016) ("In any event, the allegations of the complaint here are sufficient to state a claim for breach of the implied covenant. The complaint alleges, in substance, that Brandeis did not conform to the parties' reasonable understanding of the performance obligations, as reflected in the overall spirit of the bargain, even if Brandeis technically complied with the letter of the Handbook. Accordingly, Count Two states a claim for breach of the implied covenant of good faith and fair dealing.").

Alan C. Milstein (<u>Pro</u> <u>Hac</u> <u>Vice</u>)
SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com

*Attorneys for Plaintiff Brandon Austin*


LAW OFFICE OF BRIAN MICHAELS

By:     <u>/s/ Brian Michaels (signed with permission)</u>
        Brian Michaels (OSB #925607)
        259 East Fifth Avenue, Suite 300-D
        Eugene, OR 97401
        Telephone: 541-687-0578
        E-Mail: brian@brianmichaelslaw.com

        Alex Spiro (*Pro Hac Vice*)
        BRAFMAN & ASSOCIATES
        767 Third Avenue
        New York, NY 10017
        Telephone: 212-750-7800
        E-Mail: aspiro@braflaw.com

        *Attorneys for Plaintiffs Dominic Artis and
        Damyean Dotson*